ORAL ARGUMENT SCHEDULED FOR APRIL 4, 2023

Nos. 22-5133 & 22-5139

————————————

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

**Radiya BUCHANAN**, *et al.*, *Plaintiffs-Appellants*,

v.

**William P. BARR**, *et al.*, *Defendants-Appellees*.

————————————

**BLACK LIVES MATTER D.C.**, *et al.*, *Plaintiffs-Appellants*,

v.

**William P. BARR**, *et al.*, *Defendants-Appellees*.

————————————

Consolidated Appeals from the U.S. District Court for the District of Columbia
(Nos. 1:20-cv-1469 & 1:20-cv-1542)

————————————

## REPLY BRIEF FOR APPELLANTS

| | |
|---|---|
| Orin Snyder | Scott Michelman |
| Anne Champion | Arthur B. Spitzer |
| Katherine Marquart | Michael Perloff |
| Lee R. Crain | AMERICAN CIVIL LIBERTIES UNION |
| Maxwell K. Potluri | FOUND. OF THE DISTRICT OF COLUMBIA |
| GIBSON, DUNN & CRUTCHER LLP | 915 15th Street NW, Second Floor |
| 200 Park Avenue | Washington, D.C. 20005 |
| New York, New York 10166-0193 | Tel.: 202.601.4267 |
| Tel.: 212.351.4000 | smichelman@acludc.org |
| achampion@gibsondunn.com | |
| lcrain@gibsondunn.com | *Counsel for Plaintiffs-Appellants* |
| | *in Black Lives Matter D.C. v. Barr,* |
| *Counsel for Plaintiffs-Appellants* | *No. 22-5139* |
| *in Buchanan v. Barr, No. 22-5133* | |

*(counsel listing continues)*

Greta B. Williams
Trisha Jhunjhnuwala
Tessa Gellerson
Austin M. Donohue
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel.: 202.955.8500
gbwilliams@gibsondunn.com

*Further Counsel for Plaintiffs-
Appellants in Buchanan v. Barr, No.
22-5133*

Kaitlin Banner
Dennis Corkery
Jonathan M. Smith
WASHINGTON LAWYERS' COMM. FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, D.C. 20005
Tel.: 202.319.1000
kaitlin_banner@washlaw.org

Jon Greenbaum
Arthur Ago
David Brody
Arusha Gordon
LAWYERS' COMM. FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Tel.: 202.662.8600
jgreenbaum@lawyerscommittee.org

John A. Freedman
David E. Kouba
Sonia Tabriz
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, D.C. 20004
Tel.: 202.942.5000
John.Freedman@arnoldporter.com

*Further Counsel for Plaintiffs-
Appellants in Black Lives Matter D.C.
v. Barr, No. 22-5139*

March 6, 2023

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. ii

GLOSSARY ........................................................................................ iv

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT .......................................................................................... 5

I.   Defendants Offer No Cogent Construction of the Westfall Act and Ask This Court to Violate the Supreme Court's Directive to Respect the Views of Congress. ............................................................................... 5

   A.   Defendants' Interpretation of the Westfall Act Relies on Misreadings of *Hernandez* and *Meshal* and Contravenes Settled Canons of Statutory Interpretation. ........................................ 6

   B.   Defendants Do Not Dispute That *Bivens* Law in 1988 Included *Dellums* and Therefore Would Have Applied to This Case................ 15

II.  No Special Factors Preclude a *Bivens* Remedy Here. ................................. 18

   A.   Defendants' National Security Argument Contravenes This Court's Precedent. .................................................................. 18

   B.   Congress Has Not Created any "Alternative Remedies" That Are "Adequate" to Displace a *Bivens* Cause of Action. ........................... 21

   C.   Congress Has Not Legislated Pervasively About Protestors' Rights.................................................................................. 25

   D.   Discovery Does Not Constitute a Special Factor Here. ...................... 26

III. Any Specific Arguments Regarding Defendant Barr Have Been Waived. ............................................................................................ 28

CONCLUSION .................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cannon v. Univ. of Chicago,
    441 U.S. 677 (1979)................................................................9, 10

Carlson v. Green,
    446 U.S. 14 (1980).......................................................................25

Davis v. Mich. Dep't of Treasury,
    489 U.S. 803 (1989).......................................................................7

*Dellums v. Powell,
    566 F.2d 167 (D.C. Cir. 1977)........................................................1

Doe v. Rumsfeld,
    683 F.3d 390 (D.C. Cir. 2012)......................................................25

Egbert v. Boule,
    142 S. Ct. 1793 (2022)........................ 1, 12, 16, 17, 20, 21, 23, 24, 27

*Franklin v. Gwinnett Cnty. Pub. Schs.,
    503 U.S. 60 (1992)..................................................................9, 10, 14

Hernandez v. Mesa,
    140 S. Ct. 735 (2020)...................................... 3, 6, 7, 8, 13, 16, 17, 23

Hui v. Castaneda,
    559 U.S. 799 (2010).................................................................13, 15

Jama v. Immigr. & Customs Enf't,
    543 U.S. 335 (2005).......................................................................8

Klay v. Panetta,
    758 F.3d 369 (D.C. Cir. 2014)......................................................25

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,
    456 U.S. 353 (1982)..................................................................9, 14

Meshal v. Higgenbotham,
    804 F.3d 417 (D.C. Cir. 2015).............................................11, 12, 13

Quaker Action Grp. v. Hickel,
    421 F.2d 1111 (D.C. Cir. 1969)......................................................18

*Authorities upon which we chiefly rely are marked with asterisks*

ii

*Quaker Action Grp. v. Morton,
  516 F.2d 717 (D.C. Cir. 1975)...............................................18, 19, 21

Roth v. U.S. Dep't of Justice,
  642 F.3d 1161 (D.C. Cir. 2011).........................................................28

