# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 4, 2023                    Decided June 23, 2023

No. 22-5133

RADIYA BUCHANAN, ET AL.,
APPELLANTS

v.

WILLIAM P. BARR, IN HIS INDIVIDUAL CAPACITY AS FORMER
U.S. ATTORNEY GENERAL, ET AL.,
APPELLEES

———

Consolidated with 22-5139

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:20-cv-01542)
(No. 1:20-cv-01469)

———

*Scott Michelman* and *Lee R. Crain* argued the causes for
appellants.  With them on the briefs were *Anne Champion,
Arthur B. Spitzer, Dennis Corkery, Jonathan M. Smith, Jon*

2

*Greenbaum, Arthur Ago, David Brody, John A. Freeman,* and *David E. Kouba.*

*Scott F. Regan* and *Victoria Clark* were on the brief for *amici curiae* Institute for Justice and Foundation for Individual Rights and Expression in support of appellants.

*Gabriel K. Gillett, Ishan K. Bhabha,* and *Lauren J. Hartz* were on the brief for *amici curiae* Bipartisan Former Members of Congress in support of appellants.

*Sarah Helene Duggin, Donald Crane, Kwaku A. Akowuah, Tobias S. Loss-Eaton,* and *Lakeisha F. Mays* were on the brief for *amici curiae* Clergy and Religious Institutions in support of appellants.

*Brian J. Springer,* Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern*, Attorney.

*Christopher A. Zampogna* was on the brief for appellee Sean Kellenberger.

Before: WILKINS and WALKER, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* WILKINS.

Concurring opinion filed by *Circuit Judge* WALKER.

3

SENTELLE, *Senior Circuit Judge*:  Appellants, individual protestors and Black Lives Matter D.C., brought these consolidated actions against federal law enforcement officers, alleging that officers' actions in clearing protestors from Lafayette Park in June 2020 violated their First, Fourth, and Fifth Amendment rights and seeking damages under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Appellees, former Attorney General Barr and various named U.S. Park Police officers, moved to dismiss the claims, arguing that a *Bivens* remedy is unavailable in this context.  The district court granted the motions, and this appeal followed.  Applying Supreme Court precedent, we hold that Appellants' claims arise in a new context and that special factors counsel hesitation against extending the availability of *Bivens* claims to that context. Accordingly, we affirm.

## I.      Background

We review the district court's dismissal of Appellants' claims de novo and accept as true all well-pleaded factual allegations.  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Following the killings of George Floyd and Breonna Taylor, protestors, including Appellants, gathered in Lafayette Square across from the White House in Washington, D.C., to protest racism and police brutality.  On the evening of June 1, 2020, at the order of Attorney General Barr, federal law enforcement officers began clearing protestors from the park using physical force, chemical irritants, and munitions. Officers fired tear gas, rubber bullets, flash grenades, and pepper spray into the crowd, hitting and injuring many.  Appellants were struck with batons and rubber bullets, experienced adverse reactions to the chemical irritants, and suffered emotional and psychological harm.

4

While officers cleared protestors from the park, President Trump was on the opposite side of the White House giving a speech in the Rose Garden. Minutes later, after protestors were out of the area, President Trump, Attorney General Barr, and other senior officials walked through Lafayette Park to St. John's Church and took a photograph.

Senior administration officials gave conflicting statements on the rationale for clearing the park, including that it was done to enforce the city's curfew, which was not until twenty-five minutes after officers began clearing the park; to expand the security perimeter surrounding the White House; to protect St. John's Church, which had suffered fire damage the day before but was not encompassed by the expanded perimeter; and to curtail ongoing violence. Appellants have alleged that the dispersal was done to facilitate the President's photo opportunity at St. John's Church.

Appellants sued, bringing, *inter alia*, *Bivens* claims to recover damages for the Government's alleged violations of their First, Fourth, and Fifth Amendment rights. The district court granted the Government's motions to dismiss the claims after holding that the claims arose in a new context and that three special factors—national security, Congress's involvement in the intersection between presidential security and protestors' rights, and the availability of alternative remedies—counselled hesitation against extending *Bivens* to that context. This appeal followed.

## II.      Analysis

Starting with *Bivens* in 1971 and over the course of the following nine years, the Supreme Court has three times recognized that "victims of a constitutional violation by a federal agent have a right to recover damages against the

5

official in federal court despite the absence of any statute conferring such a right." *Carlson v. Green*, 446 U.S. 14, 18 (1980); *see Bivens*, 403 U.S. at 397; *Davis v. Passman*, 442 U.S. 228 (1979). Those three cases permitted claims for damages under the Fourth Amendment for an alleged violation of the prohibition against unreasonable searches and seizures, *see Bivens*, 403 U.S. at 389, under the Fifth Amendment for alleged sex discrimination by a Congressman, *see Davis*, 442 U.S. at 231, 248, and under the Eighth Amendment for an alleged violation of the prohibition against cruel and unusual punishment, *see Carlson*, 446 U.S. at 17–18. Such "authority to imply a new constitutional tort, not expressly authorized by statute, is anchored in our general jurisdiction to decide all cases 'arising under the Constitution, laws, or treaties of the United States.'" *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (quoting 28 U.S.C. § 1331). In the forty years following those three decisions, however, the Supreme Court has not recognized a new *Bivens* claim. *See Egbert v. Boule*, 142 S. Ct. 1793, 1799 (2022). While *Bivens* and its progeny have not been overruled and claims for damages arising under the Constitution remain available in some circumstances*,* the Supreme Court has recognized that creating implied causes of action under *Bivens* is "a disfavored judicial activity." *Id.* at 1803 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)).

