ORAL ARGUMENT NOT YET SCHEDULED

Nos. 22-5133 & 22-5139

_____

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**Radiya BUCHANAN**, *et al.*, *Plaintiffs-Appellants*,

v.

**William P. BARR**, *et al.*, *Defendants-Appellees*.

_____

**BLACK LIVES MATTER D.C.**, *et al.*, *Plaintiffs-Appellants*,

v.

**William P. BARR**, *et al.*, *Defendants-Appellees*.

_____

Consolidated Appeals from the U.S. District Court for the District of Columbia
(Nos. 1:20-cv-1469 & 1:20-cv-1542)

_____

## OPENING BRIEF FOR APPELLANTS

Orin Snyder
Anne Champion
Katherine Marquart
Lee R. Crain
Nathan Eagan
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Tel.: 212.351.4000
achampion@gibsondunn.com
lcrain@gibsondunn.com

*Counsel for Plaintiffs-Appellants*
*in Buchanan v. Barr, No. 22-5133*

Scott Michelman
Arthur B. Spitzer
Michael Perloff
AMERICAN CIVIL LIBERTIES UNION
FOUND. OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel.: 202.601.4267
smichelman@acludc.org

*Counsel for Plaintiffs-Appellants*
*in Black Lives Matter D.C. v. Barr,*
*No. 22-5139*

*(counsel listing continues)*

Greta B. Williams
Matthew Guice Aiken
Tessa Gellerson
Austin M. Donohue
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel.: 202.955.8500
gbwilliams@gibsondunn.com

*Further Counsel for Plaintiffs-
Appellants in Buchanan v. Barr, No.
22-5133*

Kaitlin Banner
Dennis Corkery
Jonathan M. Smith
WASHINGTON LAWYERS' COMM. FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, D.C. 20005
Tel.: 202.319.1000
kaitlin_banner@washlaw.org

Jon Greenbaum
Arthur Ago
David Brody
Arusha Gordon
LAWYERS' COMM. FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Tel.: 202.662.8600
jgreenbaum@lawyerscommittee.org

John A. Freedman
David E. Kouba
Sonia Tabriz
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, D.C. 20004
Tel.: 202.942.5000
John.Freedman@arnoldporter.com

*Further Counsel for Plaintiffs-
Appellants in Black Lives Matter D.C.
v. Barr, No. 22-5139*

November 23, 2022

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A. Parties and Amici

The parties before the district court and this Court in this appeal are:

*Plaintiffs-Appellants*: Black Lives Matter D.C.; Toni Sanders; J.N.C.; Kishon McDonald; Garrett Bond; Keara Scallan; Lia Poteet; Dustin Foley; Radiya Buchanan, Ann Dagrin, Lindsay Field, and E.X.F. (The Corporate Disclosure Statement for Plaintiff-Appellant Black Lives Matter D.C. appears below at page iii.)

*Defendants-Appellees*: William P. Barr; Mark Adamchik; Jonathan Daniels; Sean Cox; Luis Feliciano; Jeffrey Hendrickson; Nicholas Jarmuzewski; Bryan McDonald; Cara Seiberling; Lawrence Sinacore; Thomas LoCascio; Gregory T. Monahan, Russell Fennelly, Sean Kellenberger and John and Jane Does 1-50.

Additional parties before the district court in this matter are or were:

*Defendants named in the operative complaints who have been dismissed*: Donald J. Trump; Mark Esper; Gregory T. Monahan; James M. Murray; William J. Walker; Michael Carvajal; Peter Newsham, and Wayne Vincent.

*Defendants against whom live claims remain*: Jeffery Carroll, Anthony Alioto, Jeffrey Buchanan, Timothy Hargrove, Christopher Meyer, Clifton Murphy, Tiffany Payne, Justin Taylor, Daniel M. Thau, and Anthony A. Willis.

Amici before the district court were:

William J. Aceves; Charles Avery, Jr.; Anya Bernstein; Mary Frances Berry; Margaret Burnham; Clayborne Carson; Gregory P. Downs; Hazel Dukes; Marian Wright Edelman; Laura F. Edwards; Leitner Center For International Law & Justice, Fordham University School of Law; Wade Henderson; Judith Heumann; Dolores Huerta; International Center for Advocates Against Discrimination; International Human Rights Clinic, University of Virginia School of Law; Jesse Jackson, Sr.;

Benjamin Jealous; Martin Luther King III; Kate Masur; Marc Morial; Richard Morrisroe; James Pfander; Reporters Committee for Freedom of the Press; Robert and Helen Bernstein Institute for Human Rights, New York University School of Law; George A. Rutherglen; Ruby Sales; Carlos M. Vazquez; and Stephen I. Vladeck.

## B. Rulings Under Review

The rulings under review are the May 16, 2022, Partial Final Judgments of the U.S. District Court for the District of Columbia (Friedrich, J.), No. 1:20-cv-1469-DLF (ECF 186) and No. 1:20-cv-1542-DLF (ECF 90), and (as incorporated therein), that Court's June 21, 2021, Opinion and Order on Defendants' motions to dismiss, No. 1:20-cv-1469-DLF (ECF 159 & 160) and No. 1:20-cv-1542-DLF (ECF 68 & 69) insofar as the court granted judgment of dismissal to Defendants William P. Barr, Gregory Monahan, Mark Adamchik, Russell Fennelly, Jonathan Daniels, Sean Cox, Luis Feliciano, Jeffrey Hendrickson, Nicholas Jarmuzewski, Bryan McDonald, Cara Seiberling, Lawrence Sinacore, Thomas LoCascio, and Sean Kellenberger, against all Plaintiffs, on Claims 1 and 2 in the Plaintiffs' Third Amended Complaint, No. 1:20-cv-1469-DLF, ECF 52 and Count IV in Plaintiffs' Amended Complaint No. 1:20-cv-1542-DLF, ECF 26-2.

The opinion is reported: *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15 (D.D.C. 2021).

## C. Related Cases

These cases have not previously been before this Court.

Both of these cases also remain pending before the U.S. District Court for the District of Columbia, where they are both stayed pending the outcome of this appeal.

Counsel are aware of one additional related case pending before the U.S. District Court for the District of Columbia: *Carmer v. United States*, No. 1:22-cv-01100 (D.D.C. filed Apr. 21, 2022). Additional related cases previously pending in that Court are now closed.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and D.C. Cir. R. 26.1, appellant Black Lives Matter D.C. ("BLMDC") states that it is a District of Columbia limited liability corporation that is wholly owned by a parent corporation BLM DC, Inc., a District of Columbia nonprofit corporation organized under the District of Columbia Nonprofit Corporation Act of 2010 (D.C. Code, 2012 edition, Title 29, Chapter 4), and there is no publicly held corporation that owns 10% or more of BLMDC.

As the local chapter of the nationwide Black Lives Matter movement, BLMDC organizes against systemic racism—in particular the racially disproportionate use of state-sanctioned violence against the Black community—through protests, public accountability campaigns, coalition-building, and other programming. Members of BLMDC were in Lafayette Square on June 1, 2020—demonstrating, providing aid to demonstrators and/or monitoring law enforcement activity—when the law enforcement attack that is the subject of this lawsuit occurred.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

TABLE OF AUTHORITIES ................................................... vi

GLOSSARY .................................................................. xi

INTRODUCTION .............................................................. 1

JURISDICTION .............................................................. 5

ISSUE PRESENTED ........................................................... 5

STATEMENT OF THE CASE .................................................... 6

SUMMARY OF ARGUMENT ..................................................... 14

STANDARD OF REVIEW ...................................................... 18

ARGUMENT ................................................................. 18

I.  Congress's Affirmative Endorsement of *Bivens* As It Existed in 1988 Precludes Finding "Special Factors" Here. ....................................... 18

    A.  The two-step *Bivens* inquiry centers on respecting congressional prerogatives and effectuating congressional judgments—including Congress's decision to endorse a cause of action. ........................ 18

    B.  Congress affirmatively preserved the *Bivens* cause of action in 1988, including this Court's holding in *Dellums* ................................ 24

    C.  In light of Congress's affirmative action to preserve *Bivens*, including *Dellums*, the district court erred in dismissing the *Bivens* claims. ............... 31

II. The District Court's Special-Factors Analysis Was Erroneous. ..................... 35

    A.  D.C. Circuit precedent confirms that no special factors counsel hesitation in authorizing a *Bivens* remedy for constitutional violations during a demonstration at the seat of a branch of the federal government ............. 35

    B.  Security is not a special factor that can cut off all *Bivens* claims in Lafayette Square. .......................................................... 38

    C.  The district court's invocation of congressional silence as a special factor is counterfactual because Congress has not been silent. ..................... 45

    D.  Congress has not specified any "alternative remedies" it views as "adequate" to displace the cause of action it endorsed in 1988. ...................... 48

III. A Suit Against an Attorney General for Misconduct Personally Committed and Not Part of a Broader Policy Initiative Falls Within The *Bivens* Cause of Action Congress Endorsed in 1988. ...............................................................52

CONCLUSION .......................................................................................................54

# TABLE OF AUTHORITIES

Page(s)

## *Cases*

*A Quaker Action Grp. v. Hickel*,
421 F.2d 1111 (D.C. Cir. 1969)..........................................................40

\*A Quaker Action Grp. v. Morton*,
516 F.2d 717 (D.C. Cir. 1975)...............................................1, 39, 42

*Albernaz v. United States*,
450 U.S. 333 (1981).............................................................................26

*Alexander v. Sandoval*,
532 U.S. 275 (2001).............................................................................21

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*,
No. 22-1395 (8th Cir.) .......................................................................47

*Atl. Sounding Co., Inc. v. Townsend*,
557 U.S. 404 (2009).............................................................................26

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119 (D.C. Cir. 2015).........................................................18

*Beethoven.com LLC v. Librarian of Cong.*,
394 F.3d 939 (D.C. Cir. 2005)...........................................................27

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
403 U.S. 388 (1971)...............................................................1, 19, 35

*Bloem v. Unknown Dep't of the Interior Emps.*,
920 F. Supp. 2d 154 (D.D.C. 2013)...................................................36

*Bush v. Lucas*,
462 U.S. 367 (1983).............................................................................29

*Butz v. Economou*,
438 U.S. 478 (1978).......................................................................52, 53

*Byrd v. Lamb*,
990 F.3d 879 (5th Cir. 2021) .............................................................43

\*Cannon v. University of Chicago*,
441 U.S. 677 (1979)........................................................20, 26, 27, 28

*\*Authorities upon which we chiefly rely are marked with asterisks*

*Carlson v. Green,
  446 U.S. 14 (1980)....................................................................20, 23, 42, 46, 49

City of Mobile v. Bolden,
  446 U.S. 55 (1980)............................................................................................46

Cnty. of Sacramento v. Lewis,
  523 U.S. 833 (1998)..........................................................................................40

Corr. Servs. Corp. v. Malesko,
  534 U.S. 61 (2001)................................................................................33, 34, 50

Crawford-El v. Britton,
  523 U.S. 574 (1998)..........................................................................................54

Critical Mass Energy Project v. Nuclear Regul. Comm'n,
  975 F.2d 871 (D.C. Cir. 1992)..........................................................................36

Davis v. Mich. Dep't of Treasury,
  489 U.S. 803 (1989)..........................................................................................26

Davis v. Passman,
  442 U.S. 228 (1979)..........................................................................................52

*Dellums v. Powell,
  566 F.2d 167 (D.C. Cir. 1977)......................................................3, 29, 32, 33, 37

Edwards v. South Carolina,
  372 U.S. 229 (1963)....................................................................................19, 40

*Egbert v. Boule,
  142 S. Ct. 1793 (2022)............................. 2, 19, 22, 23, 32, 33, 34, 37, 41, 48, 49