In re Sealed Case,
  151 F.3d 1059 (D.C. Cir. 1998).........................................................23

Sherrill v. Knight,
  569 F.2d 124 (D.C. Cir. 1977)...........................................................18

*Tanzin v. Tanvir,
  141 S. Ct. 486 (2020)...............................................................9, 12, 13

U.S. ex rel. Totten v. Bombardier Corp.,
  380 F.3d 488 (D.C. Cir. 2004).........................................................28

United States v. Doe,
  968 F.2d 86 (D.C. Cir. 1992).............................................................19

United States v. Price,
  383 U.S. 787 (1966).............................................................................24

United States v. Smith,
  499 U.S. 160 (1991).............................................................................13

White House Vigil for ERA Committee v. Clark,
  746 F.2d 1518 (D.C. Cir. 1984)...................................................19, 20

Wood v. Moss,
  572 U.S. 744 (2014), Ans. Br. 18-19...............................................20

Ziglar v. Abbasi,
  582 U.S. 120 (2017)...........................................................6, 16, 18, 26

**Statutes**

8 U.S.C. § 1103...........................................................................................24

18 U.S.C. § 242...........................................................................................24

28 U.S.C. § 2679.................................................................................1, 7, 13

28 U.S.C § 2680...........................................................................................8

**Rule**

Fed. R. App. P. 28......................................................................................28

# GLOSSARY

Ans. Br.      Br. for Appellees Adamchik, Barr, Cox, Daniels, Feliciano, Fennelly,
              Hendrickson, Jarmuzewski, McDonald, Monahan, Seiberling, and
              Sinacore

FTCA         Federal Tort Claims Act

JA           Joint Appendix

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Westfall Act of 1988 expressly preserved "a civil action against an employee of the Government[] which is brought for a violation of the Constitution of the United States," 28 U.S.C. § 2679(b)(2)(A)—i.e., a *Bivens* claim. The question at the heart of this appeal is what Congress accomplished in this statute. The prior construction canon of interpretation provides the answer. Because this Court, in one of the most prominent *Bivens* decisions prior to 1988, recognized *Bivens* claims for violations of demonstrators' constitutional rights to protest outside the seat of one of the three branches of government, *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), Plaintiffs' claims here must be allowed to proceed. By ignoring the Westfall Act, the district court flouted the Supreme Court's admonition that the *Bivens* inquiry requires the "utmost deference to Congress' preeminent authority" in creating a cause of action. *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022). This Court should therefore reverse.

Plaintiffs have advanced two independent arguments in the alternative: that Congress's affirmative action in passing the Westfall Act preserved *Bivens* in the circumstances here, and that in any event, no "special factors" exist here to preclude *Bivens*.

*First*, regarding the Westfall Act, Defendants contest little of Plaintiffs' statutory interpretation. Defendants agree with Plaintiffs that separation of powers

is at the heart of the *Bivens* analysis. And Defendants do not dispute any of the following propositions, which Plaintiffs have demonstrated:

1. Respect for separation of powers demands that courts give effect to Congress's judgment regarding whether a cause of action is available, whatever that judgment is—pro or con. *See* Opening Br. 20-21.

2. Because "special factors" in *Bivens* doctrine refers to "special factors counselling hesitation in the absence of affirmative action by Congress," where Congress has affirmatively acted, there can (by definition) be no such factors. *See id.* at 23, 31.

3. The prior construction canon is the appropriate interpretative tool to determine what Congress accomplished in the Westfall Act. Under this canon, when Congress incorporates into legislation a judicially-defined legal principle, Congress is presumed to have adopted judicial interpretations of that principle—including significant appellate as well as Supreme Court rulings—and to endorse the holdings of cases it does not overrule. *See id.* at 25-28.

4. It is inappropriate to interpret the Westfall Act by incorporating interpretative presumptions and rules that the Supreme Court announced only after Congress legislated. *See id.* at 33-35, 45-47.

5. Prior to 1988, this Court in *Dellums*, in one of the best-known applications of *Bivens*, held that plaintiffs may assert *Bivens* claims for violations of constitutional rights arising out of demonstrations at the seat of a branch of the federal government. *See id.* at 3, 29-30; Br. Amicus Curiae of Bipartisan Former Members of Congress ("Congressional Br.") 3-5, 8, 25-28.

6. If Congress's passage of the Westfall Act affirmatively endorsed *Dellums*'s ruling regarding demonstrators at the Capitol, then Congress necessarily preserved the availability of *Bivens* for constitutional claims by demonstrators across the street from the White House. *See* Opening Br. 32; Congressional Br. 4, 13-25.

Accordingly, all that remains in dispute regarding the Westfall Act is a straightforward issue of statutory construction: whether the version of *Bivens* Congress endorsed in 1988—when Congress "left *Bivens* where it found it," *Hernandez v. Mesa*, 140 S. Ct. 735, 748 n.9 (2020)—encompasses *Dellums*.

Defendants offer no cogent interpretation of the statutory text or any alternative canons of construction in support of their cramped reading of the Westfall Act. Instead, Defendants implausibly assert that Congress explicitly preserved *Bivens* actions to cover *only* the specific fact patterns of the three cases that had reached the Supreme Court itself at that time (*Bivens*, *Carlson*, and *Davis*). The prior

3

construction canon disposes of that interpretation. Defendants cite no example of a statute in which Congress prescribed a rule for a broad category of claims, and yet was deemed to have limited that rule to a tiny fraction of claims in that category without saying so.

The Westfall Act compels reinstatement of Plaintiffs' *Bivens* claims here. In dismissing them, the district court thwarted the will of Congress, which is the north star of *Bivens* analysis.