The Supreme Court has set out a two-part test to determine whether to permit a *Bivens* claim. First, courts must ask if the claim arises in a "new context" from the three previous *Bivens* claims recognized by the Supreme Court. *Id.* at 1803. If the context is not new, the claim can go forward. But if the context is new, courts move to the second step and ask whether, absent any "affirmative action by Congress," there are any "special factors counselling hesitation" against extending *Bivens* to that context. *Ziglar*, 582 U.S. at 136 (quoting *Carlson*, 446 U.S. at 18). "If there is even a single 'reason to pause before applying

6

*Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Egbert*, 142 S. Ct. at 1803 (quoting *Hernández v. Mesa*, 140 S. Ct. 735, 743 (2020)). The guiding principle behind the inquiry is respect for the separation of powers and deference to Congress's preeminent role as the legislative body. *See Egbert*, 142 S. Ct. at 1803; *see also Ziglar*, 582 U.S. at 135–36.

Appellants' primary argument focuses on Congress's enactment of the Westfall Act of 1988, which requires that the United States be substituted as the defendant in all tort claims against employees of the federal government acting in their official capacities. *See* 28 U.S.C. § 2679(b)(1); *see also id.* § 1346(b)(1). Notably, however, the Act carves out an exception for, and thus preserves the availability of, "civil action[s] against an employee of the Government . . . which [are] brought for a violation of the Constitution of the United States." *Id.* § 2679(b)(2)(A). In other words, the Westfall Act "left *Bivens* where it found it." *Hernández*, 140 S. Ct. at 748 n.9.

Appellants invoke the prior construction canon, arguing that the Westfall Act "left *Bivens*" as it had been interpreted by the Supreme Court and in notable Courts of Appeals decisions prior to 1988. Specifically, Appellants rely on this Court's 1977 decision in *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), in which we affirmed the availability of a *Bivens* remedy for alleged First Amendment violations and upheld defendants' liability under *Bivens* after individuals protesting the Vietnam War had been arrested on the steps of the Capitol, *id.* at 173–74, 194–96. Appellants argue that because Congress was presumably aware of that decision, by passing the Westfall Act and "le[aving] *Bivens* where it found it," *Hernández*, 140 S. Ct. at 748 n.9, Congress affirmatively endorsed *Dellums* and the availability of *Bivens* remedies in analogous circumstances.

7

And because, definitionally, there can be no "special factors counselling hesitation in the absence of affirmative action by Congress," *Ziglar*, 582 U.S. at 136 (quoting *Carlson*, 446 U.S. at 18), where Congress *has* affirmatively acted, Appellants further argue that their own analogous *Bivens* claims—also based on alleged First and Fourth Amendment violations, in addition to an alleged Fifth Amendment violation, arising from a protest outside the seat of a branch of government—must be allowed to proceed.

Appellants may be hoist with their own petard; if Congress is aware of and incorporates prior court decisions, then Congress also should have been aware of the Supreme Court's admonition against expanding the range of the *Bivens* remedy, as recognized by Supreme Court precedent at the time. *Cf. Bush v. Lucas*, 462 U.S. 367, 390 (1983) (declining to extend *Bivens* beyond circumstances recognized in prior Supreme Court cases); *Chappell v. Wallace*, 462 U.S. 296 (1983) (same); *United States v. Stanley*, 483 U.S. 669 (1987) (same). As Supreme Court precedent makes clear, any new *Bivens* claim must still "satisf[y] the 'analytic framework' prescribed by the last four decades of intervening case law." *Egbert*, 142 S. Ct. at 1809 (quoting *Ziglar*, 582 U.S. at 139); *cf. Hernández*, 140 S. Ct. at 748 n.9 ("[The Westfall Act's exception for *Bivens* claims] is not a license to create a new *Bivens* remedy in a context [the Supreme Court] ha[s] never before addressed." (citation omitted)); *Meshal v. Higgenbotham*, 804 F.3d 417, 428 (D.C. Cir. 2015) ("[U]ncertain interpretations of what Congress did in . . . 1988 cannot overcome the weight of authority against expanding *Bivens*.").