FDIC v. Meyer,
  510 U.S. 471 (1994)....................................................................................33, 34

*Franklin v. Gwinnett County Pub. Sch.,
  503 U.S. 60 (1992)..........................................................................20, 21, 23, 31, 46

Gillespie v. Civiletti,
  629 F.2d 637 (9th Cir. 1980) ............................................................................29

Gomez-Perez v. Potter,
  553 U.S. 474 (2008)..........................................................................................26

Hartley v. Wilfert,
  918 F. Supp. 2d 45 (D.D.C. 2013)...............................................................36, 37

*Hernandez v. Mesa,
  140 S. Ct. 735 (2020)................................. 2, 20, 22, 24, 25, 31, 33, 37

*Hobson v. Wilson*,
    737 F.2d 1 (D.C. Cir. 1984) ........................................................... 29, 36

\*Hui v. Castaneda*,
    559 U.S. 799 (2010) ................................................ 2, 25, 31, 33, 34

*Hurd v. District of Columbia*,
    864 F.3d 671 (D.C. Cir. 2017) ............................................................ 18

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ........................................................................... 26

*Jacobs v. Alam*,
    915 F.3d 1028 (6th Cir. 2019) ........................................................... 22

*Jihaad v. O'Brien*,
    645 F.2d 556 (6th Cir. 1981) ............................................................ 29

*Jones v. Parmley*,
    465 F.3d 46 (2d Cir. 2006) ................................................................ 40

*Klay v. Panetta*,
    758 F.3d 369 (D.C. Cir. 2014) ..................................................... 47, 48

*Lamar, Archer & Cofrin, LLP v. Appling*,
    138 S. Ct. 1752 (2018) ..................................................................... 27

*Lash v. Lemke*,
    786 F.3d 1 (D.C. Cir. 2015) .............................................................. 36

*Lederman v. United States*,
    131 F. Supp. 2d 46 (D.D.C. 2001) ............................................... 36, 37

*Liff v. Office of Inspector Gen.*,
    881 F.3d 912 (D.C. Cir. 2018) ........................................................... 50

*Loe v. Armistead*,
    582 F.2d 1291 (4th Cir. 1978) ........................................................... 30

*Loumiet v. United States*,
    948 F.3d 376 (D.C. Cir. 2020) ..................................................... 34, 37

*Masel v. Barrett*,
    707 F. Supp. 4 (D.D.C. 1989) ............................................................ 37

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982) ..................................................................... 28, 46

*Meshal v. Higgenbotham*,
    804 F.3d 417 (D.C. Cir. 2015) ........................................................... 38

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
  474 U.S. 494 (1986)...................................................................26

*Miles v. Apex Marine Corp.*,
  498 U.S. 19 (1990)....................................................................26

*Minneci v. Pollard*,
  565 U.S. 118 (2012)...............................................................33, 34

*Mitchell v. Forsyth*,
  472 U.S. 511 (1985)..........................................................38, 52, 53

*Morris v. Wash. Metro. Area Transit Auth.*,
  702 F.2d 1037 (D.C. Cir. 1983)................................................30

*New York Tr. Co. v. Eisner*,
  256 U.S. 345 (1921).................................................................41

*Paton v. La Prade*,
  524 F.2d 862 (3d Cir. 1975) ....................................................29

*Pub. Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993)................................................28

*Saucier v. Katz*,
  533 U.S. 194 (2001).................................................................40

*Sherrill v. Knight*,
  569 F.2d 124 (D.C. Cir. 1977)................................................39

*Shorter v. United States*,
  12 F.4th 366 (3d Cir. 2021) .....................................................22

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
  476 U.S. 409 (1986).................................................................26

*\*Tanzin v. Tanvir*,
  141 S. Ct. 486 (2020).........................................2, 25, 26, 31, 35, 46

*Tatum v. Morton*,
  402 F. Supp. 719 (D.D.C. 1974)..............................................37

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
  576 U.S. 519 (2015).................................................................27

*Torossian v. Hayo*,
  45 F. Supp. 2d 63 (D.D.C 1999)..............................................37

*Trapnell v. Riggsby*,
  622 F.2d 290 (7th Cir. 1980) ...............................................29, 30

ix

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
    142 S. Ct. 941 (2022) ...........................................................................27

*United States v. Doe*,
    968 F.2d 86 (D.C. Cir. 1992) ...............................................................42

*United States v. Smith*,
    499 U.S. 160 (1991) ...............................................................2, 24, 31

*Wash. Legal Found. v. U.S. Sentencing Comm'n*,
    17 F.3d 1446 (D.C. Cir. 1994) .............................................................27

*Westfall v. Erwin*,
    484 U.S. 292 (1988) ............................................................................24

*Wilkie v. Robbins*,
    551 U.S. 537 (2007) ......................................................................33, 34

*Women Strike for Peace v. Morton*,
    472 F.2d 1273 (D.C. Cir. 1972) ...........................................................42

*\*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ................ 3, 18, 19, 20, 22, 23, 33, 34, 37, 38, 50, 51, 53

### Statutes

28 U.S.C. § 1291 ........................................................................................5

28 U.S.C. § 1331 ........................................................................................5

*\*28 U.S.C. § 2679 .......................................................................2, 24, 28, 45, 47

42 U.S.C. § 1983 ..........................................................................12, 13, 14

42 U.S.C. § 1985 ......................................................................................12

42 U.S.C. § 1986 ......................................................................................12

### Rules

Fed. R. Civ. P. 12 .....................................................................................18

Fed. R. Civ. P. 54 ...........................................................................5, 9, 12, 14

### Other Authorities

H.R. Rep. 100-700, 1988 U.S.C.C.A.N. 5945 ...................................25, 30

Insp. Gen., U.S. Dep't of the Interior,
    Review of U.S. Park Police Actions at Lafayette Park (June 8, 2021),
    https://www.oversight.gov/sites/default/files/oig-
    reports/DOI/SpecialReviewUSPPActionsAtLafayetteParkPublic.pdf ...............44

## GLOSSARY

BLMDC       Black Lives Matter D.C.

FBI         Federal Bureau of Investigation

FTCA        Federal Tort Claims Act

JA          Joint Appendix

**INTRODUCTION**

In the wake of George Floyd's murder in May 2020, civil rights supporters assembled on June 1, 2020, in Lafayette Square, next to the White House, to demonstrate peacefully for an end to racism and brutality in policing, in the tradition of countless Americans of all backgrounds and ideologies who have sought change within our democratic system.

They were met with a violent crackdown. Federal law enforcement officers charged, clubbed, tear gassed, pepper-sprayed, shot with rubber bullets, and violently dispersed the civil rights demonstrators, including children. Demonstrators struggled to breathe amidst the chemical attack. Officers repeatedly hit unarmed, peaceful people with batons and shields. This unprovoked attack by government officers against peaceful protesters—of a degree unprecedented on U.S. soil in the past half-century—occurred suddenly and without warning in the heart of the Nation's capital.

The district court erred in holding that the federal officers who ordered and perpetrated this attack cannot be held accountable, under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for their egregious constitutional violations in Lafayette Square—a public park this Court has long deemed a "unique situs for the exercise of First Amendment rights," *A Quaker*

*Action Grp. v. Morton*, 516 F.2d 717, 725 (D.C. Cir. 1975). Precedent, respect for Congress, and common sense all require reversal.

Determining whether *Bivens* claims may be brought requires "the utmost deference to Congress' preeminent authority" in creating causes of action. *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022). Accordingly, a court's refusal to recognize a cause of action that Congress has endorsed is no less a usurpation of legislative prerogatives than a court's creation of a cause of action that Congress has foreclosed.

In the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the "Westfall Act"), Congress explicitly preserved "a civil action against an employee of the Government [] which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A)—i.e., *Bivens*. The Supreme Court has confirmed that § 2679(b)(2)(A) accomplishes exactly what it says: it affirmatively preserves the cause of action for constitutional violations by government employees. *See Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020); *Hernandez v. Mesa*, 140 S. Ct. 735, 748 n.9 (2020); *Hui v. Castaneda*, 559 U.S. 799, 807 (2010); *United States v. Smith*, 499 U.S. 160, 173 (1991). More specifically, the Court has explained that Congress, using an "explicit" reference to "*Bivens* claims," *Hui*, 559 U.S. at 807, "left *Bivens* where it found it" in 1988. *Hernandez*, 140 S. Ct. at 748 n.9.

2

In one of the most prominent *Bivens* decisions by a court of appeals prior to 1988, this Court held that *Bivens* applied to circumstances remarkably like those here: violations of the First and Fourth Amendment rights of demonstrators protesting outside the seat of one of the three branches of government. *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977). The D.C. Circuit has reaffirmed *Dellums*; the case has been applied repeatedly to *Bivens* claims regarding demonstrators' rights in the District; and it remains good law today. Under the prior-construction canon of statutory interpretation, Congress is presumed to have been aware of this Court's decision in *Dellums* and to have enacted the Westfall Act with *Dellums* in mind. Thus, when Congress acted in 1988 to affirmatively preserve *Bivens* "where it found it," Congress included demonstrators' *Bivens* claims like the claims asserted here.

The district court's decision ignored all of this. Its inquiry into "special factors counselling hesitation in the absence of affirmative action by Congress," *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (cleaned up); *see* JA197-201, said nothing about the Westfall Act—an "affirmative action by Congress" that is directly on point. And the court brushed *Dellums* aside, JA195-96, spurning four decades of this Court's *Bivens* precedent on demonstrators' rights. The district court also held that the "country's national-security interest in the safety and security of the President" was a special factor counselling against *Bivens* in this case, JA197, even though it

3

admitted it was "unable at this time to credit defendants' assertion that the clearing of the Square was done in the interest of presidential security," JA222.

In dismissing Plaintiffs' *Bivens* claims, the district court announced a rule both sweeping and shocking: it held there can *never* be a damages remedy for *any* constitutional violations by federal officers in Lafayette Square. According to the district court, the very characteristic that makes Lafayette Square such a valuable forum for the exercise of First Amendment rights—its proximity to the White House—also renders those rights unenforceable via *Bivens*, because (in the court's view) presidential security is always at issue when federal officers act in proximity to the White House, whether or not the President is present or (as here) safely tucked away in the Rose Garden with the White House and its entire security apparatus between him and any protesters. *See* JA198-99, JA222. The result here, where peaceful demonstrators were gassed and beaten with an overwhelming display of force, is disturbing enough. But under the district court's rule, had the officers shot and killed the demonstrators, the Constitution would have been equally unenforceable. *Cf.* Mark T. Esper, A Sacred Oath 339 (2022) (quoting President Trump as saying to the Chairman of the Joint Chiefs, on June 1, 2020, regarding civil rights demonstrators: "Can't you just shoot them. Just shoot them in the legs or something.").

The district court's blanket rejection of constitutional enforceability is sharply inconsistent with our constitutional structure and the rule of law. Thus, it is no surprise that it is *not* the rule Congress adopted when it affirmatively acted in 1988 to preserve *Bivens* "where it found it."

Hewing closely to the will of Congress and to precedent, this Court should reverse the dismissal of the *Bivens* claims.

## JURISDICTION

The district court had jurisdiction over this case because it arises under the U.S. Constitution. 28 U.S.C. § 1331.

This Court has jurisdiction under 28 U.S.C. § 1291 over this appeal from the district court's final judgment, entered pursuant to Rule 54(b) in favor of Defendants as to the *Bivens* claims. JA237-42.