*Second*, even if Congress had not affirmatively acted to preserve *Dellums* claims in the Westfall Act, no "special factors" exist to preclude the application of *Bivens* to the facts alleged in the Complaints. Defendants' view of the "special factors" analysis is so expansive that it would effectively abrogate *Bivens* itself, by identifying "factors" that are not "special" but in fact applicable to any case (such as the ability to file injunctive claims regardless of standing). And history shows that protecting demonstrations in Lafayette Square does not conflict with national security; accordingly, Congress's interest in the President's safety does not suggest indifference to protesters' rights in Lafayette Square. The Court should reject Defendants' invitation to establish a Constitution-free zone in one of the Nation's most important public forums.

In fact, Defendants do not dispute that the district court's decision means that no federal official can ever be sued for damages for constitutional violations

committed in Lafayette Square, no matter how blatant or harmful the misconduct. *See* Opening Br. 4, 43. As amici explain, the district court's decision "threatens *all* First Amendment freedoms, including the freedom of religion" by ruling out claims against officers for "responding with force to peaceful and lawful expressions of faith." Br. of Amici Curiae Clergy and Religious Institutions 13. And under the district court's ruling, had the federal officers shot demonstrators dead (or, by the same token, had they shot amica Rev. Gerbasi as she prayed with demonstrators on the patio of St. John's, *see id.* at 17), they would be equally unaccountable to the Constitution's commands. *See* Opening Br. 4, 43.

Finally, Defendant Barr does not argue that his former high rank as Attorney General provides a separate basis to foreclose a claim against him for constitutional violations in which he personally participated. *See id.* at 52-54. Accordingly, Defendant Barr has waived that basis for defending the decision below.

## ARGUMENT

### I. Defendants Offer No Cogent Construction of the Westfall Act and Ask This Court to Violate the Supreme Court's Directive to Respect the Views of Congress.

Defendants agree with Plaintiffs that modern *Bivens* doctrine is structured as it is "[t]o safeguard constitutional separation of powers." Ans. Br. 14; *accord id.* at 9, 15. Yet Defendants puzzlingly claim that Plaintiffs, in centering their arguments on the actions of Congress, "disregard[]" the Supreme Court's framework. *Id.* at 25.

In fact, Plaintiffs' core argument—that Congress affirmatively acted to preserve a version of the *Bivens* doctrine that includes Plaintiffs' claims—arises from the very definition of "special factors." As Defendants acknowledge, the Supreme Court has directed courts to consider "whether 'special factors' counsel against implying a constitutional damages action without 'affirmative action by Congress.'" *Id.* at 15 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 136 (2017)). Accordingly—as Plaintiffs have explained and as Defendants do not dispute—where Congress has affirmatively acted, there can be no special factors of this kind. Opening Br. 23-24, 31. Defendants' attempt to brush aside the Westfall Act at the outset thus fails.

The real question then is not whether this Court should heed Congress's instructions—of course it must—but what Congress instructed. Defendants raise three objections to Plaintiffs' reading of the Westfall Act. Each is meritless. And defendants do not dispute the balance of Plaintiffs' statutory analysis, which shows why recognizing a *Bivens* claim here is required to effectuate the views of Congress.

### A. Defendants' Interpretation of the Westfall Act Relies on Misreadings of *Hernandez* and *Meshal* and Contravenes Settled Canons of Statutory Interpretation.

**1.** The Supreme Court has repeatedly recognized that Congress, through the Westfall Act, affirmatively acted to preserve *Bivens*. *See* Opening Br. 2, 24-25. Congress, the Court has explained, "left *Bivens* where it found it." *Hernandez*, 140 S. Ct. at 748 n.9. That statement confirms the dictates of the prior construction canon

of statutory interpretation: "When Congress codifies a judicially defined concept, it is presumed, absent an express statement to the contrary, that Congress intended to adopt the interpretation placed on that concept by the courts." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 813 (1989); *see* Opening Br. 25-28. Defendants do not argue otherwise.

Instead, Defendants claim that *Hernandez* circumscribed the Westfall Act when it stated that the Act "is not a license to create a new *Bivens* remedy in a context we have never before addressed." 140 S. Ct. at 748 n.9. Based on the prior construction canon, however, the most sensible way to understand that statement is in light of the specific question *Hernandez* presented: whether to extend *Bivens* to a U.S. border patrol officer's shooting of a Mexican national on the Mexican side of the international border. That context was novel not only at the Supreme Court, but had not been addressed by any court when Congress passed the Westfall Act in 1988. Therefore, the Westfall Act did not incorporate that application.

Defendants' contrary suggestion—that the words "context we have never before addressed" in *Hernandez* means a context *the Supreme Court itself* had not addressed prior to 1988—would narrow 28 U.S.C. § 2679(b)(2)(A) to the point of absurdity. Before 1988, the Supreme Court had squarely recognized a *Bivens* claim in just three circumstances: a warrantless search and seizure in a home, employment discrimination by a Congressman, and denial of medical care at a prison. *See*

*Hernandez*, 140 S. Ct. at 741. The idea that Congress would have legislated to preserve *Bivens* actions in *just these three particular circumstances and no others* is at odds with the broad language and legislative history of the Westfall Act, the prior construction canon, and common sense.

First, the text of § 2679(b)(2) refers broadly to an "action . . . brought for a violation of the Constitution." If Congress actually meant for this language to cover only three Supreme Court cases, it would have used far more specific and limiting language of the kind it used in the very next section of the FTCA. *See* 28 U.S.C § 2680(h) (allowing certain intentional tort claims only when they arise from the "acts or omissions of investigative or law enforcement officers"); *see generally id.* § 2680 (prescribing other circumstances when the government is immune from suit). Courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005). The legislative history likewise reflects that Congress consulted decisions beyond those of the Supreme Court itself to understand the scope of *Bivens*. *See* Opening Br. 30-31.