Turning then to that framework, we hold that Appellants' claims arise in a new context and that national security is a special factor counselling hesitation against extending *Bivens* to that context. First, neither party contends that these claims

8

do not arise in a new context, and for good reason. What constitutes a "new context" is exceedingly broad. "If the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court, then the context is new." *Ziglar*, 582 U.S. at 139. Examples of meaningful differences include "the rank of the officers involved[,] the constitutional right at issue," and "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Id.* at 139–40. Appellants' First, Fourth, and Fifth Amendment claims satisfy this test. The Supreme Court has never recognized the availability of *Bivens* claims for First Amendment violations. *See Egbert*, 142 S. Ct. at 1807 ("[W]e have never held that *Bivens* extends to First Amendment claims." (citation omitted)); *Bush*, 462 U.S. at 390. Appellants' Fourth and Fifth Amendment claims likewise arise in a new context because the clearing of protestors from a public park by federal law enforcement officers is notably different from an unlawful search and arrest by federal narcotics officers, *see Bivens*, 403 U.S. at 389–90, and from sex discrimination by a Congressman, *see Davis*, 442 U.S. at 231.

Claims that arise in a new context are not necessarily precluded, however, so long as there are no "special factors counselling hesitation" against extending *Bivens* to that context. *Ziglar*, 582 U.S. at 136 (quoting *Carlson*, 446 U.S. at 18). As with the "new context" test, what constitutes a "special factor" is interpreted broadly. *See Egbert*, 142 S. Ct. at 1805 ("A court inevitably will 'impair' governmental interests, and thereby frustrate Congress' policymaking role, if it applies the "'special factors" analysis' at such a narrow 'level of generality.'" (alterations omitted) (quoting *Stanley*, 483 U.S. at 681)). Where there is even the "potential" that "'judicial intrusion' into a given field might be 'harmful' or 'inappropriate,'" courts cannot permit *Bivens* claims to

9

proceed.  *Id.* at 1805 (emphasis omitted) (quoting *Stanley*, 483 U.S. at 681).

As the Supreme Court has made clear in recent years, "a *Bivens* cause of action may not lie where . . . national security is at issue." *Egbert*, 142 S. Ct. at 1805; *see Hernández*, 140 S. Ct. at 746–47.  Appellees argue that national security concerns regarding the safety of the President and the area surrounding the White House justify finding a special factor in this case. Appellants rely on their well-pleaded allegation that "the law-abiding, peaceful protestors posed no threat to the President." Appellants' Opening Br. at 44.  But Appellants misunderstand the applicable standard.   Officers need not have been responding to an ongoing or imminent threat to national security to invoke national security as a special factor.  *See Hernández*, 140 S. Ct. at 746 ("The question is not whether national security *requires* such conduct . . . ." (emphasis added)).  Instead, courts ask whether they "should alter the framework established by the political branches" for handling cases with possible national security implications. *Id.*  Because "[n]ational-security policy is the prerogative of the Congress and President," the answer most often will be no.  *Ziglar*, 582 U.S. at 142.

Under any of the proffered explanations given for clearing protestors from Lafayette Park, Appellees' actions implicate national security under the Supreme Court's broad understanding of that special factor.  While we recognize that Lafayette Square is a "unique situs" for First Amendment activity, "it cannot be denied that a public gathering presents some measure of hazard to the security of the President and the White House." *Quaker Action Grp. v. Morton*, 516 F.2d 717, 725, 731 (D.C. Cir. 1975).  Given the nation's "overwhelming . . . interest in protecting the safety of its Chief Executive," *Watts v. United States*, 394 U.S. 705, 707 (1969), officers in

10

the area surrounding the White House and the President must be able to act without hesitation. But faced with "[t]he risk of personal damages liability," officers are more likely "to second-guess difficult but necessary decisions concerning national-security policy," *Ziglar*, 582 U.S. at 142, including decisions regarding presidential and White House security. Because "regulating the conduct of [law enforcement officers near the White House] unquestionably has national security implications, the risk of undermining [presidential and White House] security provides reason to hesitate before extending *Bivens* into this field." *Hernández*, 140 S. Ct. at 747.

Appellants caution that such a ruling creates a "Constitution-free zone" by precluding *Bivens* claims for any constitutional violation occurring in Lafayette Square due to its sensitive location, Appellants' Opening Br. at 45, and treats national security as a "talisman used to ward off inconvenient claims," *Ziglar*, 582 U.S. at 143. Without purporting to decide the availability of any *Bivens* claim arising from events in Lafayette Park under other circumstances, we note that to the extent Appellants' fears come to fruition, it is a result of heeding the Supreme Court's admonition to "ask 'more broadly' if there is any reason to think that 'judicial intrusion' into a given *field* might be 'harmful' or 'inappropriate.'" *Egbert*, 142 S. Ct. at 1805 (alteration omitted) (quoting *Stanley*, 483 U.S. at 681) (emphasis added). Finally, it bears mention that First Amendment activity in Lafayette Park remains constitutionally protected. We decide only the availability of damages, not the existence of a constitutional violation. To the extent damages under a federal cause of action are necessary for full enjoyment of that constitutional right, such endorsement must come from the Supreme Court or from Congress.

11

Because the presence of one special factor is sufficient to preclude the availability of a *Bivens* remedy, we do not reach Appellees' other special factors arguments regarding the availability of alternative remedies, congressional involvement in the intersection between presidential security and protestors' rights, the political branches' activity in investigating the events underlying Appellants' claims, and the risk that discovery might expose "sensitive Executive Branch communications between high-ranking officials."   Gov't Appellees' Br. at 24–25; *see Egbert*, 142 S. Ct. at 1803 ("'Even a single sound reason to defer to Congress' is enough to require a court to refrain from creating such a remedy." (alteration omitted) (quoting *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1937 (2021))).