## ISSUE PRESENTED

Whether the district court erred in holding "special factors" precluded *Bivens* claims brought by peaceful protesters attacked by federal government officials in Lafayette Square, where: (a) Congress's affirmative endorsement of *Bivens* as it existed in 1988 precludes by definition the existence of any such special factors in light of this Court's prior recognition that *Bivens* claims are available to protect the constitutional rights of demonstrators; and (b) the attack did not implicate any interest in national security, Congress was not "silent" on whether to authorize

*Bivens* claims in this instance, and injunctive relief was not an available "alternative remedy."

## STATEMENT OF THE CASE[1]

Because of its location, Lafayette Square has long been the site of influential protests—including for women's suffrage and civil rights, and against the Vietnam War, among many other causes—serving as "a focal point for the expression of American ideals." JA144.

The individual Plaintiffs are eleven local residents of various races and backgrounds, who came to Lafayette Square on June 1, 2020—in the wake of the murder of George Floyd and other tragic killings of Black people—to participate in a peaceful demonstration against racism and police brutality. JA98-106, JA133, JA150, JA153, JA155. One Plaintiff is a U.S. Navy veteran. JA100. Others include children who came with their parents, JA98-99, JA106, teachers, JA153, JA155, and an employee at an education non-profit organization, JA150. Several Plaintiffs seek to represent overlapping putative classes of injured demonstrators. JA110-14.

Plaintiff Black Lives Matter D.C. ("BLMDC") is a D.C. corporation that organizes against systemic racism through protests, public campaigns, and other

---

[1] All facts are taken from Plaintiffs' complaints, drawing all reasonable inferences in Plaintiffs' favor. "Plaintiffs" refers collectively to all plaintiffs in both actions consolidated in this appeal, and "Complaint" refers to both operative complaints unless noted otherwise. *See* JA188 n.2.

programming; BLMDC members were demonstrating and providing food and water to demonstrators at Lafayette Square on June 1. JA77, JA96.

The gathering at Lafayette Square was calm and peaceful, with some people singing, dancing, or kneeling in silence; children and pets were present. JA145. The demonstrators, including Plaintiffs, chanted "I can't breathe," knelt, raised their hands up, carried signs with messages like "Black Lives Matter," and engaged in other acts of non-violent expressive conduct to protest police brutality against Black people. JA86, JA133, JA145, JA152.

Around 6 p.m., federal law enforcement officers, including from the U.S. Park Police, U.S. Secret Service, Federal Bureau of Prisons, and D.C. National Guard, massed at Lafayette Square and donned gas masks in preparation for a chemical attack. JA86-88, JA145-46. At 6:08 p.m., Defendant Barr entered Lafayette Square and personally ordered it cleared, as the Department of Justice later acknowledged. JA88, JA145. At approximately 6:30 p.m., at the command of the U.S. Park Police incident commander, Defendant Adamchik, federal law enforcement officers clad in riot gear attacked the peaceably assembled protesters. JA78, JA88, JA145-47. There was no warning of the officers' attack—one minute people were protesting peacefully; the next, the air was filled with smoke, and people were screaming and running away. JA152. At the time Defendants Barr and Adamchik gave the orders, the demonstrators were not engaging in unlawful conduct or conduct posing a threat

to any person or property, or public safety generally. JA89, JA99-101, JA103-04, JA106, JA152. Defendants U.S. Park Police officers Feliciano, LoCasico, Jarmuzewski, Hendrickson, Cox, McDonald, Sinacore, Daniels, Kellenberger, and Seiberling all took part in the attack. JA78-80 (identifying individuals by helmet or arm patch numbers); *see* JA181-82 (correlating numbers in the complaint with names). At the time, President Trump was safely ensconced on the White House grounds: as protesters were being shot and gassed across the street, he was giving a speech in the Rose Garden, on the opposite side of the White House from the fence facing Lafayette Square. JA85, JA148.

Despite the lack of any threat, *see* JA222, federal officers fired flash-bang shells, tear gas, pepper spray, smoke canisters, pepper balls, rubber bullets, and other projectiles and chemical irritants into the crowd of Plaintiffs and putative class members. JA89. The unprovoked violence caused what news reports described as a "blind panic" as the crowd attempted to flee. JA148. Rubber bullets fired by Defendants struck Plaintiff Scallan in her face, arm, and leg. JA103. Chemical gasses in the air caused people, including Plaintiffs Scallan and Dagrin, to struggle to breathe; other demonstrators vomited. JA103, JA154. Plaintiff Bond aided a demonstrator who had a rubber bullet lodged in his face and was bleeding profusely. JA102. Plaintiff McDonald's eyes stung and he coughed from the tear gas, and he witnessed concussion grenades exploding with enough force to put holes in the

ground. JA100. Plaintiffs Sanders, Foley, and E.X.F. also suffered the effects of tear gas. JA99, JA107-08.

Federal officers struck, shoved, and otherwise assaulted the demonstrators with their fists, feet, batons, and shields. JA90, JA147. Victims included demonstrators whose backs were turned from the police and who were trying to flee the officers. JA90, JA147. For example, Plaintiff McDonald was repeatedly struck by multiple officers with their shields. JA100. When the assault began, Plaintiff Poteet stood with her hands up; nonetheless, an officer charged her, knocking her down with his riot shield, then beat her while she was on the ground, striking her in the stomach and knocking the wind out of her. When Ms. Poteet stood up, the officer knocked her over again, hitting her harder. When she managed to limp away, she was struggling to breathe, with flash bangs exploding at her feet. JA104-05.

Other demonstrators experienced similar treatment. For example, as Plaintiff Field walked away from the police barricades, she was struck in the back of her thigh, and she witnessed police hitting protesters with night sticks. JA156-57. A protester (and putative class member) holding a bandage to his face and walking away from the park was slammed into the wall of a building by Defendant Sinacore and other officers. JA90-91. When the protester tried to run away, Defendant Sinacore beat him with his baton. *Id.* Defendant Feliciano used his shield to bash a protester scrambling to avoid the charging line of law enforcement officers. JA91.

9

The protesters received no warning to disperse. JA89, JA91-93, JA99-100, JA103, JA107, JA146-47, JA152, JA154. Nor did Defendants indicate that demonstrators would be permitted to resume demonstrating nearby—for instance, after moving a prescribed distance away. JA93. Indeed, Defendants' use of force to scatter the demonstrators was so overwhelming that resuming the demonstration elsewhere was impossible. *See* JA88-91.

At approximately 7:01 p.m., President Trump emerged from the White House, accompanied by security personnel and administration officials, including Defendant Barr, and walked through the now-cleared Lafayette Square and across the street to St. John's Church, where President Trump posed for photographs. JA109, JA148-50.

The individual Plaintiffs were injured by the chemical irritants, JA99-100, JA103, JA105, JA107-08, JA152, JA154, and other aspects of the attack. Rubber bullets caused pain and bruises on Plaintiff Scallan's arm and cuts on her face, and made it difficult to eat or brush her teeth. JA103. Days after the attack, Plaintiff Poteet still had welts and bruises from where the officer beat her, including on her knee (on which she had previously had surgery). JA105. Plaintiffs were injured emotionally by the trauma of the event and fear of excessive force by law enforcement at future demonstrations. JA99, JA101-02, JA105, JA109, JA153-55, JA157. Plaintiff Buchanan experienced heightened anxiety and considerable

difficulty sleeping. JA153. The day after the attack, Plaintiff Dagrin experienced a panic attack at a protest and had to leave immediately. JA154-55. Plaintiff J.N.C., age 9, experienced anxiety when Plaintiff Sanders (his stepmother) went to subsequent protests. JA99.

Defendants offered shifting justifications for their brutality. *First*, a White House press statement claimed that "[t]he perimeter was expanded to help enforce the 7 p.m. curfew." JA158. This explanation was quickly debunked, when the Mayor of Washington, D.C., who had ordered the curfew, condemned the attack as having occurred "[a] full 25 minutes before the curfew & w/o provocation." *Id. Second*, the Park Police and Defendant Barr claimed that law enforcement had been responding to violence by protesters. JA158-59. But Defendant Barr later abandoned this explanation, telling the press, "[t]his was not an operation to respond to that particular crowd" and subsequently testifying under oath that the decision to extend the security perimeter "was something conceived of long before and didn't turn on the nature of the crowd." JA159. *Third*, Defendant Monahan testified to Congress that the purpose of driving protesters from Lafayette Square was to promptly build a fence around it—but the fencing material was not brought to the Square until hours after the attack. JA160-61. *Fourth*, the White House Press Secretary claimed that "the burning at St. John's [on May 31] is what prompted the decision to move the

11

perimeter." JA161. Yet the expanded security perimeter following June 1, 2020 did not encompass St. John's. *Id.*

As members of law enforcement, including former U.S. Capital Police Chief Terrance Gainer and one National Guardsman present at Lafayette Square on June 1, stated, even if clearing the park was required, "there was no reason" for "an unprovoked escalation and excessive use of force"; Defendants "could have [cleared the park] in a very orderly way, giving people notice." JA136, JA160.

The attack on the demonstrators was not also carried out to protect presidential security. When the attack began, the President was on the other side of the White House, with the White House fence and the entire White House security apparatus between him and the protesters, JA85, JA148.

Plaintiffs filed these cases in June 2020. JA22, JA57. The *BLMDC* Plaintiffs asserted claims on behalf of themselves and two classes of similarly situated individuals (one class for damages; one for equitable relief). All Plaintiffs sought damages for First and Fourth Amendment violations under *Bivens* against appellees and other "John Doe" federal officers. The *Buchanan* Plaintiffs further asserted *Bivens* claims under the Fifth Amendment. All Plaintiffs also sought equitable relief against the federal government. The *BLMDC* Plaintiffs brought additional claims under 42 U.S.C. § 1983 against Washington, D.C., officers as well as claims under 42 U.S.C. §§ 1985(3) and 1986 against federal, D.C. and Arlington, Virginia

officers. The *Buchanan* Plaintiffs brought § 1983 claims against D.C. and Arlington officers. JA110-26 (*BLMDC*); JA171-79 (*Buchanan*).

In June 2021, the district court granted the federal officers' motion to dismiss the *Bivens* claims. JA183-85, JA193-201. (The court also dismissed the §§ 1985 and 1986 claims, JA208-12, JA218, some but not all of the injunctive-relief claims, JA201-08, and some but not all of the claims under § 1983, JA218-28). The court held that several special factors precluded a *Bivens* claim. The first was presidential security. JA197. No matter the circumstances, the court reasoned, "[w]hen it comes to managing crowd activity directly outside of the White House, decisionmakers must weigh public, presidential, and White House security interests." JA198. Although the court was "unable at this time to credit the defendants' assertion that the clearing of the Square was done in the interest of presidential security," JA222, it concluded that the national/presidential security "special factor" applied: "it matters not whether the national security risk actually justified the particular action taken." JA198. A second special factor, the court stated, was that Congress has held hearings and passed laws relating to presidential security but none of them provided for a cause of action. JA199-201. The court identified as a third factor Plaintiffs' ability to seek an injunction against future misconduct, which showed that an "alternative remed[y]" was available, JA201—although the court also held that Plaintiffs lacked standing to bring such claims, JA206.

13

In a part of the district court's opinion dealing with the claims against *local* officials (asserted under § 1983 rather than *Bivens*), one of the claims that survived a motion to dismiss was that Defendants committed "a violation of foundational First Amendment rights" by "forcibly end[ing] a peaceful protest in a traditional public forum without any legitimate justification for doing so"—which any reasonable officer would have known violated the Constitution. JA221. In other words, had a *Bivens* cause of action existed against the federal officials, Plaintiffs would have alleged valid constitutional claims against those officials; under the district court's ruling, these Defendants' federal status was all that shielded them from these otherwise viable claims.