Second, the prior construction canon also refutes Defendants' interpretation of *Hernandez*. The canon presumes that Congress incorporates judicial

understandings of the concepts it codifies, *including understandings by the courts of appeals*. *See* Opening Br. 27-28 (collecting cases). And the canon is no less applicable when the judicially-developed concept at issue is an implied cause of action. *See id.* (discussing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 379, 386 (1982), and *Cannon v. Univ. of Chicago*, 441 U.S. 677, 699 (1979)); *see also id.* at 20-21 (discussing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992)).

Finally, reading the Westfall Act to preserve just three applications disrespects Congress by adopting an unnaturally cramped understanding of its legislation. To justify limiting the Westfall Act to the fact patterns in three Supreme Court cases, Defendants appear to rely on the Supreme Court's "new context" test. But the Court adopted this new context inquiry long after Congress enacted the Westfall Act. *See id.* at 34 n.4. For judicial presumptions of this kind to "inform the understanding of a word or phrase" in statutory text, "those presumptions must exist at the time of enactment." *Tanzin v. Tanvir*, 141 S. Ct. 486, 493 (2020). There is no reason to believe Congress in 1988 would have thought that leaving "*Bivens* where it found it" meant it was endorsing only the three Supreme Court cases that would go on to take outsized importance in the "new context" test nearly three decades later. Opening Br. 34 n.4. Members of Congress certainly did not believe that was what they were doing in the Westfall Act. *See* Congressional Br. 3-5.

One of the leading Supreme Court cases about congressional endorsement of a judicially inferred cause of action refutes the type of miserly statutory construction Defendants advance here. In *Franklin*, the Supreme Court held unanimously that Congress had endorsed the holding of *Cannon*, finding an implied cause of action under Title IX. *See* Opening Br. 20-21 (discussing *Franklin* in detail). No Justice suggested that Congress's action extended only to the specific context of *Cannon*: a claim of discrimination in medical school admissions. *See* 441 U.S. at 680. On the contrary, the Court in *Franklin* had no trouble concluding, unanimously, that the congressionally-endorsed Title IX cause of action extended to the very different circumstances in *Franklin*: a middle school student who had been sexually assaulted by a teacher. *See* 503 U.S. at 63. There as here, holding that Congress had endorsed a cause of action for just one fact pattern would have made no sense. Defendants offer no explanation why this Court should depart from *Franklin*'s approach and apply the Westfall Act's broad statutory language to just three idiosyncratic fact patterns. In fact, Defendants do not point to any case concluding that Congress legislated a general rule that it intended (without saying so) to apply to just a handful of specific fact patterns nowhere identified in the statute.

In sum, Defendants' reading of the *Hernandez* footnote is singularly implausible, contradicting statutory text, legislative history, canons of construction, and precedent. When Congress "left *Bivens* where it found it," that included extant

applications of *Bivens*—not only by the Supreme Court, but also the courts of appeals—including this Court's prominent *Dellums* decision, of which Congress was surely aware. *See* Opening Br. 29-30; Congressional Br. 25-28.

    **2.**    *Meshal* does not undercut the straightforward application of the prior construction canon to the Westfall Act. Defendants make much of *Meshal*'s refusal to rule there based on "uncertain interpretations of what Congress did in . . . 1988." Ans. Br. 27 (quoting *Meshal v. Higgenbotham*, 804 F.3d 417, 428 (D.C. Cir. 2015)). But in discussing whether Congress affirmatively endorsed or ratified *Bivens*, this Court stated, in the very same sentence Defendants quote, that it was "not foreclosing either interpretation" of the Westfall Act—i.e., for or against ratification. 804 F.3d at 428. Thus, the question remains open for decision now.

    What *Meshal* rejected was a far more expansive position than the one Plaintiffs advance here. Amir Meshal sought a remedy for torture in foreign countries in connection with a national security investigation. *Id.* at 418. He identified no pre-1988 *Bivens* case endorsing that application, so the Court had to ask, "Did Congress intend to ratify *Bivens*' scope as it was in 1988 *or more broadly*?" *Id.* at 428 (emphasis added). Only the latter view would provide relief to Meshal. ("If Congress intended to ratify *Bivens* only as it existed in 1988 then this would be an easy case." *Id.*) It is no wonder that the Court thought Meshal's position—that *Bivens* applied *more broadly* than its scope in 1988—was

11

"uncertain." *Id.* The Court used that adjective in rejecting the plaintiff's expansive argument in that case; it did not reject the more modest proposition Plaintiffs advance here: that Congress preserved prominent *Bivens* applications *extant in 1988*. That is the question *Meshal* explicitly left open.

**3.**  Defendants' remaining argument about the Westfall Act tries to inject uncertainty into clear statutory text. Defendants contend that for Congress to have endorsed *Bivens*, it would have needed either to fold constitutional torts into the FTCA's framework for substituting the United States as a defendant and waiving sovereign immunity, Ans. Br. 25-27, or to use text that was somehow more explicit than that of the Westfall Act, *see id.* at 27-28 (claiming a "lack of textual support for plaintiffs' position in the Westfall Act"). This position reflects profound disrespect for the legislative branch. It imposes unforgiving drafting requirements that license courts to muddy clear statutory text and substitute their own judgment for that of Congress—precisely what the Supreme Court has warned against. "[A]bsent utmost deference to Congress' preeminent authority in this area, the courts arrogate legislative power." *Egbert*, 142 S. Ct. at 1803 (cleaned up); *see generally Tanzin*, 141 S. Ct. at 493 ("Our task is simply to interpret the law as an ordinary person would.").

As a matter of plain meaning, it is unclear how Congress (other than by adding the word "*Bivens*") could have referred more clearly to *Bivens* claims than with the

language it enacted, which preserved "a civil action against an employee of the Government [] which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). Defendants cite dicta from *Meshal* questioning the Westfall Act's clarity, *see* Ans. Br. 28 (citing 804 F.3d at 428 n.9), but the Supreme Court has had no trouble understanding that the Westfall Act preserved *Bivens* claims—as it has stated four separate times. *See Tanzin*, 141 S. Ct. at 491; *Hernandez*, 140 S. Ct. at 748 n.9; *Hui v. Castaneda*, 559 U.S. 799, 807 (2010); *United States v. Smith*, 499 U.S. 160, 173 (1991).