## III.    Conclusion

Mindful of our obligation to faithfully apply Supreme Court precedent and avoid arrogating legislative power, we affirm.

WILKINS, *Circuit Judge*, concurring:  I join the majority opinion in full.  Supreme Court precedent requires us to affirm the District Court's dismissal of Appellants' *Bivens* claims.  As our opinion explains, those claims arise in a "new context," and the "special factor" of national security precludes us from extending *Bivens* to that new context.  I write separately because in my view, applying that precedent here would seem to undermine the very separation-of-powers concerns that underlie modern *Bivens* doctrine in the first place.

The Supreme Court has long "presume[d] that Congress[,]" when it legislates, is "thoroughly familiar with . . . unusually important precedents" from not only the Supreme Court but also the Courts of Appeals.  *Cannon v. Univ. of Chi.*, 441 U.S. 677, 698–99 & n. 23 (1979).  Examples abound across a wide range of statutory contexts.  For instance, in construing the Copyright Act's safe-harbor provision, the Court recently found "no indication that Congress intended to alter" a similar rule established by prior lower court decisions.  *Unicolors, Inc. v. H&M Hennes & Mauritz, LP*, 142 S. Ct. 941, 947–48 (2022) ("When Congress codifies a judicially defined concept, it is presumed, absent an express statement to the contrary, that Congress intended to adopt the interpretation placed on that concept by the courts." (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 813 (1989)).  Similarly, in interpreting the scope of a judicial review provision of the Immigration and Nationality Act, the Court "assume[d] that Congress" was "aware" of "lower court precedent" regarding the scope of habeas review and intended its enactment to conform with that view.  *Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1072 (2020).  When Congress amended a provision of the Bankruptcy Code, the Court subsequently reasoned that Congress was "presumptively . . . aware" of prior lower court opinions interpreting the same phrase and that Congress therefore "intended it to retain its established meaning." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 & n.3 (2018).  The Court has made the same presumption in

2

interpreting Title VII, *see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 & n.8 (1975), Title IX, *see Cannon*, 441 U.S. at 698 n.23, the Americans with Disabilities Act, *see Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978), and the National Labor Relations Act, *see NLRB v. Gullett Gin Co.*, 340 U.S. 361, 365–66 (1951).  This presumption holds for not only civil but also criminal statutes, *see Abuelhawa v. United States*, 556 U.S. 816 (2009), and equally when Congress does *not* act, *i.e.*, when it "retain[s] . . . statutory text" that has been construed by the Courts of Appeals.  *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. 519, 535–37 (2015).

Applying that rule here, Congress was presumably aware of our decision in *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), when it enacted the Westfall Act in 1988, which preserved a damages remedy against individual federal officers for constitutional violations.  Pub. L. No. 100-694, § 5, 102 Stat. 4563 (1988) (codified at 28 U.S.C. § 2679(b)(2)(A)).  By any measure, *Dellums* was an "unusually important precedent[.]"  *Cannon*, 441 U.S. at 699.  The events giving rise to *Dellums* had garnered nationwide media attention, and we held for the first time that a *Bivens* remedy was available for certain First Amendment violations.  Not only that, the "presumption is particularly appropriate here" because of the unique nexus between the facts and parties of that case and Congress itself.  *Lorillard*, 434 U.S. at 581.  The lead plaintiff in *Dellums* was a member of Congress, the case arose from mass arrests during a nationally prominent protest on the steps of the Capitol, and members of both the House and Senate made floor remarks regarding the events of that day.  *See* Bipartisan Former Members of Cong. *Amicus* Br. 21–23 & n.15 (collecting statements of members of Congress).

If we are also to presume, in the words of the Supreme Court, that the Westfall Act "left *Bivens* where it found it" in

3

1988, *Hernandez v. Mesa*, 140 S. Ct. 735, 748 n.9 (2020), then Congress must have intended to leave *Dellums v. Powell* where it found it—that is, as good law. There is no compelling reason to conclude otherwise. The Supreme Court denied *certiorari* in *Dellums*, *see* 438 U.S. 916 (1978), and no decision prior to 1988, either of that Court or our court, cast doubt on *Dellums's* validity.[1] To be sure, and as the majority opinion acknowledges, by 1988 the Court had declined several times to expand the range of the *Bivens* remedy "beyond circumstances recognized in prior Supreme Court cases." Maj. Op. 7. But that does not undermine the key point. Declining to discuss important lower court precedent is not the same as calling that precedent into question or *sub silentio* overruling it. More importantly, it is even more unclear that *Congress* would have understood any of the Court's pre-1988 cases to have that effect, that is, to render wholly irrelevant all existing lower court *Bivens* precedent. In other words, a few cases in which the Court exercised caution before extending *Bivens* to new contexts cannot overcome the strong and well-settled presumption that Congress was aware of a case like *Dellums*.