The case was stayed for settlement talks in July 2021. In April 2022, the Plaintiffs settled their remaining equitable-relief claims against the United States. With live § 1983 claims remaining against D.C. officers, Plaintiffs moved the district court to enter partial final judgment under Rule 54(b), which the court did on May 16, 2022. JA237-42. Plaintiffs noticed their appeals the same day. JA243-46. Proceedings in the district court are stayed pending this appeal.

## SUMMARY OF ARGUMENT

**1.** *Bivens* doctrine requires, above all, faithfulness to the will of Congress. The Court's new-context/special-factors analysis and recent gloss on that test (asking whether Congress is better suited to weigh whether a damages action should exist)

14

put Congress at the heart of the inquiry. Accordingly, the courts must give effect to congressional judgment about the propriety of a cause of action, whatever that judgment may be.

**2.** The district court erred in ignoring what Congress has said about *Bivens*. In the Westfall Act, Congress affirmatively endorsed *Bivens* in statutory text, as the Supreme Court has noted four separate times. Under basic principles of statutory interpretation, that text endorsed the state of the law as it existed at the time, including prominent decisions of the appellate courts. The Supreme Court has repeatedly interpreted statutes creating or preserving causes of action in light of prevailing judicial interpretations that existed when Congress acted. And the Court has cautioned against disrespecting Congress either by requiring it to (re)state explicitly the law as it already exists or by retroactively applying judicial presumptions that arose after Congress legislated.

In 1988, Congress was surely aware that the D.C. Circuit had concluded, in the well-known 1977 *Dellums* case about a massive demonstration on the steps of the Capitol itself, that *Bivens* applied to First and Fourth Amendment claims of peaceful demonstrators at the seat of a branch of the federal government. It follows that this case falls within the core of the *Bivens* action that Congress acted affirmatively to preserve.

The district court brushed *Dellums* aside on the view that only Supreme Court precedent is relevant to the determination of what is a "new context" for purposes of the *Abbasi* test. But that is only the first step of *Abbasi*, the second being whether there are "special factors counselling hesitation in the absence of affirmative action by Congress." Under *Abbasi*, a *Bivens* claim is viable if it is *either* not a new context *or* there are no "special factors." The district court ignored the implications of *Dellums* in assessing whether there are any "special factors counselling hesitation in the absence of affirmative action by Congress." *Dellums* is critical to understanding the scope of Congress's affirmative action in 1988 to preserve *Bivens*: it demonstrates *Bivens* was understood at that time to encompass First and Fourth Amendment claims for demonstrators' rights at the seat of a branch of government. That holding is part and parcel of what Congress preserved when it affirmatively legislated in 1988.

Accordingly, giving effect to the will of Congress requires permitting the *Bivens* claims here to proceed.

**3.** None of the special factors the district court invoked to reject Plaintiffs' claims withstands scrutiny. Chiefly, the court concluded that presidential security inheres in *any* federal law enforcement activity at Lafayette Square, regardless of where the President is or what he is doing; thus, in the district court's view, constitutional damages claims are *always* foreclosed in Lafayette Square. JA198-99.

16

That conclusion defies common sense: it would turn one of the Nation's most vital forums for free expression into a Constitution-free zone as far as the conduct of federal law enforcement is concerned. Here, the President was safely on the other side of the White House from the peaceful demonstration when Defendants carried out their unprovoked attack with tear gas, rubber bullets, and a baton charge. This Circuit has consistently held for decades both that the public has a First Amendment right to conduct demonstrations in Lafayette Square and that *Bivens* claims may be brought to vindicate demonstrators' rights, including both at Congress and the White House. This long history forcefully refutes the notion that allowing *Bivens* claims brought by protesters in Lafayette Square is incompatible with national security. The district court brushed aside or ignored all of this precedent.

The district court's reliance on supposed congressional silence as a special factor is also misplaced, because Congress was not silent. It spoke affirmatively via the Westfall Act. And the district court's invocation of Plaintiffs' claim for injunctive relief from future attacks (which the court dismissed for lack of standing) as an "alternative remedy" foreclosing *Bivens* likewise fails to afford due regard to the judgments of Congress. It also misreads Supreme Court caselaw on alternative remedies.

**4.** Finally, Defendant Barr's high rank does not justify dismissing the claims against him. The *Bivens* remedy Congress preserved in 1988 covered claims against

17

an Attorney General acting personally to violate constitutional rights—as demonstrated by Supreme Court precedent.

## STANDARD OF REVIEW

This Court reviews a Rule 12(b)(6) dismissal de novo. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1128 (D.C. Cir. 2015). On a motion to dismiss, the Court must accept as true all facts plausibly pleaded in the complaint, drawing all reasonable inferences in plaintiffs' favor. *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017).

## ARGUMENT

**I.    Congress's Affirmative Endorsement of *Bivens* As It Existed in 1988 Precludes Finding "Special Factors" Here.**

**A.    The two-step *Bivens* inquiry centers on respecting congressional prerogatives and effectuating congressional judgments—including Congress's decision to endorse a cause of action.**

In *Bivens*, the Supreme Court recognized a cause of action arising out of the Constitution for damages against federal agents who violate a person's constitutional rights. Although the Court has modified the test for determining when *Bivens* applies, it has steadfastly refused to overrule *Bivens*. On the contrary, the Court has noted that *Bivens* "vindicate[s] the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward." *Abbasi*, 137 S. Ct. at 1856-57. The Court has also pointed to "[t]he settled law of *Bivens*" and "the undoubted reliance upon it as a fixed principle in the

18

law" as "powerful reasons to retain it" in the sphere of law enforcement. *Id.* at 1857. Indeed, "individual instances of . . . law enforcement overreach," the Court recognized, are by "their very nature . . . difficult to address except by way of damages actions after the fact." *Id.* at 1862.[2]

The primary change to the Court's approach to *Bivens* since 1971 is its view of the judicial role in this arena. Whereas the Court once thought it was its duty to "use any available remedy to make good the wrong done," *Bivens*, 403 U.S. at 396 (cleaned up), the Court has now abjured the power "to independently assess the costs and benefits of [inferring] a cause of action" in the absence of congressional guidance. *Egbert*, 142 S. Ct. at 1805. Instead, the core of today's *Bivens* doctrine is respect for the views of Congress. "[A]bsent utmost deference to Congress' preeminent authority in this area," the Court has cautioned, "the courts arrogate legislative power." *Id.* at 1803 (cleaned up). "The question is who should decide whether to provide for a damages remedy, Congress or the courts? The answer most

---

[2] The only type of *Bivens* claim the Court has categorically foreclosed is a First Amendment retaliation claim. *Egbert*, 142 S. Ct. at 1807. That does not preclude other, non-motive based First Amendment theories, such as Plaintiffs' claims that the suppression of their speech was unconstitutional absent a clear and present danger and also failed the constitutional test for a valid time/place/manner restriction. *See* JA219-22 (explaining why Defendants' violent dispersal of the demonstration violated clearly established First Amendment rights); *see also Edwards v. South Carolina*, 372 U.S. 229 (1963).

often will be Congress." *Abbasi*, 137 S. Ct. at 1857 (cleaned up); *accord Hernandez*, 140 S. Ct. at 742.

Although the Supreme Court's own cases mainly reflect the Court's deference to Congress's judgment that *Bivens* ought *not* be available, *e.g.*, *Hernandez*, 140 S. Ct. at 747, the logical corollary is that the judiciary must be equally respectful of Congress when it decides that *Bivens is* available. Thus, *Carlson v. Green*, 446 U.S. 14 (1980), recognized a *Bivens* claim even where a parallel claim under the Federal Tort Claims Act was available, because "when Congress amended [the] FTCA in 1974 to create a cause of action against the United States for intentional torts committed by federal law enforcement officers, the congressional comments accompanying that amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.* at 19-20 (citation omitted). *Carlson*'s respect for congressional judgment about what remedies should be available fits squarely within the deferential approach commanded by *Abbasi*, *Hernandez*, and *Egbert*.

*Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), likewise recognized the primacy of congressional directives in assessing the scope of a cause of action that the Court had previously created. The issue in *Franklin* was whether a plaintiff asserting the implied right of action that the Court had recognized in *Cannon v. University of Chicago*, 441 U.S. 677 (1979), for Title IX of the Education

Amendments of 1972, could seek damages. The Court unanimously held that she could, in significant part because Congress, after *Cannon*, enacted a statute that clearly indicated Congress's acceptance of the remedy and its understanding that damages should be available. *See Franklin*, 503 U.S. at 72-73 (discussing the Rehabilitation Act Amendments of 1986). The Court concluded that Congress had accepted that remedy even though it had not explicitly codified the right of action the Court had inferred or explicitly provided for damages. *See id.* Even the Justices who questioned the propriety of judicially inferred causes of action generally nonetheless concluded that Congress's ratification of the remedy was dispositive:

> Because of legislation enacted subsequent to *Cannon*, it is too late in the day to address whether a judicially implied exclusion of damages under Title IX would be appropriate. The Rehabilitation Act Amendments of 1986 must be read, in my view, not only "as a validation of *Cannon*'s holding," but also as an implicit acknowledgment that damages are available.

*Id.* at 78 (Scalia, J., joined by Rehnquist, C.J., and Thomas, J., concurring in judgment) (citations omitted); *accord Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (citing this analysis approvingly and describing the 1986 Act as placing "beyond dispute" the existence of the implied cause of action). *Franklin* thus confirms that deference to congressional judgment about the scope of a preexisting cause of action is equally compelled whether congressional action affirms or negates the cause of action—regardless of how judges might have felt about the cause of action in the absence of such a congressional judgment.

With deference to Congress as the driving force behind the Court's modern *Bivens* doctrine, the Court has applied a two-step analysis to determine whether *Bivens* is available in any given case. First, courts must assess whether the claim arises in a "new context." *Abbasi*, 137 S. Ct. at 1859. What makes a context "new" is any "meaningful[] differen[ce]" between the case at hand and the Supreme Court's own prior cases recognizing a *Bivens* remedy. *Egbert*, 142 S. Ct. at 1803. If the context is not new, the claim may proceed. *See, e.g.*, *Shorter v. United States*, 12 F.4th 366, 372 (3d Cir. 2021); *Jacobs v. Alam*, 915 F.3d 1028, 1038-39 (6th Cir. 2019). If it is new, courts proceed to the second step, at which they consider any "special factors counselling hesitation in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857; *accord Hernandez*, 140 S. Ct. at 755. The "special factors" inquiry "concentrate[s] on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857-58. Examples of "special factors" causing hesitation "absent congressional action or instruction" include (but are not limited to) interference with foreign relations, *see Hernandez*, 140 S. Ct. at 744, and national security, *Abbasi*, 137 S. Ct. at 1861, including border security, *Egbert*, 142 S. Ct. at 1804. It is also a "special factor" if "Congress has provided alternative remedies for aggrieved parties in [the plaintiff's] position," *id.* at 1806—with the caveat that "whether a given remedy is adequate is

a legislative determination that must be left to Congress, not the federal courts." *Id.* at 1807. The Court has also suggested that the two steps of *Abbasi* often boil down to a single question: "whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Id.* at 1805 (quoting *Abbasi*, 137 S. Ct. at 1858).

However the inquiry is framed, its north star is the will of Congress. This means that in novel situations like cross-border shootings (*Hernandez*) or terrorism investigations (*Abbasi*) for which Congress has not endorsed a *Bivens* remedy, courts will not recognize one. But it also means that where Congress has endorsed a *Bivens* remedy, it is no more a court's place to displace that remedy than to extend *Bivens* to where Congress has decided it does not belong. *See Carlson*, 446 U.S. at 19-20. Congress's endorsement of a judicially recognized cause of action is entitled to respect and must be given effect by the courts even if jurists today might reach a different conclusion on a blank slate. *See Franklin*, 503 U.S. at 72-73; *id.* at 78 (Scalia, J., concurring in judgment).