The fact that Congress chose not to incorporate constitutional tort claims into the FTCA's remedial model does not render Congress's action nugatory: respecting Congress's decision to preserve *Bivens* claims as a parallel mechanism for relief, separate from the FTCA, is part of respecting the separation of powers. Courts have no license to disregard what Congress has done just because government lawyers think Congress should have done it differently.

Finally, if Defendants are suggesting that some kind of special statement was required to preserve a remedy that originated with the judicial branch, Supreme Court precedent refutes that position. The Court has recognized congressional endorsements of judicially-inferred causes of action multiple times; it has never imposed a "clear statement rule" or suggested that normal rules of statutory interpretation—including the prior construction canon—do not apply. Plaintiffs

have discussed in detail three examples (*Cannon*, *Curran*, and *Franklin*), along with the government's own embrace of this position in appellate litigation now pending. *See* Opening Br. 20-21, 27-28, 46-47.

Defendants' attempt to distinguish these authorities as involving statutes "in which Congress enacted language with a settled judicial interpretation" fails. Ans. Br. 28. In *Curran*, the Court held that Congress endorsed a judicially-inferred cause of action not by enacting remedy-creating *language* with a settled judicial interpretation, but by using a savings clause to make clear its intent to preserve the cause of action courts had already recognized. 456 U.S. at 386-87. In *Franklin*, the Court unanimously agreed that Congress's enactment of a statutory requirement, mandating that states waive sovereign immunity for claims under Title IX as a condition of accepting federal funding, was an "implicit acknowledgment that damages are available" to Title IX plaintiffs under the previously judicially-recognized cause of action for that law. 503 U.S. at 78 (Scalia, J., concurring in the judgment); *accord id.* at 72-73 (majority opinion). That was true even though the relevant statute "sa[id] nothing about the nature of" the Title IX remedy. *Id.* at 73. *Curran* and *Franklin* thus demonstrate that the prior construction canon has just as much force when Congress uses clear statutory text to indicate its view about an existing judicially-recognized remedy as when Congress's statutory language *itself* has a judicially-recognized meaning (as was the case in *Cannon*, *see* Opening Br.

27). Accordingly, when Congress affirmatively legislated to preserve *Bivens* using an "explicit" reference to "*Bivens* claims," *Hui*, 559 U.S. at 807, there was no further requirement that it enact any particular language to indicate its approval.

In sum, Defendants' view of the Westfall Act fails to give effect to statutory text and settled canons of construction. Rather, as Plaintiffs have shown, *see* Opening Br. 24-28, applying the prior construction canon to the plain statutory text shows that Congress took the affirmative step in the Westfall Act of preserving the *Bivens* remedy as it existed in 1988.

### B.    Defendants Do Not Dispute That *Bivens* Law in 1988 Included *Dellums* and Therefore Would Have Applied to This Case.

Beyond their arguments that the Westfall Act is irrelevant, Defendants do not dispute Plaintiffs' other arguments explaining why Congress's endorsement of *Bivens* as it existed in 1988 included a cause of action applicable to the allegations pleaded in the Complaints here.

*Dellums* held that *Bivens* is available to redress violations of demonstrators' constitutional rights at the seat of a branch of government. It was a prominent part of the *Bivens* landscape when Congress passed the Westfall Act, Opening Br. 29-31; *see also* Br. of Amici Curiae Inst. for Justice and Found. for Indiv. Rts. & Expression 12-14—as confirmed by sixteen former Members of Congress (of both parties) who served when the Westfall Act was passed, *see* Congressional Br. 25-28. Defendants do not dispute this.

15

*Dellums* applies squarely to the facts of this case—with close parallels including the presence of a peaceful group of demonstrators at the headquarters of a branch of government, and federal officers' forcibly shutting down the demonstration without justification. As Plaintiffs and congressional amici have shown, if Congress endorsed *Dellums* in the Westfall Act, then Congress endorsed a *Bivens* action in the circumstances of this case. Opening Br. 32-33; Congressional Br. 14-25. Defendants do not dispute this, either.

Defendants argue only that *Dellums* cannot govern because its analysis predated the modern *Bivens* tests. But that (again) ignores the preeminent role of Congress in creating a cause of action. *See Egbert*, 142 S. Ct. at 1802; *Hernandez*, 140 S. Ct. at 742; *Abbasi*, 582 U.S. at 134-35. The significance of *Dellums* to the Westfall Act lies not in the methodology *Dellums* employed, but its existence as a prominent application of *Bivens* prior to Congress's action in 1988—perhaps the *most* prominent application. *See* Congressional Br. 25-26 ("*Dellums* involved constitutional violations committed against Members of Congress themselves, and the arrests took place on the steps of the Capitol. The protest at the Capitol on May 5th made national news, and it was certainly a major story within Washington and on Capitol Hill."); *see also id.* at 26-27 (discussing congressional debates influenced by *Dellums*). However reasoned, *Dellums* was indisputably a part of *Bivens* law in 1988 when Congress acted affirmatively to "le[ave] *Bivens* where it found it."

*Hernandez*, 140 S. Ct. at 748 n.9. In short, *Dellums* governs here because that is what Congress, through the Westfall Act, provided. The judiciary must be equally respectful of Congress when Congress decides that *Bivens is* available as when Congress decides that it is not. *See* Opening Br. 20-21. Defendants do not—and cannot—dispute that respect for Congress means respect for whatever judgment Congress made.