Thus, deferring to Congress—as the Supreme Court has repeatedly urged courts to do in deciding the viability of *Bivens* claims—would counsel strongly in favor of recognizing such

---

[1] In 1983, the Supreme Court declined to find available a *Bivens* remedy for a First Amendment retaliation claim brought by a federal civil service employee. *Bush v. Lucas*, 462 U.S. 367 (1983). In reaching that conclusion, the Court observed that Congress had already created "an elaborate remedial system . . . with careful attention to conflicting policy considerations," to address such claims. *Id.* at 388. It saw no need to supplement that "comprehensive" scheme of existing statutory remedies with a judge-made one. *Id.* at 388–90. In contrast, no such remedial system existed that would have offered the *Dellums* plaintiffs alternative relief. Thus, *Bush v. Lucas* did not call into question *Dellums*.

4

claims in cases analogous to *Dellums*. *See Egbert v. Boule*, 142 S. Ct. 1793, 1802–04 (2022) ("[T]he most important question is who should decide whether to provide for a damages remedy, Congress or the courts? . . . If there is a rational reason to think that the answer is 'Congress'—as it will be in most every case, . . . no *Bivens* action may lie." (internal quotations and citations omitted)); *Hernandez*, 140 S. Ct. at 750; *Ziglar v. Abbasi*, 582 U.S. 120, 135–36 (2017). As Appellants and the former members of Congress *amici* argue, it is hard to imagine a case more analogous to *Dellums* than this one. The following describes equally both cases: Plaintiffs allege that federal officers used violence to clear a peaceful protest in a quintessential public forum for political speech in our nation's capital, for viewpoint-discriminatory reasons.

The problem for Appellants with this line of reasoning is that the Supreme Court's "new context" test renders irrelevant all pre-1988 lower court decisions recognizing *Bivens* claims, including *Dellums*. The "new context" inquiry considers only prior Supreme Court—not lower court—precedent. *Egbert*, 142 S. Ct. at 1803; *Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020) ("[T]he new-context analysis may consider only Supreme Court decisions . . ."). In turn, courts may not "justify a *Bivens* extension based on parallel circumstances" with pre-1988 cases. *Egbert*, 142 S. Ct. at 1809 (internal quotations omitted). We must follow that precedent. I simply observe that here, that precedent "is in tension with the Court's insistence that 'prescribing a cause of action is a job for Congress, not the courts.'" *See Egbert*, 142 S. Ct. at 1823 (Sotomayor, J., concurring in the judgment in part and dissenting in part) (quoting majority opinion).

WALKER, *Circuit Judge*, concurring:

Protesters say federal officers violated their constitutional rights by forcibly dispersing a demonstration outside the White House. So they sued for damages, claiming that the Constitution gives them permission to bring their suit. *See Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

But as the Court's opinion explains, the protesters' claims do not fit any recognized cause of action under the Constitution. And gone are the days when federal courts could invent new remedies to redress the protesters' injuries. *See Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022).

Yet that does not mean the protesters have no way to recover. For most of our history, those injured by federal officers' unconstitutional conduct could sue for damages in state court. The Framers saw state common-law suits as an important check on federal misconduct.

Some have assumed that those suits are now precluded by the Westfall Act. It bars many "civil action[s] . . . for money damages" filed to redress "injury or loss . . . resulting from" federal officers' conduct. 28 U.S.C. § 2679(b)(1). But it also has an exception. It does *not* bar "a civil action . . . brought for a violation of the Constitution of the United States." *Id.* § 2679(b)(2)(A).

That exception might preserve state tort suits "brought" to remedy constitutional injuries. Reading the Act that way accords with Founding-era principles of officer accountability and closes the remedial gap left by today's narrow approach to remedies under the Constitution — ensuring relief for those unconstitutionally injured by federal officers.

2

## I. Tort Suits Against Federal Officers Today

Tort suits against federal officers are channeled through the Federal Tort Claims Act. 28 U.S.C. § 2679. That's because another statute — the Westfall Act — makes the FTCA "the exclusive remedy for most claims against [federal] employees arising out of their official conduct." *Hui v. Castaneda*, 559 U.S. 799, 806-07 (2010) (citing 28 U.S.C. § 2679(b)(1)). So tort victims generally cannot sue federal officers personally under state law. *Id.*

But the FTCA's remedies are limited. It puts procedural and substantive limits on claims that would otherwise be available under state law. *See, e.g.*, *id.* §§ 2675(a) (claims must first be "denied by [an] agency in writing" before a plaintiff can sue under the FTCA), 2680 (listing substantive exceptions). That leaves some victims of officers' unconstitutional conduct without compensation.

To illustrate how restrictive the FTCA can be, consider an example. A federal prosecutor maliciously prosecutes a plaintiff, forcing him to defend against made-up charges. *See Thompson v. Clark*, 142 S. Ct. 1332 (2022) (Fourth Amendment protects against malicious prosecution). Can the plaintiff sue for damages under the FTCA? Probably not. He can't bring a claim directly for the constitutional violation "because constitutional claims are not cognizable under the FTCA." *Harper v. Williford*, 96 F.3d 1526, 1528 (D.C. Cir. 1996). And even if he repackages his claim as a state-law suit, that avenue isn't available either. *See* 28 U.S.C. § 2680(h) (barring claims

3

for most intentional torts, including "malicious prosecution"); *Moore v. United States*, 213 F.3d 705, 710 (D.C. Cir. 2000).[1]

The upshot is that the FTCA leaves some plaintiffs with no remedy — even plaintiffs who have been intentionally and unconstitutionally harmed by federal officers. *See Byrd v. Lamb*, 990 F.3d 879, 883 n.8 (5th Cir. 2021) (Willett, J., concurring) ("For victims" of excessive force, the FTCA "offers no protection at all.").