That is why a "special factor" is a factor that counsels hesitation "in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857. Where Congress *has* affirmatively acted, by definition there cannot be "special factors counselling hesitation *in the absence of affirmative action by Congress*." (Emphasis added.) That circumstance describes this case: Congress affirmatively acted via the

Westfall Act in 1988 to preserve *Bivens* as it then existed, including this Court's prominent endorsement in *Dellums* of First and Fourth Amendment claims on behalf of demonstrators at the seat of a branch of the federal government.

### B. Congress affirmatively preserved the *Bivens* cause of action in 1988, including this Court's holding in *Dellums*.

Congress addressed *Bivens* directly in the Federal Employees Liability Reform and Tort Compensation Act of 1988. That statute was passed in response to *Westfall v. Erwin*, 484 U.S. 292 (1988), which "recognized the continuing viability of state-law tort suits against federal officials." *Hernandez*, 140 S. Ct. at 748. Congress promptly overruled *Westfall* (hence the Act's common appellation, "Westfall Act") by making the FTCA the "exclusive" remedy for injuries resulting from the conduct of a federal employee acting within the scope of employment, 28 U.S.C. § 2679(b)(1)—with (as relevant here) a critical exception: This exclusivity provision "does not extend or apply to a civil action against an employee of the Government [] which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A).

As the Supreme Court has repeatedly recognized, § 2679(b)(2)(A) means what it says: that *Bivens* claims (which are, by definition, "civil action[s] against an employee of the Government . . . brought for a violation of the Constitution of the United States") are preserved. In *United States v. Smith*, 499 U.S. 160, 173 (1991), the Court recognized this provision as "expressly . . . preserving employee liability

for *Bivens* actions." In *Hui v. Castaneda*, 559 U.S. 799, 807 (2010), the Court called this provision "[t]he Westfall Act's explicit exception for *Bivens* claims." The Court explained in *Hernandez*, 140 S. Ct. at 748 n.9, that the provision, though not licensing especially "robust" enforcement of *Bivens* (meaning, presumably, extension to the unusual circumstance of a cross-border shooting at issue in that case), "simply left *Bivens* where it found it." And *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020), reiterated that the "Westfall Act . . . left open claims for constitutional violations."

As the Court recognized, Congress's affirmative action to preserve *Bivens* claims was a considered judgment. The committee report on the Westfall Act contains a substantive discussion of *Bivens*, in which the committee characterized the preservation of *Bivens* claims as a "major feature" of the bill and declared that the bill "would not affect the ability of victims of constitutional torts to seek personal redress from Federal employees who allegedly violate their Constitutional rights." H.R. Rep. 100-700, at *6, 1988 U.S.C.C.A.N. 5945, 5949-50.

To determine the contours of the *Bivens* cause of action Congress preserved when it acted in 1988, the appropriate tool of statutory construction is the prior-construction canon. Under that canon, when a court interprets legislation, "it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with these unusually important precedents from [the Supreme Court] and other

25

federal courts and that it expected its enactment to be interpreted in conformity with them." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 699 (1979); *accord, e.g.*, *Gomez-Perez v. Potter*, 553 U.S. 474, 485 (2008). Thus, "[w]hen Congress codifies a judicially defined concept, it is presumed, absent an express statement to the contrary, that Congress intended to adopt the interpretation placed on that concept by the courts." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 813 (1989); *accord Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 422 (2009) ("'We assume that Congress is aware of existing law when it passes legislation.'" (quoting *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990))).

Applying this presumption, the Court has repeatedly held that Congress legislates against the backdrop of relevant precedent and incorporates the understandings of those cases it does not overrule. *See, e.g.*, *Tanzin*, 141 S. Ct. at 490-91; *Gomez-Perez*, 553 U.S. at 484-85; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 176-77 (2005); *Miles*, 498 U.S. at 32; *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 419 (1986); *see generally Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."); *Albernaz v. United States*, 450 U.S. 333, 341-42 (1981) (presuming that Congress was aware of relevant precedent "and legislated with it in mind," because "[i]t is not a function of this

Court to presume that Congress was unaware of what it accomplished" (cleaned up)).

The presumption that Congress incorporates judicial understandings of the concepts it codifies encompasses "unusually important precedents from . . . federal courts" in addition to the Supreme Court. *Cannon*, 441 U.S. at 699. In *Cannon*, for instance, the Court recognized that when Congress enacted Title IX in 1972 and chose language mirroring that of Title VI of the Civil Rights Act of 1964, Congress understood that this language had been held by federal courts to create an individual right of action, *see* 441 U.S. at 695-98 & nn. 20-21—even though the Supreme Court would not address this question until two years after Title IX was adopted, *see id.* at 702 n. 33. The Court continues today to interpret statutes in accord with prominent appellate case law enacted at the time of the statute's passage. *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 142 S. Ct. 941, 947-48 (2022); *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 & n.3 (2018); *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536 (2015). This Court's cases, similarly, interpret legislation with a presumption that Congress is aware of appellate decisions. *See Beethoven.com LLC v. Librarian of Cong.*, 394 F.3d 939, 945-46 (D.C. Cir. 2005) (holding 1976 federal legislation using the phrase "any aggrieved party" incorporated the understanding of that language from earlier D.C. Circuit cases); *see also Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17

27

F.3d 1446, 1450 (D.C. Cir. 1994); *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 195 (D.C. Cir. 1993).

The presumptions about congressional incorporation of prevailing judicial interpretations apply equally when the underlying rule concerns recognition of an implied cause of action. That was the precise circumstance in *Cannon*, 441 U.S. at 696-98 & nn. 20-21. It was also the case in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 379, 386 (1982), which held that Congress, in the 1974 amendments to the Commodity Exchange Act, preserved an implied cause of action that "the federal courts routinely and consistently had recognized" at that time, where Congress's enactment of a "saving clause . . . provides direct evidence of legislative intent to preserve the implied private remedy federal courts had recognized under the [Act]." As the Court stated the interpretive rule in *Curran*: "When Congress acts in a statutory context in which an implied private remedy has already been recognized by the courts . . . Congress need not have intended to create a new remedy, since one already existed; the question is whether Congress intended to preserve the pre-existing remedy." *Id.* at 378-79. This is no mere inference from congressional silence. Rather, in each of those cases, as here, Congress enacted affirmative language: in *Cannon*, the adoption of the Title VI statutory language; in *Curran*, a savings clause; and here, the explicit exception in § 2679(b)(2)(A) to the exclusive-remedy provision.

At the time Congress enacted the Westfall Act, the leading *Bivens* case on demonstrators' rights and the First Amendment generally was this Court's decision in *Dellums v. Powell*. There, a class of thousands of demonstrators asserted First and Fourth Amendment *Bivens* claims after their Vietnam War protest on the steps of the Capitol Building was shut down by a mass arrest. 566 F.2d at 173-74. This Court affirmed (as to liability) a verdict for the plaintiffs on the Fourth Amendment *Bivens* claims, *see id.* at 175-91, and held that federal courts were capable of addressing First Amendment *Bivens* claims as well, *see id.* at 194-96 (affirming as to liability on First Amendment claim).

Prior to the enactment of the Westfall Act, this Court also recognized a *Bivens* action for demonstrators' First Amendment rights in *Hobson v. Wilson*, 737 F.2d 1, 56, 62-63 (D.C. Cir. 1984), *partially abrogated on other grounds*, *Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993). And *Dellums* and *Hobson* were, in turn, part of a widespread understanding among the federal courts of appeals prior to 1988 that *Bivens* was available for First Amendment claims (except those by federal employees who had access to comprehensive "alternative remed[ies]," *see Bush v. Lucas*, 462 U.S. 367, 377-78 (1983)).[3] As of 1988, in fact,

---

[3] *See, e.g.*, *Paton v. La Prade*, 524 F.2d 862, 870 (3d Cir. 1975); *Jihaad v. O'Brien*, 645 F.2d 556, 558 n.1 (6th Cir. 1981); *Trapnell v. Riggsby*, 622 F.2d 290, 294 (7th Cir. 1980); *Gillespie v. Civiletti*, 629 F.2d 637, 641-42 (9th Cir. 1980); *see generally*

(footnote continues next page)

no court of appeals had held that *Bivens* was categorically unavailable for demonstrators' rights claims. At the time of the Westfall Act's passage, other federal courts of appeals had cited *Dellums* as a basis for their own parallel conclusions that *Bivens* applied to First Amendment claims. *See Trapnell v. Riggsby*, 622 F.2d 290, 294 (7th Cir. 1980); *Loe v. Armistead*, 582 F.2d 1291, 1294-95 (4th Cir. 1978). And because *Dellums* concerned events on the steps of the Capitol and the lead plaintiff was a Congressman, it is particularly likely to have been familiar to the Members of Congress.

The presumption under the prior-construction canon—that Congress looked to prominent appellate decisions like *Dellums* in assessing the scope of the *Bivens* remedy it was preserving in 1988—is buttressed by clues in the legislative history of the Westfall Act. Those clues confirm that Congress understood *Bivens* more broadly than by reference to Supreme Court precedent alone. The section of the Westfall Act committee report discussing *Bivens* repeatedly refers to decisions of the "courts" more generally—indicating that Congress consulted decisions beyond those of the Supreme Court in determining what the *Bivens* cause of action entailed. H.R. Rep. 100-700, at *6, 1988 U.S.C.C.A.N. 5945, 5949-50 ("*Courts have drawn*

---

*Morris v. Wash. Metro. Area Transit Auth.*, 702 F.2d 1037, 1041-42 (D.C. Cir. 1983) ("[T]he courts have recognized the existence of a *Bivens*-type remedy for violations of the First Amendment[.]").

*a sharp distinction* between common law torts and constitutional or *Bivens* torts. . . . *[T]he courts have identified* this type of tort as a more serious intrusion of the rights of an individual that merits special attention." (emphasis added)).

In sum, through the "explicit" statutory text of the Westfall Act, *Hui*, 559 U.S. at 807, Congress "left open claims for constitutional violations," *Tanzin*, 141 S. Ct. at 491, "le[aving] *Bivens* where it found it," *Hernandez*, 140 S. Ct. at 748 n.9. Congress intended to preserve the *Bivens* holding of *Dellums*.

### C. In light of Congress's affirmative action to preserve *Bivens*, including *Dellums*, the district court erred in dismissing the *Bivens* claims.

Congress's affirmative endorsement of *Bivens* as it existed in 1988 precludes, by definition, the existence in this case of "special factors counselling hesitation in the absence of affirmative action by Congress." There can be no "special factors counselling hesitation *in the absence of affirmative action by Congress*," because Congress *has* affirmatively acted here, using "explicit" statutory text to preserve *Bivens*, *see Hui*, 559 U.S. at 807; *accord Smith*, 499 U.S. at 173. Congress's endorsement of a judicially recognized cause of action must be given effect by the courts even if jurists today might reach a different conclusion on a blank slate. *See Franklin*, 503 U.S. at 72-73; *id.* at 77-78 (Scalia, J., concurring in judgment). To hold otherwise would replicate the affront to separation of powers that concerned the Supreme Court in *Egbert*, where the Court concluded lower court judges had

failed to recognize that "Congress is far more competent than the Judiciary to weigh [the various] policy considerations" that inform the decision whether to recognize a cause of action. *Egbert*, 142 S. Ct. at 1803 (cleaned up). Here, Congress *has* weighed the costs and benefits and concluded that it is appropriate to allow a damages action to proceed in cases like *Dellums*.