In the end, Defendants appear to rely primarily on the Supreme Court's pronouncements that *Bivens* is "disfavored" to justify their conclusion that there simply *cannot* be a claim here. But the *reason Bivens* is disfavored, as the Court has repeatedly explained, is *not* a judicial determination that *Bivens* claims are inherently undesirable; imposition of such a policy preference by judges would "arrogate legislative power," *Egbert*, 142 S. Ct. at 1803 (cleaned up), just as much as novel *Bivens* expansions that the Supreme Court has reversed. Rather, the principle of law the Supreme Court has established is: Courts must defer to Congress when it comes to causes of action. They must, as Defendants put it, "respect the legislative role." Ans. Br. 15. With respect to the circumstances here, Congress expressed its views in 1988 through the language of the Westfall Act. On this basis alone, the dismissal of Plaintiffs' *Bivens* claims must be reversed.

## II.     No Special Factors Preclude a *Bivens* Remedy Here.

Even if Congress had not affirmatively acted via the Westfall Act to preserve *Bivens* claims in the circumstances here, proper application of the "special factors" analysis requires that the *Bivens* claims be allowed to proceed.

### A.     Defendants' National Security Argument Contravenes This Court's Precedent.

Defendants' invocation of national security as a special factor here exemplifies a specific "danger" the Supreme Court has warned of—that "national-security concerns must not become a talisman used to ward off inconvenient claims." *Abbasi*, 582 U.S. at 143 (cleaned up). As this Court has repeatedly recognized, insubstantial invocations of "national security" do not justify restrictions on constitutional rights around or even *in* the White House. *Sherrill v. Knight*, 569 F.2d 124, 130-31 (D.C. Cir. 1977); *Quaker Action Grp. v. Morton*, 516 F.2d 717, 730-31 (D.C. Cir. 1975) ("*Quaker Action IV*"); *Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1117-18 (D.C. Cir. 1969). Defendants' position would effectively convert Lafayette Park into a Constitution-free zone—a result that "threatens *all* First Amendment freedoms," including not just speech and association but also religious liberty. Br. of Amici Curiae Clergy and Religious Institutions 13.

Lafayette Park is a "quintessential public forum," with special status—"a primary assembly point for First Amendment activity aimed at influencing national policies," "where the government not only tolerates but explicitly permits

18

demonstrations and protests because of its unique location across the street from the White House." *United States v. Doe*, 968 F.2d 86, 87-89 (D.C. Cir. 1992); *accord Quaker Action IV*, 516 F.2d at 725. Defendants do not dispute that in the decades since *Dellums* and *Quaker Action IV* were decided, protests in Lafayette Park have not compromised national security. *See* Opening Br. 41, 45. That silence is telling: It reveals that Defendants' asserted "special factor" has no basis in fact.

To support their conclusory contention that *any* protest in Lafayette Park *per se* threatens the President's safety, Defendants misread multiple authorities. Quoting *Quaker Action IV*, Defendants warn that "'a public gathering,' especially a group of thousands of unscreened demonstrators, 'presents some measure of hazard to the security of the President and the White House.'" Ans. Br. 18 (quoting 516 F.2d at 731). But Defendants ignore that, even despite that "measure of hazard," this Court in *Quaker Action IV* "s[aw] problems" with certain regulations aimed at restricting protests in Lafayette Park and *invalidated* those restrictions, such as those limiting protests to 3,000 people. 516 F.2d at 732.[1]

Nor does *White House Vigil for ERA Committee v. Clark*, 746 F.2d 1518 (D.C. Cir. 1984), suggest national security is *always* implicated by Lafayette Square

---

[1]    Defendant Kellenberger argues that *Quaker Action IV* is distinguishable because the demonstrators lacked a permit. Kellenberger Ans. Br. 19. No such fact is in the complaint, and in any event, would not justify a vicious law enforcement attack, nor has the government suggested that it would.

demonstrations. *Clark* concerned security issues not with demonstrations in general but specific activities: leaving "unattended parcels" that "could contain an explosive device" on the White House sidewalk and carrying signs constructed of rigid materials that could be used to "scale the White House fence." *Id.* at 1533-34, 1539-41. Defendants' attempt to generalize from these specific activities to every manner of peaceful protest is not only a non sequitur; it is refuted by *Clark* itself, where the Court wrote: "[A] strong argument could have been made that a regulation banning all demonstrations on the White House sidewalk and in Lafayette Park would have been unconstitutional." *Id.* at 1527. As in *Quaker Action IV*, this Court paid serious attention to White House security but simultaneously confirmed the constitutionally-protected status of demonstrations in Lafayette Park.

Finally, Defendants' reliance on *Wood v. Moss*, 572 U.S. 744 (2014), Ans. Br. 18-19, is likewise misplaced, because the protesters there were "within weapons range of, and had a direct line of sight to, the President's location." 572 U.S. at 752; *accord id.* at 760. By contrast, when Defendants brutally assaulted the peaceful protesters in Lafayette Park, the President was on the opposite side of the White House, JA85, JA148, well-hidden from people in Lafayette Square.

Defendants also overread the Supreme Court's instruction that special factors not be assessed at "[too] granular a level." Ans. Br. 19 (citing *Egbert*, 142 S. Ct. at 1806). *Egbert* reversed an appellate decision rejecting national security as a special

20

factor in a case about a border agent's actions several feet from the border—actions that directly involved international border operations. *Egbert*, 142 S. Ct. at 1805-06. Here, by contrast, drawing a line between what does and doesn't implicate Presidential security is not splitting hairs over a few feet; it reflects an essential constitutional balance this Court has struck over the course of half a century—and an equally long history of protests regularly occurring in Lafayette Park *without* endangering presidential security. *See* Opening Br. 36 (collecting cases).