That gap was temporarily filled, in part, by *Bivens* suits — damages actions implied under the Constitution. But the modern Supreme Court has all-but removed that option. Since 1980, the Court has refused to expand *Bivens* beyond three narrow contexts. *See Egbert v. Boule*, 142 S. Ct. 1793, 1802 (2022) (describing those contexts); Maj. Op. 4-5 (same). Over and over again, the Court has said judges should not extend *Bivens* when "there is *any* reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803 (emphasis added).

---

[1] True, the FTCA allows some intentional-tort claims to proceed against "investigative or law enforcement officers." 28 U.S.C. § 2680(h). But that exception is narrow. Only claims for "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" are allowed. *Id.* And even then, the suit must be against an "investigative or law enforcement officer," excluding many federal tortfeasors. *See, e.g.*, *Moore*, 213 F.3d at 710 (prosecutors not covered); *Wilson v. United States*, 959 F.2d 12, 15 (2d Cir. 1992) (parole officers not covered); *Solomon v. United States*, 559 F.2d 309, 310 (5th Cir. 1977) (some security employees not covered); *see also Pellegrino v. TSA*, 937 F.3d 164, 170-81 (3d Cir. 2019) (allowing claim against TSA employees to proceed, but articulating a convoluted test).

4

That may mean that we should *never* extend *Bivens*. "[C]reating a cause of action is a legislative endeavor" that requires "evaluat[ing] a range of policy considerations." *Id.* at 1802 (cleaned up). So "in most every case," Congress is "far more competent" to decide whether to create a new cause of action. *Id.* at 1803 (cleaned up); *see also id.* at 1810 (Gorsuch, J., concurring).

Does that leave today's Plaintiffs with no remedy for federal officers' allegedly unconstitutional conduct? They say it does. I'm not so sure. For most of our history, state tort suits were the primary mechanism for holding federal officers accountable. And an overlooked exception to the Westfall Act may allow some of those suits to proceed today.

## II. Remedies Against Federal Officers at the Founding

At the Founding, constitutional claims against federal officials were litigated in state tort suits. *Hernandez v. Mesa*, 140 S. Ct. 735, 751 (2020) (Thomas, J., concurring). In those suits, "[t]he ultimate issue before the court concerned the federal Constitution," but the cause of action was supplied by state law. Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1506 (1987).

Those suits would proceed in three steps:

- Imagine a federal officer unlawfully searches a house. To get damages, the owner would file a state-law trespass suit against the officer.

- As a defense, the officer would argue that his actions were authorized by a federal statute, a warrant, or a command from a superior officer.

5

- To defeat that defense, the owner would argue that
  any purported federal authorization was unconstitu-
  tional.[2]

*Little v. Barreme* is a good example. 6 U.S. (2 Cranch)
170 (1804). Following instructions from President Adams to
seize ships going to or coming from French ports, a U.S. Navy
captain captured a Danish ship. *Id.* at 176-78. The owner sued
in trespass. The Supreme Court held that the captain was liable
because the President's instructions were not authorized by
statute. *Id.* at 179. Because the instructions were invalid, they
could not "legalize an act" that was otherwise "a plain tres-
pass." *Id.*; *see also Solcum v. Mayberry*, 15 U.S. (2 Wheat) 1,
10 (1817) ("if the seizure be finally adjudged wrongful, and
without reasonable cause, [the victim] may proceed, at his elec-
tion, by a suit at common law . . . for damages for the illegal
act").

The ratification debates suggest that the Framers thought
state tort suits would be an important check against federal mis-
conduct. In North Carolina, Archibald Maclaine said a citizen
"would have redress in the ordinary courts of common law"
after a federal "deput[y]" followed the President's unlawful in-
structions and "distressed" the citizen. 4 Jonathan Elliot, *The
Debates in the Several State Conventions on the Adoption of
the Federal Constitution*, 47 (2d ed. 1836). And Richard
Dobbs Spaight agreed that "it was very certain and clear that,

---

[2] *See Mitchell v. Harmony*, 54 U.S. (13 How.) 115 (1851); *Wise v.
Withers*, 7 U.S. (3 Cranch) 331 (1806); *Wheeldin v. Wheeler*, 373
U.S. 647, 652 (1963) ("When it comes to suits for damages for abuse
of power, federal officials are usually governed by local law. Federal
law, however, supplies the defense"); Alfred Hill, *Constitutional
Remedies*, 69 Colum. L. Rev. 1109, 1128-29 n.89 (1969) (collecting
cases).

6

if any man [i]s injured by an officer of the United States, he could get redress by a suit at law." *Id.* at 36-37.  Relying on state causes of action to hold federal officers accountable put an important structural check on federal power.  State courts would have a strong incentive to zealously enforce state law, guarding against federal overreach.