There are powerful parallels between *Dellums* and this case. In both cases, law enforcement acted to cut off a peaceful demonstration, *see* 566 F.2d at 183 (recounting evidence, credited by the jury, that the crowd was "reasonably orderly") in front of the headquarters of a branch of the federal government. If one replaces "Congress" with "the President" in this Court's encapsulation of the issue in *Dellums*, the Court's ruling applies squarely to this case: "[W]hat is at stake here is loss of an opportunity to express to Congress one's dissatisfaction with the laws and policies of the United States." *Id.* at 195. Absent a basis for deeming the security of one branch of government more important than another, this Court's holding regarding demonstrations in front of Congress must apply to demonstrations in front of the White House. To the extent *Dellums* and this case differ in any material respect, the security concern the *Dellums* demonstrators posed was *more* acute than the one presented here—those demonstrators were physically on the steps of the Capitol, whereas the protesters here were in a park across the street from the White House and its security fence.

Giving effect to Congress's instructions in the Westfall Act by applying *Dellums* would not represent the type of "robust" enforcement of *Bivens* the Court rejected when considering the Westfall Act in *Hernandez*, 140 S. Ct. at 748 n.9. Rather, it is perfectly consistent with Congress's endorsement of *Bivens* in 1988— including *Dellums*, involving political speech at the heart of the First Amendment— to acknowledge that Congress in 1988 did not implicitly authorize other *Bivens* claims of various novel kinds, including those seeking liability: against federal agencies, *FDIC v. Meyer*, 510 U.S. 471, 484 (1994); against private corporations, *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 (2001); against private contractors, *Minneci v. Pollard*, 565 U.S. 118, 120 (2012); based on a novel theory of governmental "retaliation for exercising [plaintiff's] property right," *Wilkie v. Robbins*, 551 U.S. 537, 562 (2007); where Congress explicitly foreclosed liability, *Hui*, 559 U.S. at 802; regarding the Nation's investigation of the September 11 terror attacks, *Abbasi*, 137 S. Ct. at 1851, 1863; and for incidents at the international border, *Hernandez*, 140 S. Ct. at 739; *Egbert*, 142 S. Ct. at 1804.

The district court's reliance on the "new context" doctrine to justify disregarding *Dellums*, JA195-96, does not withstand scrutiny. Although an important part of modern *Bivens* doctrine, this test does not supplant normal tools of statutory interpretation for purposes of construing Congress's determination to endorse the *Bivens* doctrine as it stood in 1988. The new context test focuses on the

specific *Bivens* applications *by the Supreme Court*. *See Abbasi*, 137 S. Ct. at 1859;

*Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020). But the Westfall Act

reflects the view of *Congress*, precluding the notion that any special factors counsel

hesitation in recognizing a *Bivens* action here. Courts must accord the "utmost

deference to Congress' preeminent authority" in recognizing causes of action.

*Egbert*, 142 S. Ct. at 1803. When Congress enacted the Westfall Act, it legislated

against the backdrop of *Bivens* doctrine as a whole—not merely the three Supreme

Court cases relevant to the new context test. *See supra* Part I.B.

Similarly, because the new context test was developed *decades* after Congress

endorsed the *Bivens* doctrine as it stood in 1988, it would profoundly disrespect the

legislative branch to rule that Congress intended in 1988 to permit the recognition

of *only* those claims that pass the more recently developed new context test.[4] The

Supreme Court has unanimously rejected the view that Congress can be charged

with foreknowledge of interpretive principles or presumptions that arise from cases

decided after it legislates: "Although background presumptions can inform the

---

[4] The new context concept did not become part of the Supreme Court's test for
*Bivens* until just five years ago, in *Abbasi*. Before *Abbasi*, whether a *Bivens* claim
constituted a "new context" served only as an observation about the trend in modern
*Bivens* jurisprudence to act cautiously, *see, e.g.*, *Malesko*, 534 U.S. at 68 ("Since
*Carlson* we have consistently refused to extend *Bivens* liability to any new context
or new category of defendants."); *accord Meyer*, 510 U.S. at 484. The three *Bivens*
cases leading up to *Abbasi* did not consider the "new context" question or indicate
that it was part of the test for whether to recognize a *Bivens* claim. *See Minneci*, 565
U.S. at 122-23; *Hui*, 559 U.S. at 812; *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).

understanding of a word or phrase, those presumptions must exist at the time of enactment. We cannot manufacture a new presumption now and retroactively impose it on a Congress that acted 27 years ago." *Tanzin*, 141 S. Ct. at 493. Sending the "new context" analysis back in time three decades and superimposing it on the Westfall Act is exactly the type of retrofitting the Supreme Court has disapproved.

Because Congress affirmatively acted, explicitly endorsing *Bivens* as it stood in 1988, including *Dellums*, there are by definition no "special factors counselling hesitation in the absence of affirmative action by Congress." The Court's only task is to give effect to the will of Congress as expressed in the Westfall Act—that is, to allow Plaintiffs to proceed with their *Bivens* claims.

## II.    The District Court's Special-Factors Analysis Was Erroneous.

Even had Congress not endorsed claims like Plaintiffs' in the Westfall Act, this Circuit's precedent refutes the district court's "special factors" analysis. No special factors bar Plaintiffs' claims here under the First, Fourth, and Fifth Amendments.

### A.    D.C. Circuit precedent confirms that no special factors counsel hesitation in authorizing a *Bivens* remedy for constitutional violations during a demonstration at the seat of a branch of the federal government.

The special factors inquiry has existed since *Bivens* itself in 1971. *See* 403 U.S. at 396 ("[t]he present case involves no special factors counselling hesitation"). In *Dellums*, no special factors prevented the court from applying *Bivens* to a context

35

just like this one: where police violated the First and Fourth Amendments by disrupting a large, peaceful demonstration in front of the seat of one of our three branches of government. If no special factors existed there, none exist here. *Dellums*, of course, is binding circuit precedent, which may not be overruled absent contrary Supreme Court authority. *See Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992).

More broadly, this Circuit has never suggested that special factors preclude the application of *Bivens* to enforce the constitutional rights of protesters. On the contrary, this Court and the district court have repeatedly recognized *Bivens* damages claims by demonstrators both before and after *Dellums*. *See, e.g.*, *Lash v. Lemke*, 786 F.3d 1, 5 n.2 (D.C. Cir. 2015) ("[t]here is no question" that protester tased by U.S. Park Police officers "may pursue an excessive force claim under *Bivens*"); *Hobson*, 737 F.2d at 56, 62-63 (*Bivens* First Amendment damages claim against FBI agents who impeded protests); *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 50-54 (D.D.C. 2013) (*Bivens* First Amendment claim for trying to intimidate plaintiff out of protesting near the White House); *Bloem v. Unknown Dep't of the Interior Emps.*, 920 F. Supp. 2d 154, 156-57, 159-61 (D.D.C. 2013) (noting that "the availability of [Fourth and Fifth Amendment remedies] is well established" in case where U.S. Park Police seized and destroyed protester's property); *Lederman v. United States*, 131 F. Supp. 2d 46, 47, 57, 61, 63 (D.D.C. 2001) (*Bivens* First and

Fourth Amendment claim for Capitol Police officer's arrest of demonstrator), *rev'd on other grounds*, 291 F.3d 36 (D.C. Cir. 2002); *Torossian v. Hayo*, 45 F. Supp. 2d 63, 66 (D.D.C 1999) (recognizing that "a *Bivens* action . . . has been held to be available to plaintiffs claiming violations of the First and Fourth Amendments" against demonstrators); *Masel v. Barrett*, 707 F. Supp. 4, 5-7 & n.1 (D.D.C. 1989) (*Bivens* excessive force claim by demonstrator protesting on White House sidewalk); *Tatum v. Morton*, 402 F. Supp. 719, 720, 724-25 & n.13 (D.D.C. 1974) (First Amendment *Bivens* claim by demonstrators on the sidewalk in front of the White House), *remanded for reassessment of damages*, 562 F.2d 1279 (D.C. Cir. 1977).

This decades-long and ongoing recognition of *Bivens* damages claims for demonstrators covers claims for activity both near the White House, *see Hartley*, 918 F. Supp. 2d at 50-52; *Masel*, 707 F. Supp. at 5-7; *Tatum*, 402 F. Supp. at 720, and at the Capitol, *see Dellums*, 566 F.2d at 173; *Lederman*, 131 F. Supp. at 57, 63.

The facts of this case and of those recent Supreme Court and D.C. Circuit cases where special factors have been found are worlds apart. This is not a case about a terrorism investigation, *Abbasi*, 137 S. Ct. at 1860-63, or foreign relations, *Hernandez*, 140 S. Ct. at 744-47, or the border, *Egbert*, 142 S. Ct. at 1804. And the two recent D.C. Circuit cases in which special factors counseled against a *Bivens* remedy are entirely inapposite. In *Loumiet v. United States*, 948 F.3d 376, 384 (D.C.

Cir. 2020), the detailed administrative remedial process of the Financial Institutions Reform, Recovery, and Enforcement Act precluded the availability of *Bivens*. And in *Meshal v. Higgenbotham*, 804 F.3d 417, 425-27 (D.C. Cir. 2015), national security and foreign affairs counseled hesitation in allowing a claim challenging federal agents' actions regarding a suspected terrorist in the custody of a foreign government. Neither of these cases is remotely similar to this one, which involves law enforcement officers brutally attacking and disrupting a peaceful demonstration on U.S. soil, suppressing speech that was clearly constitutionally protected in one of the Nation's most important public forums.

### B. Security is not a special factor that can cut off all *Bivens* claims in Lafayette Square.

The district court erred in holding that national security interests in "managing crowd activity directly outside the White House" counsel against permitting any *Bivens* claims in Lafayette Square. JA198. Although national security can qualify as a special factor, *Abbasi* specifically admonished against knee-jerk invocations of security concerns to preclude a *Bivens* remedy, warning that "national-security concerns must not become a talisman used to ward off inconvenient claims—a 'label' used to 'cover a multitude of sins.'" 137 S. Ct. at 1862 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)). In fact, the Court observed that the "danger of abuse" of the "national security" label is "heightened" in purely "domestic cases." *Id.* (cleaned up). And even when addressing the exercise of First Amendment rights

38

*in* the White House, this Court has not permitted speculative, conclusory invocations of "security" to justify curtailment of protected expressive activity. *Sherrill v. Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977) (requiring the White House to justify the rejection of press pass applicants for "reasons of security" because the phrase was "unnecessarily vague and subject to ambiguous interpretation").

The district court's reliance on the supposed omnipresence of security concerns not only flies in the face of these authorities and *Dellums*; it also contravenes this Court's precedent specifically addressing the security implications of demonstrations in Lafayette Square. In *A Quaker Action Grp. v. Morton*, 516 F.2d 717 (D.C. Cir. 1975) ("*Quaker Action IV*"), this Court considered an assertion akin to the district court's categorical view that all demonstrations in Lafayette Square implicate national security. *See id.* at 730 (summarizing testimony of Secret Service officials to the effect that "*any* demonstration, especially a large one, would pose an unreasonable danger to the security of the President and of the White House" (emphasis added)). The Court nevertheless held that a regulation capping crowd size in Lafayette Square at 3,000 people was unconstitutional. *See id.* at 732-33. Thus, at the heart of the district court's conception of the presidential security interest is a theory this Court has rejected. More generally, the district court's approach would obliterate this Court's instruction regarding Lafayette Square demonstrations to balance "First Amendment freedoms against safety requirements," *id.* at 722; *see*

39

*also A Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1117 (D.C. Cir. 1969) ("*Quaker Action I*") (noting that courts must make independent judgments regarding security threats asserted by the government), and replace it with the rule that any group of demonstrators on a public street or in a park near the White House represents a security threat worthy of being viciously beaten and gassed at the whim of federal officers.