As this Court has recognized, the White House is "virtually the safest place for the President"—surely safer than "when he moves in a parade or visits a baseball stadium or makes any sort of public appearance." *Quaker Action IV*, 516 F.2d at 730 n.40 (citing testimony by the Secret Service Assistant Director for Protective Intelligence). Defendants' insistence that Presidential security precludes accountability for any federal officials' actions in Lafayette Square—requiring a rule under which (Defendants do not dispute) they may attack and even kill civilians with impunity for exercising fundamental rights—reflects an all-encompassing vision of Presidential security that this Court, consistent with its precedents, should again reject.

**B.    Congress Has Not Created any "Alternative Remedies" That Are "Adequate" to Displace a *Bivens* Cause of Action.**

"[W]hether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts." *Egbert*, 142 S. Ct. at 1807. Here,

Congress endorsed the *Bivens* damages action as it existed in 1988, including demonstrators' rights claims in cases like *Dellums*. *See* Part I above. Defendants have not pointed to any "legislative determination" that an alternative remedy is adequate to displace the *Bivens* claim Congress endorsed. Instead, Defendants suggest that either injunctive relief or investigation by the political branches constitutes an adequate alternative remedy. Neither suggestion holds water.

**1.** Injunctive relief was not an adequate remedy here: Although Plaintiffs filed injunctive claims seeking to prevent a repeat of Defendants' attack, the district court dismissed them (on Defendants' motion) for lack of standing. JA206. Defendants misleadingly suggest these claims were not dismissed but settled for policy changes. Ans. Br. 9, 24. In fact, the only injunctive claims that remained pending at the time of that partial settlement related to Plaintiffs' "challenge [to] the continued restrictions on access to Lafayette Square," JA236—a claim that did not arise out of the June 1 attack. The surviving, settled injunction claim would have provided no remedy for the damage done on June 1, 2020.[2]

*Abbasi* is not to the contrary; it did not hold that the mere ability to file a claim seeking an injunction—regardless of a litigant's standing—forecloses all *Bivens*

---

[2]     Although the settlement applied to any equitable claims that *could* have been brought based on the June 1 attack, the settlement agreement could not disturb the district court's conclusion that Plaintiffs lacked standing to seek an injunction against a replay of June 1.

remedies. *See* Opening Br. 50-51. Such a rule would self-evidently preclude all *Bivens* claims, notwithstanding that the Supreme Court has consistently reaffirmed their viability in narrow circumstances. *See, e.g.*, *Egbert*, 142 S. Ct. at 1803. The Supreme Court cannot be construed to have overruled consistently-reaffirmed precedent *sub silentio*. *See In re Sealed Case*, 151 F.3d 1059, 1064 (D.C. Cir. 1998).

**2.** Defendants are mistaken that legislative or executive branch investigations into the Lafayette Park assault foreclose a *Bivens* remedy. Ans. Br. 20. First, a congressional investigation is not an alternative *remedy*, i.e., "a remedial process . . . sufficient to secure an adequate level of deterrence" against "the unconstitutional acts of individual officers." *Egbert*, 142 S. Ct. at 1806-07. Whereas the processes cited in *Egbert* could lead to discipline or charges, *see id.* at 1806 (citing Border Patrol's statutory obligation to "control, direc[t], and supervis[e]" its employees), and *Hernandez*, *see* 140 S. Ct. at 740 (noting that the government could have brought "charges"), Defendants identify no disciplinary consequence that can arise from a congressional investigation, nor any congressional finding that such an investigation alone creates "an adequate level of deterrence" for "officers." *Egbert*, 142 S. Ct. at 1806-07.

Second, as to the *executive* grievance/investigatory mechanisms, Defendants have not shown the necessary link to a judgment of *Congress*. Although *Egbert* recognized that an alternative remedy could be created by "Congress or the

23

Executive" and then suggested in dicta that "it"—perhaps meaning either branch—could "find[]" that process "sufficient," *id.* at 1807, the immediately prior sentence of *Egbert* and that decision's *holding* on alternative remedies leave no doubt where the ultimate judgment of adequacy must come from: Congress. Specifically: "[T]he question whether a given remedy is adequate is a legislative determination that must be left to Congress[.]" *Id.* In fact, *Egbert*'s holding depended on a process of the Border Patrol that implemented *Congress's* statutory command "to 'control, direc[t], and supervis[e] . . . all employees.'" *Id.* at 1806 (quoting 8 U.S.C. § 1103(a)(2)).

Here, by contrast, Defendants, in invoking an agency grievance process, cite no *congressionally*-mandated statutory obligation to do anything that would deter officers—only generalized "investigatory and reporting obligations," Ans. Br. 20. And Defendants make no showing that Congress made the "legislative determination" that this "remedy is adequate." *Egbert*, 142 S. Ct. at 1807. Defendants fall back on the possibility that the government *could* prosecute officers under the general criminal prohibition against officials' violation of constitutional rights, 18 U.S.C. § 242, *see* Ans. Br. 21, but that argument proves far too much: That statute has existed since Reconstruction, *see United States v. Price*, 383 U.S. 787, 791 (1966), so it would be astonishing to discover only now that an alternative remedy foreclosing *Bivens* has existed alongside *Bivens* for the doctrine's entire half-century history. As with Defendants' view of injunctive relief, their position on

24

executive-branch investigations and criminal prosecution would effectively swallow the rule of *Bivens* itself.

Finally, the government notes that there are "separately pending Federal Tort Claims Act claims stemming from the 2020 protests in Lafayette Park." Ans. Br. 24 n.2. But the Supreme Court has rejected the argument that the FTCA is an "alternative remedy" for *Bivens* purposes, *Carlson v. Green*, 446 U.S. 14, 23 (1980), and Defendants do not argue the contrary.