Reflecting that approach, the First Congress understood "that under the new federal system, litigants would . . . be able to file common-law claims against federal officials for wrongdoing in the course of their duties."  Jennifer Mascott, *The Ratifiers' Theory of Officer Accountability*, 29 (forthcoming), https://perma.cc/AS4U-56WA.  So when Congress passed the First Judiciary Act, it required federal marshals to assume personal liability for the misdeeds of their deputies by posing "sureties . . . in the sum of twenty thousand dollars," while leaving deputies' liability to state law.  Judiciary Act of 1789, § 27, 1 Stat. 73, 87.

Using tort suits to hold executive officers accountable was a model borrowed from England.  In two famous unlawful-search cases, the English courts held Crown officials liable for trespass, awarding the plaintiffs damages.  *Wilkes v. Wood* (1763) 98 Eng. Rep. 489; *Entick v. Carrington* (1765) 95 Eng. Rep. 807.  Those cases are important today because they "profoundly influenced" the drafting of the Fourth Amendment.  *City of West Covina v. Perkins*, 525 U.S. 234, 247 (1999) (Thomas, J., concurring).

That background may explain why the Bill of Rights did not contain an express cause of action.  The Framers likely expected our newly guaranteed rights to be secured by old common-law actions.  Federal officers would not be *above* the law because they would be *subject* to the same common law as private citizens.  Amar, *supra* at 1507 (the Bill of Rights

presupposed "a general backdrop of private law" causes of action to vindicate "primary rights of personal property and bodily liberty").[3]

## III. The Westfall Act's Constitutional-Tort Exception

If federal officers had been above the law at the Founding, the new rights won at Yorktown and guaranteed by the Bill of Rights would have been significantly declawed. For that reason, some judges and scholars have said prohibiting all damages actions against federal officers might be a constitutional problem today.[4]  But those concerns may be premature.  It's

---

[3] It's not surprising that the Constitution silently assumed the availability of state common-law actions.  The Framers also assumed the continued existence of other long-standing features of the legal landscape.  Take sovereign immunity.  Until the Eleventh Amendment, the Constitution didn't say a word about it.  But state immunity from suit was part of the "plan of the Convention" — that is, implicit in "the structure of the original Constitution itself." *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2258 (2021) (cleaned up).  The same is probably true of state tort actions against federal officers.

[4] *See, e.g.*, *Byrd v. Lamb*, 990 F.3d 879, 883-84 (5th Cir. 2021) (Willett, J., concurring) (it would raise "serious constitutional concerns" to "slam[ ] shut" the "courthouse doors" on "victims of unconstitutional conduct"); Brief of Professor Jennifer L. Mascott as Amicus Curiae in Support of Petitioner at 28-29, *Egbert v. Boule*, 142 S. Ct. 1793 (2022) (noting but not endorsing the view that "*some* remedy" might be "constitutionally necessary to address government official actions taken without any lawful scope of authority"); William Baude, *Bivens Liability and Its Alternatives*, Summary, Judgment (Feb. 27, 2020) ("It does seem perverse to think that Congress can eliminate state law damages for constitutional violations without either Congress or the courts providing an alternative."), https://perma.cc/BL77-3JSU.  I take no position on whether those scholars and judges are correct that removing all damages remedies against federal officers would violate the Constitution.

8

possible that a careful reading of the Westfall Act avoids any constitutional problem by preserving state tort suits against federal officers for constitutional violations.

Recall that the Westfall Act generally prohibits tort victims from bringing state tort suits against federal officers, forcing victims instead to pursue the limited remedies in the FTCA. 28 U.S.C. § 2679(b)(1).  But the Westfall Act does not preclude "a civil action . . . brought for a violation of the Constitution of the United States."  *Id.* at (b)(2)(A).  Though overlooked, that exception may allow state tort suits "brought for" constitutional violations to proceed.

On a broad reading of the exception, a suit might count as "brought for a violation of the Constitution" if its *purpose* is to remedy a constitutional violation.  For instance, a state trespass suit could proceed if its goal was to remedy an unconstitutional search.  That interpretation arguably tracks the ordinary meaning of the phrase "brought for."  Courts have long used it to describe the goal of a suit, not the cause of action.  *See, e.g.*, *Escanaba & Lake Michigan Transportation Co. v. City of Chicago*, 107 U.S. 678, 684 (1883) (describing a suit as "brought for damages"); *see also* Carlos M. Vázquez & Stephen I. Vladeck, *State Law, the Westfall Act, and the Nature of the Bivens Question*, 161 U. Pa. L. Rev. 509, 570-77 (2013) (proposing a similar interpretation).