Adhering to decades of Circuit precedent authorizing constitutional claims in this context leaves ample latitude for security officers to do their job. Sufficient deference to decisions made based on presidential security is already embodied in the substantive constitutional rules themselves, which permit, *inter alia*, dispersals based on a "clear and present danger," *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963); *accord, e.g.*, *Jones v. Parmley*, 465 F.3d 46, 58 (2d Cir. 2006) (Sotomayor, J.), and searches and seizures that are "reasonable"—a standard that takes into account "the duty to protect the safety and security of" high-level officials, *see Saucier v. Katz*, 533 U.S. 194, 209 (2001), *abrogated on other grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47, 855 (1998) (excessive force by law enforcement must "shock the conscience" to violate due process). These standards fully enable federal officials to make security decisions and protect the President without the need for an extreme rule that individuals whose constitutional rights are violated by federal officers in

Lafayette Square may *never* sue for damages no matter how egregiously unconstitutional the officials' conduct or how serious the injuries they inflict.

Thus, nearly a half-century of Circuit case law regarding First Amendment rights in Lafayette Square—together with the string of precedent, just as long, permitting *Bivens* claims by demonstrators, *see supra* Part II.A—refutes any suggestion that allowing a *Bivens* claim here is incompatible with national security. These unbroken lines of precedent are powerful, real-world evidence that the principal special factor relied on by the district court—that permitting such claims would compromise national/presidential security—is unfounded. Indeed, Defendants in this case have not claimed that White House security has been threatened by demonstrators a single time in more than four decades of living under of *Dellums* and *Quaker Action IV*. "[A] page of history is worth a volume of logic." *New York Tr. Co. v. Eisner*, 256 U.S. 345, 349 (1921) (Holmes, J.). When Congress acted affirmatively to preserve *Bivens* in 1988, it had more than ten years of experience under *Dellums* and was therefore in the best position to weigh the risks. In imposing its own view, diverging from the one enacted by Congress, the district court "arrogate[d] legislative power." *Egbert*, 142 S. Ct. at 1803 (cleaned up).

Congress also had good reason to endorse *Dellums*' holding in the face of purported security concerns. A public forum like Lafayette Square is a particularly important place for people to exercise their First Amendment rights to communicate

41

directly with their elected leaders—one of the fundamental tools of democracy. Lafayette Square is not just a "quintessential public forum," *United States v. Doe*, 968 F.2d 86, 87 (D.C. Cir. 1992), but one with special status, *id.* at 88—"a primary assembly point for First Amendment activity aimed at influencing national policies," *id.* at 89, "where the government not only tolerates but explicitly permits demonstrations and protests because of its unique location across the street from the White House," *id.* at 88. It is, in short, a "unique situs for the exercise of First Amendment rights." *Quaker Action IV*, 516 F.2d at 725; *accord Women Strike for Peace v. Morton*, 472 F.2d 1273, 1287 (D.C. Cir. 1972) (opinion of Wright, J.) ("There is an unmistakable symbolic significance in demonstrating close to the White House or on the Capitol grounds[.]"). It is entirely sensible that Congress would have wanted to ensure these unique, special places would remain robust forums for speech and to safeguard them by providing precisely the type of remedy that deters egregious abuses to suppress speech—like the events at issue here. *See Carlson*, 446 U.S. at 21 ("It is almost axiomatic that the threat of damages has a deterrent effect[.]").

The district court's contrary conclusion is deeply troubling. The district court reasoned that, because of the "inherently insecure" nature of the White House, "national-security concerns [a]re present in the decision-making process the federal officials face[]" whenever they address in any way "crowd activity directly outside

42

of the White House" in Lafayette Square. JA98. These concerns exist, the court insisted, regardless of "whether national security requires such conduct," JA198 (citation and internal quotation marks omitted)—that is, regardless of whether President's safety was implicated by the specific conduct at issue (and it was not, *see, e.g.*, JA222). Under the district court's rule, even in the absence of an actual security threat and even if the President were on an overseas trip thousands of miles from the White House, no *Bivens* claim could *ever* be available for constitutional violations by federal officers in Lafayette Square.

That means not just that a constitutional damages remedy is foreclosed for what happened here (which was bad enough): a blitzkrieg of tear gas, rubber bullets, and an armed baton charge that federal officers perpetrated against peaceful, law-abiding demonstrators, including children. It also means that had the officers shot with live ammunition, constitutional accountability would remain equally out of reach. And it also means that violations of other constitutional rights in Lafayette Square—for instance, violence against people exercising their right to pray for our Nation's leaders—cannot be redressed under *Bivens*. Judge Willett has warned that too stingy an application of *Bivens* effectively "allow[s] federal officials to operate in something resembling a Constitution-free zone." *Byrd v. Lamb*, 990 F.3d 879, 884 (5th Cir. 2021) (Willett, J., concurring). The district court's ruling creates exactly

43

that type of "zone" in the heart of the Nation's capital—and at an especially problematic location, the "unique situs" of Lafayette Square.

Finally, the Court's conclusions about the security risks ignore the well-pleaded allegations in the Complaint that the law-abiding, peaceful protesters posed no threat to the President. JA86, JA136. They were at Lafayette Square, not on the White House Lawn. The President was not present when Defendants' attack occurred; he was in the Rose Garden making a speech in one of the most secure locations in the world. JA85, JA148. There were no split-second decisions to be made. On the contrary, *Defendants* were the aggressors who initiated the confrontation. JA87-89, JA152. In rejecting the non-federal Defendants' invocation of qualified immunity, the district court even acknowledged that, based on the pleadings, it was "unable at th[at] time to credit the [appellees]' assertion that the clearing of the Square was done in the interest of presidential security." JA222.[5] Yet the district court's *Bivens* analysis relied on the assumption that presidential security was necessarily implicated by the attack.

---

[5] A 2021 report from the Department of the Interior's Inspector General likewise concluded that the attack on the demonstrators was unrelated to the President's walk through Lafayette Square; according to that report, the purpose of the attack was to facilitate the installation of additional fencing. *See* Office of Insp. Gen., U.S. Dep't of the Interior, Review of U.S. Park Police Actions at Lafayette Park 24-25 (June 8, 2021), https://www.oversight.gov/sites/default/files/oig-reports/DOI/Special ReviewUSPPActionsAtLafayetteParkPublic.pdf.

In sum: On top of Congress's endorsement of *Bivens* in the Westfall Act, this Circuit's precedent recognizing *Bivens* claims for demonstrators' rights and protecting the right to hold large demonstrations in Lafayette Square; the historical fact that this precedent has persisted for nearly a half-century without compromising presidential security; and the sweeping and drastic consequences of the district court's contrary view, security cannot possibly be a special factor that defeats Plaintiffs' claims here and creates a "Constitution-free zone" in one of this Nation's most important public forums.

### C.    The district court's invocation of congressional silence as a special factor is counterfactual because Congress has not been silent.

Congress's endorsement of the *Bivens* remedy in the Westfall Act rebuts the second special factor on which the district court relied: supposed congressional "silence" regarding *Bivens* in the field of presidential security. "Because of Congress' extensive activity in the field," the court concluded that Congress could not have meant for a *Bivens* cause of action to exist here without saying so. JA200. But Congress did say so, by explicitly preserving "a civil action against an employee of the Government [] which is brought for a violation of the Constitution of the United States," 28 U.S.C. § 2679(b)(2)(A). Thus, the "congressional silence" argument rests on a faulty premise.

Of course, Congress might have chosen in 1988 to state with more particularity that it intended a "cause of action" to exist and what applications it

wished to preserve—particularly if Congress had anticipated the shift in later Supreme Court cases regarding implied rights of action. But the Court does not impose such unforgiving drafting requirements on Congress, expecting it to anticipate future court decisions. *See Tanzin*, 141 S. Ct. at 493 ("We cannot manufacture a new presumption now and retroactively impose it on a Congress that acted 27 years ago."). As the Court put it in a circumstance similar to the one here, involving the question whether Congress preserved a preexisting, judicially-recognized remedy: "Congress could have made its intent clearer only by expressly providing for a private cause of action in the statute. In the legal context in which Congress acted, this was unnecessary." *Curran*, 456 U.S. at 387; *see also Carlson*, 446 U.S. at 19 n.5 (rejecting the suggestion that Congress must "recite[] any 'magic words'" to indicate its views regarding remedies); *cf. Franklin*, 503 U.S. at 78 (Scalia, J., concurring in judgment) (giving effect to Congress's "implicit acknowledgment that damages are available").

As the United States itself recently argued, in describing the presumptions applicable in light of prior judicial decisions when Congress amended the Voting Rights Act in 1982:

> Congress had no reason to codify an express right of action to enforce Section 2. The Supreme Court assumed the existence of a private right of action to enforce Section 2 in *City of Mobile v. Bolden*, 446 U.S. 55 (1980), which held that the original version of the statute reached only conduct prohibited by the Fifteenth Amendment. *Id.* at 60-61. Thus, when Congress amended Section 2 in response to *Bolden* to make clear

46

> that proof of discriminatory intent is not necessary to establish a violation of the statute, it had no need to revise the statute to expressly provide a private right of action. Pointing to the continued existence of such a right was sufficient.

Br. for U.S. as Amicus Curiae Supporting Plaintiffs-Appellants at 13-14, *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 22-1395 (8th Cir. filed Apr. 22, 2022). Likewise, here, "[p]ointing to the continued existence of such a right"— which Congress did in the explicit language of § 2679(b)(2)(A)—"was sufficient." Congressional silence cannot be a special factor here because Congress was not silent.

The district court's error is compounded by its misidentification of the relevant field of congressional activity. When assessing whether Congress has legislated extensively in a certain field, courts look to legislation on the "particular topic" on which the plaintiff's claims center. *Klay v. Panetta*, 758 F.3d 369, 376 (D.C. Cir. 2014). Plaintiffs' claims center on protesters' rights, i.e., "government officers' response to a large protest in Lafayette Square." JA196. The district court misidentified the field in question as the safety of the President and the security of the White House. JA199-201. The complaints very plausibly allege the attack on the demonstrators was *not* undertaken to protect the President, *see supra* Part II.B—who was safely on the White House grounds while protesters peacefully sang, danced, and kneeled amongst a crowd of children and pets. Testimony, video footage, police radio, and the lack of arrests corroborate the absence of protester violence. JA159.

Defendant Barr himself later acknowledged that the attack wasn't "to respond to that particular crowd." *Id.* That Congress legislated extensively about protecting the President provides no indication whatsoever that Congress wanted to immunize *all* federal officials who commit constitutional violations in Lafayette Square—whether against peaceful protesters, those engaged in silent prayer, or anyone else. Rather, it is the Westfall Act that reflects Congress's view. *See* Part I.B.

In sum, the district court erred in holding that Congress's purported "silence" counsels against recognition of Plaintiffs' *Bivens* claims. Congress was not silent.

### D.    Congress has not specified any "alternative remedies" it views as "adequate" to displace the cause of action it endorsed in 1988.

Finally, the district court stated that the mere possibility of seeking injunctive relief from future dispersals constituted an "alternative remedy" foreclosing *Bivens*. JA201. The court deemed such a remedy an "alternative" even though Plaintiffs had no standing to seek such relief. JA206. That conclusion, like the court's others, reflects insufficient deference to Congress. "[W]hether a given remedy is adequate is a legislative determination that must be left to Congress, not the federal courts." *Egbert*, 142 S. Ct. at 1807. Here, Congress recognized the *Bivens* damages action as it existed in 1988, including demonstrators' rights claims under cases like *Dellums* and *Hobson*. Neither Defendants nor the district court has pointed to any "legislative determination" that any other alternative remedy is "adequate" to displace the *Bivens* cause of action that Congress endorsed.