## C. Congress Has Not Legislated Pervasively About Protestors' Rights.

Courts have found Congress's legislation on a particular topic to weigh against recognizing a *Bivens* remedy only where the legislation is "aimed at combating th[e] scourge" complained of. *See Klay v. Panetta*, 758 F.3d 369, 376 (D.C. Cir. 2014); *Doe v. Rumsfeld*, 683 F.3d 390, 396-97 (D.C. Cir. 2012). Defendants argue *Bivens* should be foreclosed here because Congress has enacted extensive legislation on the topic of presidential security. Ans. Br. 18. But that is not the relevant "scourge." *Klay*, 758 F.3d at 376. Instead, Plaintiffs' claims concern the brutal suppression of peaceful demonstrators' First Amendment freedoms in a quintessential public forum. Defendants have not identified any pervasive congressional activity regarding *that* scourge.

Defendants' reliance on the House Select Committee on Assassinations and its 1979 Report, Ans. Br. 23, is misplaced. Defendants suggest that because the

25

report resulted in no legislation creating a cause of action for protesters, Congress wanted none to exist.  But *Dellums* was decided in 1977, meaning Congress in 1979 understood that *Bivens* remedies *were* available for violations of demonstrators' constitutional rights. Defendants argue that Congress's attention in the 1979 Report to White House "security breaches" shows that the failure to provide a damages remedy was not "inadvertent." But in light of *Dellums*, Congress would have had no need in 1979 to create a damages remedy redundant to the one this Court had already recognized. If anything, the lack of congressional action at that time reflected satisfaction with *Dellums*—not a desire to wipe it out.

### D.    Discovery Does Not Constitute a Special Factor Here.

Defendants raise on appeal an additional supposed special factor: that Plaintiffs' claims would require discovery into the communications and decision-making processes of high-level government officials. Ans. Br. 24-25. This argument misreads *Abbasi*, which cautioned against discovery into deliberations regarding government *policies*, not discrete actors' rogue acts. *See* 582 U.S. at 140-41 (finding special factors where suit "would require courts to interfere in an intrusive way with sensitive functions of the Executive Branch" via a "discovery and litigation process [that] would either border upon or directly implicate the discussion and deliberations

that led to the formation of the policy in question"). Here, no policy is at issue. Opening Br. 53.

To the extent that Defendants' discovery concerns are tied to issues of "motive" raised by Plaintiffs' claims as originally pleaded, Ans. Br. 25, these concerns can be put to rest: Plaintiffs recognize that *Egbert* "hold[s] that there is no *Bivens* action for First Amendment retaliation," 142 S. Ct. at 1807, and accordingly that Plaintiffs will have to rely on their other First Amendment theories to succeed if their *Bivens* claims are reinstated. *See* Opening Br. 19 n.2 (enumerating Plaintiffs' other First Amendment theories, one of which the district court held survived a motion to dismiss against non-federal defendants).

Finally, Defendants are wrong to suggest that the rejection of a *Bivens* remedy would meaningfully circumscribe discovery against them in this case. Plaintiffs currently have viable constitutional claims pending in the district court against District of Columbia and Arlington County officials. JA235. Discovery on those claims will involve federal officials, including Defendants. Even if Defendants are not parties to this case, they remain critical percipient witnesses, and rejecting the *Bivens* claims cannot change that. Accordingly, discovery is not a special factor counseling against recognizing a *Bivens* claim here.

\* \* \*

27

Defendants have failed to identify any "special factors" counseling hesitation in recognizing a *Bivens* remedy in this case.

## III. Any Specific Arguments Regarding Defendant Barr Have Been Waived.

An appellee's brief "must contain" the appellee's "contentions and the reasons for them." Fed. R. App. P. 28(a)(8)(A), 28(b). Arguments not raised are waived. *See U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004). "Even appellees waive arguments by failing to brief them." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1181 (D.C. Cir. 2011) (citation and quotations omitted).

As Plaintiffs have shown, high-ranking officials like Defendant Barr who participate personally in a constitutional violation can be liable under *Bivens*. Opening Br. 52-54. No Defendant (including Barr) argues otherwise. Therefore, any such argument has been waived.

## CONCLUSION

The Court should reverse the dismissal of the *Bivens* claims.

28

March 6, 2023

Respectfully submitted,
*/s/ Anne Champion*
*/s/ Lee R. Crain*
Orin Snyder
Anne Champion
Katherine Marquart
Lee R. Crain
Maxwell K. Potluri
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Tel: 212.351.4000
achampion@gibsondunn.com
lcrain@gibsondunn.com

Greta B. Williams
Trisha Jhunjhnuwala
Tessa Gellerson
Austin M. Donohue
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel: 202.955.8500
gbwilliams@gibsondunn.com

*Counsel for Plaintiffs-Appellants*
*in Buchanan v. Barr, No. 22-5133*

Respectfully submitted,
*/s/ Scott Michelman*
Scott Michelman
Arthur B. Spitzer
Michael Perloff
AMERICAN CIVIL LIBERTIES UNION
FOUND. OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel.: 202.601.4267
smichelman@acludc.org

Kaitlin Banner
Dennis Corkery
Jonathan M. Smith
WASHINGTON LAWYERS' COMM. FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, D.C. 20005
Tel.: 202.319.1000
kaitlin_banner@washlaw.org

Jon Greenbaum
Arthur Ago
David Brody
Arusha Gordon
LAWYERS' COMM. FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Tel.: 202.662.8600
jgreenbaum@lawyerscommittee.org

John A. Freedman
David E. Kouba
Sonia Tabriz
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue NW
Washington, D.C. 20004
Tel.: 202.942.5000
John.Freedman@arnoldporter.com

*Counsel for Plaintiffs-Appellants
in Black Lives Matter D.C. v. Barr,
No. 22-5139* [3]

---

[3] Counsel wish to acknowledge the assistance of paralegal Jada Collins in the preparation of this brief.

## CERTIFICATE OF WORD COUNT

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 6,488 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface (Times New Roman 14-point type) using Microsoft Word.

*/s/ Anne Champion*
Anne Champion