Even if that reading is too broad, the exception may *still* allow some suits to proceed.  On a narrower reading, a suit might count as "brought for a violation of the Constitution" if a constitutional violation is part of the plaintiff's cause of action.  Though that reading would preclude most state tort suits — a constitutional violation is not part of a trespass action, for example — some suits might still fit the bill.  In many states plaintiffs can file an "action on the statute," alleging a

9

"cause of action in tort resulting from activity in violation of a legislatively created duty or standard." Vázquez & Vladeck, *supra* at 538-39 (cleaned up). A plaintiff might use that cause of action to allege that a federal officer violated the Constitution. And if current state laws do not meet the exception, nothing would stop a state from creating a new cause of action allowing plaintiffs to directly allege federal constitutional violations. *See* Akhil Reed Amar, *Using State Law to Protect Federal Constitutional Rights: Some Questions and Answers About Converse-1983*, 64 U. Colo. L. Rev. 159, 160 (1993); *see also* Thomas Koenig & Christopher D. Moore, *Of State Remedies and Federal Rights*, 36 (forthcoming), https://perma.cc/6LH6-6TM2 ("the text of the Westfall Act counsels in favor of reading" the constitutional-tort exception "to extend to *state* civil actions brought for federal constitutional violations").

    True, until now, the Westfall Act's constitutional-tort exception has been read more narrowly than that. The Supreme Court has said the exception "simply left *Bivens* where it found it," ensuring that *Bivens* actions weren't precluded by the Westfall Act. *Hernandez v. Mesa*, 140 S. Ct. 735, 748 n.9 (2020). But that does not foreclose the possibility that the Act could *also* let some state tort suits proceed.[5]

_____

[5] *Minneci v. Pollard* might be read to go further. 565 U.S. 118, 126 (2012). It explained that there was a need for a *Bivens* remedy against federal prison guards, but no need for one against private guards operating a federal prison. That's because state tort actions are generally available "against employees of a private firm," but are generally barred by the FTCA "against employees of the Federal Government." *Id.*

    Some have read that statement to foreclose interpreting the Westfall Act to allow state tort suits. James E. Pfander & David P. Baltmanis, *W(h)ither Bivens?*, 161 U. Pa. L. Rev. Online 231, 243 (2013). But that may read *Pollard* for more than it's worth. For one

10

Plus, reading the exception as a good-for-*Bivens*-only rule is in tension with the statutory text and context. From the Founding until the 1970s, state suits were *the* primary regime for holding federal officers accountable for constitutional violations.[6] So we might expect exceptionally clear language if Congress had wanted to abrogate that regime. Instead, we find statutory text tailored to *preserve* it: The Act does not cover suits "brought for a violation of the Constitution." 28 U.S.C. § 2679(b)(2)(A); *see also Meshal v. Higgenbotham*, 804 F.3d 417, 428 (D.C. Cir. 2015) (noting that Congress tried to ensure the Westfall Act would not leave victims of constitutional torts remediless). If Congress had meant to limit that exception to *Bivens* suits, it might have said "suits *arising under* the Constitution," not suits "*brought for*" constitutional violations. *See Davis v. Passman*, 442 U.S. 228, 229-30 (1979) (describing *Bivens* suits as "aris[ing] under the Constitution").

Finally, the Westfall Act's historical context provides no clear evidence that Congress wished to upset the long tradition

---

thing, the Court's fleeting remark about the Westfall Act gave little attention to its text. For another, in at least one post-Westfall-Act case, the Court reached a different conclusion. In *Wilkie v. Robbins*, the Court suggested that a tort victim didn't need a *Bivens* remedy because under state law he "had a civil remedy in damages for trespass" against offending federal officials. 551 U.S. 537, 551 (2007). For that statement to be correct, the Westfall Act must not preclude state tort suits brought for constitutional violations.

[6] For proof that state tort suits were used to remedy constitutional violations until the 1970s, look no further than the Solicitor General's Brief in *Bivens*. There, the government assured the Court that there was no need to create a new federal remedy for Fourth Amendment violations, because "a body of state law" already provided "substantial recovery." Brief for the United States at 38, *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).

11

of using state tort actions to police constitutional violations. The Act abrogated *Westfall v. Erwin*, 484 U.S. 292, 297-98 (1988). There, the Supreme Court refused to grant federal employees' absolute immunity from state tort suits. Because that decision "eroded the common law tort immunity previously available to Federal employees," Congress passed the Westfall Act to funnel future tort claims through the FTCA. Westfall Act, Pub. L. No. 100-694, § 2(a)(4), 102 Stat. 4563 (1988). But *Westfall* did not concern a suit brought for a constitutional violation. And Congress enacted an express exception to carve out such suits.

\*     \*     \*

I'm not certain whether the Westfall Act is best read to allow state tort suits for constitutional injuries. But that reading finds support in the text of the statute, accords with Founding-era principles of officer accountability, and closes a remedial gap — ensuring relief for those injured by federal officers' unconstitutional conduct. For those reasons, I hope the Act gets close attention in an appropriate case.

*If* the Westfall Act does not preclude state tort suits against federal officers for constitutional violations, the protesters in this case may yet seek a remedy. They allege that federal officers violated the Fourth Amendment by using "excessive force" against them. JA 173. DC law provides a cause of action for tortious assault and battery. *See District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003). The protesters could thus file a tort action, claiming assault and battery, to recover damages for the alleged Fourth Amendment violation.

But the protesters did not file those claims in this case. And I agree with the Court that their *Bivens* claims fail.