48

*Egbert* illustrates the district court's error. There, even though the Court recognized the adequacy of an agency's administrative grievance process as an alternative to *Bivens*, the Court did not take up the defendant's suggestion to overrule its holding in *Carlson* that the FTCA—which includes a full-fledged right to sue in court for damages—is *not* an "alternative remedy" displacing *Bivens*. *See Egbert*, 142 S. Ct. at 1822 n.7 (Sotomayor, J., concurring in part and dissenting in part) ("Agent Egbert contends that the FTCA offers an alternative remedy for claims like Boule's. This Court does not endorse this argument, and for good reason.") The FTCA is a more robust remedy than the administrative process invoked in *Egbert*. But that is not what matters; what matters is the judgment of Congress. *See Carlson*, 446 U.S. at 19-20 & n.5. Where the judiciary would otherwise be making a policy judgment about whether to afford a right of action (as in *Egbert*), even a modest reason to infer that a different remedy is adequate is enough to tip the scales against recognizing a *Bivens* claim, because of the Court's duty to respect the prerogatives of Congress in creating (or not creating) causes of action. By the same token, where Congress has affirmatively endorsed a *Bivens* claim (as here), the same duty points the other way, as it did in *Carlson*. Here, Plaintiffs' cause of action is squarely within the *Bivens* remedy that Congress endorsed in 1988, and in the absence of a "legislative determination" that some other alternative is adequate, *Egbert*, 142 S. Ct. at 1807, it is not the judiciary's role to displace *Bivens*.

49

Affirmative congressional guidance distinguishes the cases on which the district court relied. Two involved comprehensive remedial schemes specifically *adopted by Congress* for the purposes at hand. *Schweiker*, 487 U.S. at 426 ("Congress chose specific forms and levels of protection for the rights of persons affected by incorrect eligibility determinations[.]"); *Liff v. Office of Inspector Gen.*, 881 F.3d 912, 922, 924 (D.C. Cir. 2018) (rejecting former government contractor's *Bivens* claims over denial of future contracts and reputational harm because, respectively, "the congressionally created system for government-contract adjudication precludes judicial extension of further remedies," and "[t]he Privacy Act represents Congress's legislative judgment about the appropriate remedies with respect to the accuracy, fairness, and use of government information"). The district court's additional citation to *Malesko*, 534 U.S. at 69, adds little, as the cited passage merely discusses *Schweiker*.

Finally, to the extent the district court relied on *Abbasi*, it drew far more of an implication from one paragraph than it can bear. First, *Abbasi* discussed injunctive relief not as a special factor that foreclosed the *Bivens* action but to rebut the objection that the plaintiffs in that case lacked a remedy—i.e., to explain why "this is not a case like *Bivens* or *Davis* in which 'it is damages or nothing.'" *Abbasi*, 137 S. Ct. at 1862 (citations omitted). Second, even if that brief discussion in *Abbasi* is understood as an "alternative remedies" analysis, it cannot logically be read as the

50

district court construed it. If the mere ability to *file a case* for injunctive relief foreclosed *Bivens*, then the alternative-remedies exception to *Bivens* would swallow the rule: no other special factor would ever need to be discussed, and each of the Supreme Court's three recent treatments of the *Bivens* question could have been reduced to a single paragraph. One can *always* file a suit seeking an injunction against a repeat of a constitutional violation, even if (as here) such a claim will be dismissed for lack of standing. *Abbasi*'s invocation of injunctive relief can sensibly be understood only in the particular context in which it was invoked: where "large-scale policy decisions" were challenged. *Id.* It is "[t]o address those kinds of decisions," *Abbasi* explained, that plaintiffs "may seek injunctive relief." *Id.* By contrast, as the Court explained in the same paragraph, "individual instances of . . . law enforcement overreach . . . due to their very nature are difficult to address except by way of damages actions after the fact." *Id.* Here, Plaintiffs did not challenge a large-scale policy—or any policy at all. Rather, their claims challenge "individual instances of . . . law enforcement overreach"—exactly what the Court has said damages, not injunctive relief, are for.

The district court erred in denying the *Bivens* action that Congress authorized, in deference to possible alternatives about which Congress has said nothing.

* * *

51

In sum, each of the three special factors on which the district court relied contravenes this Court's precedent and/or the views of Congress. Plaintiffs should be allowed to proceed with their *Bivens* action to seek redress for Defendants' violations of their First, Fourth, and Fifth Amendment rights in violently suppressing their demonstration.

**III.    A Suit Against an Attorney General for Misconduct Personally Committed and Not Part of a Broader Policy Initiative Falls Within The *Bivens* Cause of Action Congress Endorsed in 1988.**

High-ranking officials are not categorically immune from *Bivens*. Rather, in the unusual circumstance where a high-ranking official participates personally in a constitutional violation, liability can attach—as the Supreme Court held prior to the Westfall Act. *See Davis v. Passman*, 442 U.S. 228 (1979) (Member of Congress liable under *Bivens*); *see also Mitchell v. Forsyth*, 472 U.S. 511, 513, 523 n.7 (1985) (considering *Bivens* case against former Attorney General without questioning existence of cause of action, and approvingly citing *Bivens* regarding the deterrent value of damages suits); *Butz v. Economou*, 438 U.S. 478, 482-83 (1978) (considering *Bivens* case against former Secretary of Agriculture without questioning existence of cause of action). Relatedly, the Supreme Court held in *Bivens* cases prior to 1988 that cabinet members do not need absolute immunity in order to perform their jobs, including as relevant to national security. *See Mitchell*, 472 U.S. at 524 ("We do not believe that the security of the Republic will be

threatened if its Attorney General is given incentives to abide by clearly established law."); *Butz*, 438 U.S. at 506-07. Denying a cause of action to high-ranking officials simply because of their rank is functionally equivalent to granting them absolute immunity—the result *Mitchell* squarely rejected. 472 U.S. at 521 ("[T]he Attorney General's status as a Cabinet officer is not in itself sufficient to invest him with absolute immunity[.]").

*Abbasi* is not to the contrary. There, the Court rejected *Bivens* claims against high-ranking officials because the claims "would call into question the formulation and implementation of a general policy," and in turn lead to intrusive discovery that would "border upon or directly implicate the discussion and deliberations that led to the formation of the policy in question." *Abbasi*, 137 S. Ct. at 1860-61. These concerns were absent in *Davis* (concerning a single employment decision), *Mitchell* (concerning a single wiretap), and *Butz* (concerning a single administrative proceeding)—all of which were prominent decisions in the body of law that the Westfall Act endorsed. Such concerns about general federal policy are absent here as well. No one alleges that the U.S. government has a policy of attacking peaceful demonstrators. Former Attorney General Barr is sued because he personally ordered Lafayette Square cleared. JA88, JA145. Accordingly, discovery would not touch upon "the discussion and deliberations that led to the formation of [any] policy." And even if it did, executive officials do not have blanket immunity from discovery,

53

which can be carefully tailored to protect a defendant from undue burden. *See Crawford-El v. Britton*, 523 U.S. 574, 598-600 (1998).

Former Attorney General Barr's prior high rank does not exempt him from *Bivens* as it was understood in 1988 when Congress affirmatively endorsed it, so it should not bar claims against him here.

## CONCLUSION

The Court should reverse the dismissal of the *Bivens* claims.

November 23, 2022

Respectfully submitted,
*/s/ Anne Champion*
*/s/ Lee R. Crain*
Orin Snyder
Anne Champion
Katherine Marquart
Lee R. Crain
Nathan Eagan
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Tel: 212.351.4000
achampion@gibsondunn.com
lcrain@gibsondunn.com

Greta B. Williams
Matthew Guice Aiken
Tessa Gellerson
Austin M. Donohue
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036-5306
Tel: 202.955.8500
gbwilliams@gibsondunn.com

Respectfully submitted,
*/s/ Scott Michelman*
Scott Michelman
Arthur B. Spitzer
Michael Perloff
AMERICAN CIVIL LIBERTIES UNION
FOUND. OF THE DISTRICT OF COLUMBIA
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel.: 202.601.4267
smichelman@acludc.org

Kaitlin Banner
Dennis Corkery
Jonathan M. Smith
WASHINGTON LAWYERS' COMM. FOR
CIVIL RIGHTS AND URBAN AFFAIRS
700 14th Street NW, Suite 400
Washington, D.C. 20005
Tel.: 202.319.1000
kaitlin_banner@washlaw.org

Jon Greenbaum
Arthur Ago

*Counsel for Plaintiffs-Appellants*
*in Buchanan v. Barr, No. 22-5133*

David Brody
Arusha Gordon
LAWYERS' COMM. FOR CIVIL RIGHTS
UNDER LAW
1500 K Street NW, Suite 900
Washington, D.C. 20005
Tel.: 202.662.8600
jgreenbaum@lawyerscommittee.org

John A. Freedman
David E. Kouba
Sonia Tabriz
ARNOLD & PORTER KAYE SCHOLER
LLP
601 Massachusetts Avenue NW
Washington, D.C. 20004
Tel.: 202.942.5000
John.Freedman@arnoldporter.com

*Counsel for Plaintiffs-Appellants*
*in Black Lives Matter D.C. v. Barr,*
*No. 22-5139*[6]

---

[6] Counsel wish to acknowledge the assistance of paralegal Elaine Stamp in the preparation of this brief and the research assistance of law student interns Nina Gerdes and Erica Witter.

## CERTIFICATE OF WORD COUNT

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 12,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface (Times New Roman 14-point type) using Microsoft Word.

*/s/ Scott Michelman*
Scott Michelman

# STATUTORY ADDENDUM

<u>Page</u>

28 U.S.C. § 2679 ................................................................................Add. 1

**28 U.S.C. § 2679.  Exclusiveness of remedy**

(a)  The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.

(b)(1)  The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

(2)  Paragraph (1) does not extend or apply to a civil action against an employee of the Government—

(A)  which is brought for a violation of the Constitution of the United States, or

(B)  which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized.

(c)  The Attorney General shall defend any civil action or proceeding brought in any court against any employee of the Government or his estate for any such damage or injury.  The employee against whom such civil action or proceeding is brought shall deliver within such time after date of service or knowledge of service as determined by the Attorney General, all process served upon him or an attested true copy thereof to his immediate superior or to whomever was designated by the head of his department to receive such papers and such person shall promptly furnish copies of the pleadings and process therein to the United States attorney for the district embracing the place wherein the proceeding is brought, to the Attorney General, and to the head of his employing Federal agency.

(d)(1)  Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

Add. 1

(2)  Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a State court shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or proceeding is pending. Such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.  This certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal.

(3)  In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment.  Upon such certification by the court, such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. A copy of the petition shall be served upon the United States in accordance with the provisions of Rule 4(d)(4)1 of the Federal Rules of Civil Procedure.  In the event the petition is filed in a civil action or proceeding pending in a State court, the action or proceeding may be removed without bond by the Attorney General to the district court of the United States for the district and division embracing the place in which it is pending.  If, in considering the petition, the district court determines that the employee was not acting within the scope of his office or employment, the action or proceeding shall be remanded to the State court.

(4)  Upon certification, any action or proceeding subject to paragraph (1), (2), or (3) shall proceed in the same manner as any action against the United States filed pursuant to section 1346(b) of this title and shall be subject to the limitations and exceptions applicable to those actions.

(5)  Whenever an action or proceeding in which the United States is substituted as the party defendant under this subsection is dismissed for failure first to present a claim pursuant to section 2675(a) of this title, such a claim shall be deemed to be timely presented under section 2401(b) of this title if—

(A) the claim would have been timely had it been filed on the date the underlying civil action was commenced, and

(B) the claim is presented to the appropriate Federal agency within 60 days after dismissal of the civil action.

(e)  The Attorney General may compromise or settle any claim asserted in such civil action or proceeding in the manner provided in section 2677, and with the same effect.