ORAL ARGUMENT NOT YET SCHEDULED

Nos. 22-5133, -5139

# United States Court of Appeals for the District of Columbia Circuit

RADIYA BUCHANAN, *et al.*,

*Plaintiffs–Appellants,*

v.

WILLIAM P. BARR, *et al.*,

*Defendants–Appellees.*

BLACK LIVES MATTER DC, *et al.*,

*Plaintiffs–Appellants,*

v.

WILLIAM P. BARR, *et al.*,

*Defendants–Appellees.*

Consolidated Appeals from the U.S. District Court
for the District of Columbia (Nos. 1:20-cv-1469, -1542)

## BRIEF OF CLERGY AND RELIGIOUS INSTITUTIONS AS AMICI IN SUPPORT OF APPELLANTS AND REVERSAL

Sarah Helene Duggin
Room 411
3600 John McCormack Road NE
Washington, DC 20064
(301) 509-7023
sarah@stjohnsgeorgetown.org

Donald Crane
3727 Northampton Street NW
Washington, DC 20015
(202) 664-9858
donaldexplore@gmail.com

*Counsel for Amicus Curiae
Rev. Virginia Gerbasi*

Kwaku A. Akowuah
Tobias S. Loss-Eaton
    *Counsel of Record*
John L. Gibbons
Lakeisha F. Mays
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8427
tlosseaton@sidley.com

*Counsel for Amici Curiae*

## CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES AND RULE 26.1 STATEMENT

Under Circuit Rules 26.1 and 28(a)(1), undersigned counsel certifies as follows:

**(A)**  **Parties and *amici***

All parties, intervenors, and *amici* appearing in this Court to date are listed in appellants' opening brief and the briefs for *amici* Institute for Justice and Foundation for Individual Rights and Expression and Bipartisan Former Members of Congress.

*Amici* appearing on this brief are: The Rev. Virginia "Gini" Gerbasi; the Rev. Julia Joyce Domenick; Interfaith Alliance Foundation; Foundry United Methodist Church; the Rev. Dr. Amy Butler; the Rt. Rev. John Bryson Chane, D.D., the Rev. Gayle Fisher-Stewart, Ph.D.; the Rev. Ginger E. Gaines-Cirelli; the Rev. Elenora Giddings Ivory; the Rev. Glenna J. Huber; the Rev. Linda Kaufman; the Rt. Rev. Chilton R. Knudsen; Pastor William H. Lamar IV; the Rev. Ledlie I. Laughlin; the Rev. Kent Marcoux; the Rev. Michele H. Morgan; Rabbi Jonathan Roos; the Rev. David Wacaster; the Rev. Jim Wallis; John Wimberly; and Rabbi Daniel G. Zemel.

Interfaith Alliance Foundation is a non-profit organization; it has no parent corporation and does not issue stock. Foundry United Methodist Church is a non-profit organization; it has no parent corporation and does not issue stock. All other *amici* appearing on this brief are individuals.

**(B)**   <u>**Rulings under review**</u>

References to the order at issue appear in appellants' opening brief.

**(C)**   <u>**Related cases**</u>

To counsel's knowledge, references to all related cases appear in appellants' opening brief.

<u>/s/ *Tobias S. Loss-Eaton*</u>
Tobias S. Loss-Eaton

## <u>TABLE OF CONTENTS</u>

Certificate of parties, rulings, and related cases and Rule 26.1 statement .............................................................................. i

Table of authorities ............................................................... iv

Amici curiae's identities, interests, and authority to file ....................... 1

Introduction and summary of argument ................................................ 11

Argument ........................................................................... 14

    Denying an individual remedy for the plaintiffs' free-expression claims would endanger religious liberty...................... 14

    A.  By attacking the St. John's patio, seizing it, and using it as a prop for partisan messaging, the defendants trampled the free exercise of religion................................... 15

        1.  The defendants forcibly ejected clergy and worshippers, supplanted the church's message with their own, and then blocked access to the churchyard for days. .................................................... 15

        2.  The defendants' actions were a grave affront to the First Amendment's guarantee of religious freedom. ...................................................... 22

    B.  Freedom of speech and religion are inextricably intertwined, both here and throughout our nation's history. ................................................................ 28

Conclusion........................................................................... 33

Certificate of service

Certificate of compliance

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*,
    482 U.S. 569 (1987) ................................................................ 30

*Engel v. Vitale*,
    370 U.S. 421 (1962) ................................................................ 28

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020) ............................................................ 11

*Everson v. Bd. of Educ.*,
    330 U.S. 1 (1947) .................................................................... 23

*Fulton v. City of Phila.*,
    141 S. Ct. 1868 (2021) ....................................................... 12, 24

*Good News Club v. Milford Cent. Sch.*,
    533 U.S. 98 (2001) .................................................................. 30

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993) ................................................................ 30

*Lee v. Int'l Soc'y for Krishna Consciousness, Inc.*,
    505 U.S. 830 (1992) ................................................................ 29

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*,
    138 S. Ct. 1719 (2018) ............................................................ 30

*McCreary Cnty. v. ACLU of Ky.*,
    545 U.S. 844 (2005) ................................................................ 11

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ................................................................ 30

*Nat'l Inst. of Family & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) ............................................................ 29

*O'Hair v. Andrus,*
  613 F.2d 931 (D.C. Cir. 1979) ................................................ 28

*Schneider v. Town of Irvington,*
  308 U.S. 147 (1939) ............................................................... 29

*Est. of Thornton v. Caldor, Inc.,*
  472 U.S. 703 (1985) ............................................................... 23

*W. Va. Bd. of Educ. v. Barnette,*
  319 U.S. 624 (1943) ......................................................... 13, 28

*Watchtower Bible Tract Soc'y v. Vill. of Stratton,*
  536 U.S. 150 (2002) ............................................................... 29

*Wooley v. Maynard,*
  430 U.S. 705 (1977) .............................................................. 29

## Other Authorities

U.S. Const., preamble ................................................................ 32

Marta Cook & John Halpin, *The Role of Faith in the Progres-
  sive Movement*, Ctr. for Am. Progress (Oct. 2010),
  http://bit.ly/3goYOHJ ............................................................ 31

Sarah Duggin & Donald Crane, *Commandeering the
  Churchyard: The First Amendment Implications of the
  Government's June 2020 Assault on St. John's – Lafeyette
  Square*, 32 Geo. Mason U. C.R. L.J. 99 (2021) .......... 19, 23, 25, 26, 27

Gina Gerbasi, *I'm a priest. The police forced me off church
  grounds for Trump's photo op.*, Wash. Post (June 3, 2020),
  http://bit.ly/3GA80ng .......................................................... 21

*Germantown Quaker Petition Against Slavery*, Nat'l Park
  Serv. (Apr. 5, 2016), http://bit.ly/3OuvpZh ......................... 30

Brian Kilmeade, *Donald Trump Interview*, Fox News Radio
  (June 3, 2020), https://youtu.be/cAsHRZCz8fg ................... 26

Martin Luther King, Jr., *"I Have a Dream" Speech*, NPR (Aug. 28, 1963), http://bit.ly/3Vc3GyB ...................................................... 32

Martin Luther King, Jr., *"Our God is Marching On!" Speech*, Stanford Univ. (Mar. 25, 1965), http://bit.ly/3ErthwT ........................ 32

William H. Lamar IV, *Trump's stunt at St. John's is the result of American churches bowing to power*, NBC News (June 3, 2020), http://bit.ly/3ioUubX ...................................................... 8

MAAP, *Theodore Wright House*, Columbia Univ., http://bit.ly/3girOB5 (last visited Nov. 29, 2022) ................................ 31

Valerie J. Munson, *On Holy Ground: Church Sanctuary in the Trump Era*, 47 Sw. L. Rev. 49 (2017) ........................................... 24

*Presiding Bishop Michael Curry's Statement on Pesident Donald Trump's Use of St. John's, Holy Bible*, Episcopal Church Off. of Pub. Affs. (June 1, 2020), http://bit.ly/3VgHGTN ...................................................................... 22

*Statement of Reverend Virginia (Gini) Gerbasi Before the Subcomm. on C.R. & C.L., H. Comm. on Oversight & Reform*, 116th Cong. (June 29, 2020), http://bit.ly/3AuTut3 ...................................................... 21, 26

*Trial of the Rev. Jacob Gruber, Minister in the Methodist Episcopal Church, at the March term, 1819, in the Frederick County Court, for a Misdemeanor*, Library of Cong., http://bit.ly/3OoZXvi (last visited Nov. 29, 2022) .............................. 30

*Unanswered Questions About the U.S. Park Police's June 1 Attack on Peaceful Protesters at Lafeyette Square: Oversight Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. (June 29, 2020), http://bit.ly/3VgsB4l ............................ 22

@WhiteHouse, Twitter (June 1, 2020), http://bit.ly/3AUAZie ............... 25

Bertram Wyatt-Brown, *American Abolitionism and Religion*, Nat'l Humanities Ctr., http://bit.ly/3Eo3A07 (last visited Nov. 29, 2022) ...................................................................... 31

## AMICI CURIAE'S IDENTITIES, INTERESTS,
## AND AUTHORITY TO FILE

*Amici* are DC-area clergy and religious institutions of different faiths who are deeply concerned that the defendants' violence on June 1, 2020—in both Lafayette Square and a nearby churchyard—undermines constitutional protections for all Americans. As the plaintiffs' complaints allege, the defendants' unprovoked attack violated the free-speech and assembly rights of civil-rights demonstrators in and around Lafayette Square. And, by ejecting clergy (including some *amici*) and others engaged in ministry from the patio of St. John's Church, Lafayette Square, the defendants also infringed the free exercise of religion. The defendants later compounded this injury by using the church to convey a partisan political message contrary to the church's own teachings, and then preventing *amici* and others from returning to the churchyard for days. *Amici* are concerned that the district court's refusal to recognize a remedy for these unconstitutional actions endangers both free speech and religious liberty.

**The Rev. Virginia "Gini" Gerbasi** is the Rector of St. John's Episcopal Church, Georgetown, in Washington, DC.[1] She is a graduate of the Wesley Theological Seminary and both the Undergraduate Program and Law School of the College of William & Mary. Before pursuing her religious education, Rev. Gerbasi worked in public policy law relating to poverty and hunger and as a criminal defense attorney. She was a staff member of St. John's, Lafayette Square from 2012 to 2014. As described below, Rev. Gerbasi was praying for and offering support to demonstrators on the patio of St. John's on June 1, 2020, when she was subjected to tear gas, flash-bang grenades, and smoke bombs and violently forced off the property by the defendants' actions.

**The Rev. Julia Joyce Domenick** is the Associate Rector of St. John's Episcopal Church in Boulder, Colorado. She graduated from Virginia Theological Seminary in Alexandria, Virginia, where she received the Dean's Cross for Servant Leadership for her service to the seminary community. She also served as the deacon at St. John's Episcopal Church,

---

[1] While their names are similar, St. John's, Lafayette Square and St. John's Georgetown are separate churches within the Episcopal Diocese of Washington. Below, "St. John's" refers to St. Johns, Lafayette Square, where the events at issue took place.

Georgetown. Before seminary, Rev. Domenick served as an emergency room registered nurse for twenty years. She was also present for the events of June 1, 2020.

**Interfaith Alliance Foundation** is a national non-profit organization committed to championing true religious freedom and strengthening the separation between religion and government. With members from over 75 faith traditions and of no faith, Interfaith Alliance promotes policies that protect personal belief, combat extremism, and ensure that all Americans are treated equally under law.

**Foundry United Methodist Church** is an historic congregation of the United Methodist Church, located on 16th Street NW in Washington, DC. Founded in 1814, Foundry has been a spiritual leader in the nation's capital for more than 200 years. Foundry is a historic, progressive church that welcomes all, worships passionately, challenges the status quo, and seeks to transform the world through God's love. Foundry was a hub for respite services—snacks, water, restrooms—along the route of George Floyd protest marches down 16th Street in June 2020.

**The Rev. Dr. Amy Butler** is Interim Senior Minister of National City Christian Church in Washington, DC. She served until 2019 as the

seventh Senior Minister and first woman at the helm of The Riverside Church in the City of New York. She holds degrees from Baylor University, the International Baptist Theological Seminary, and Wesley Theological Seminary. Her professional ministry career began as the director of a homeless shelter for women in New Orleans, Louisiana; she later became Associate Pastor of Membership and Mission at St. Charles Avenue Baptist Church in New Orleans. In 2003, she was called to the position of Senior Minister of Calvary Baptist Church in Washington, D.C.'s Chinatown, where she was also the first woman to lead that historic congregation.

**The Rt. Rev. John Bryson Chane, D.D.**, was the eighth Bishop of the Episcopal Diocese of Washington, DC. He served in that role from 2002 until his retirement 2011. He also served as Interim Dean of the National Cathedral from 2003 to 2005. He continues to serve the National Cathedral as Senior Advisor for Interreligious Dialogue, and the Episcopal Diocese of San Diego, California as Assisting Bishop. His canonical jurisdiction while serving as the Bishop of Washington consisted of the District of Columbia, and Prince Georges, Montgomery, Saint Mary's, and Charles Counties in Maryland.

**The Rev. Gayle Fisher-Stewart, Ph.D.**, a retired priest in the Episcopal Diocese of Washington, is President of the DC Chapter, Union of Black Episcopalians. Before accepting the call to ordained ministry, she retired from the DC Metropolitan Police Department as a captain and then taught at the university level. Her area of special interest is the history of policing as it intersects with race in America.

**The Rev. Ginger E. Gaines-Cirelli** is Senior Pastor of *amicus* Foundry United Methodist Church. She has served in that role since 2014. She received her M.Div from Yale Divinity School, is the author of *Sacred Resistance: A Practical Guide to Christian Witness and Dissent,* and is a General Editor and writer for *The CEB Women's Bible.* Rev. Gaines-Cirelli was blocked by police from attending a prayer gathering at St. John's in June 2020.

**The Rev. Elenora Giddings Ivory** was ordained by the Presbytery of Boston in 1976, the third African American woman ordained in the Presbyterian Church. She served as Associate for Mission and Ecumenical Affairs of the Presbytery of National Capital and Director of the Presbyterian Church (U.S.A.) Washington Office, where her legislative advocacy focused on civil rights and religious liberty. She went on to be

5

the Director of the Division on Public Witness-Justice at the World Council of Churches in Geneva, Switzerland, where the bible and the U.N. Declaration on Human Rights guided the work of advocacy. She is a graduate of Douglass College of Rutgers University and Harvard Divinity School.

**The Rev. Glenna J. Huber** is the Rector of the Church of the Epiphany in Washington, DC. Before joining Epiphany, she served as Vicar at the Holy Nativity Episcopal Church in Baltimore, Maryland. She is also a consultant for congregations on the efficacy of community organizing in congregational development.

**The Rev. Linda Kaufman** was ordained in 1987 as an Episcopal priest. She has served the Foundry United Methodist Church in Washington, DC in various capacities, including as Minister of Missions. Rev. Kaufman's calling has been very specific and very powerful: to help the homeless, particularly the urban homeless. As Homeless Services Coordinator for the Downtown D.C. Business Improvement District, she has established new systems for providing valuable services to the homeless—from shelter and daily care, to housing and employment

opportunities. She also serves on the ministry of St. Stephen and the Incarnation in downtown Washington.

**Bishop Chilton R. Knudsen** served as Assisting Bishop of the Episcopal Diocese of Washington from 2019 to 2021. In that capacity, she provided pastoral care for DC-area Episcopal clergy who supported racial-justice demonstrations in the summer of 2020. She is currently Assisting Bishop of the Diocese of Chicago. She previously served as the diocesan bishop of Maine for a decade, as Interim Bishop in the Diocese of Lexington, and as Assistant Bishop in the Diocese of New York and the Diocese of Long Island. She is a graduate of Chatham College and Seabury-Western Theological Seminary.

**William H. Lamar IV** is pastor of the historic Metropolitan African Methodist Episcopal Church in Washington, DC. Ordained as an itinerant elder in 2000 at the Florida Annual Conference of the AME Church, he has also served congregations in Florida and Maryland. Previously, he was the managing director of Leadership Education at Duke University Divinity School. For nearly 15 years, Pastor Lamar has being actively involved with organizations like Direct Action Research Training (DART), Industrial Areas Foundations (IAF), and Washington Interfaith

Network (WIN) for faith-based community organizing for justice. Pastor Lamar published an opinion piece with NBC News about the events at issue here. *See* William H. Lamar IV, *Trump's Stunt at St. John's is the Result of American Churches Bowing to Power*, NBC News (June 3, 2020), http://bit.ly/3ioUubX.

**The Rev. Ledlie I. Laughlin** is Rector of St. Columba's Episcopal Church in Washington, DC. For 25 years, he has served in urban parishes up and down the East Coast. He attended Oberlin College and Yale Divinity School.

**The Rev. Kent Marcoux** is Rector at Transfiguration Parish Episcopal Church in Silver Spring, MD. He previously served as Rector of St. George's Episcopal Church in Washington, DC. He is a graduate of the University of New Orleans, Yale Divinity School, and the Yale School of Management.

**The Rev. Michele H. Morgan** is Rector of St. Mark's Episcopal Church, Capitol Hill. She was ordained in 2004, and came to St. Mark's in 2015. Rev. Morgan is a passionate advocate for LGBT equality and gun violence prevention.

**Rabbi Jonathan Roos** has served as Senior Rabbi at Temple Sinai in Washington, DC since 2010. He was ordained as a rabbi from the Hebrew Union College – Jewish Institute of Religion in 2002 with special awards for best sermon delivered, outstanding contributions to women and Judaism and outstanding academic achievement. He graduated from the University of Pennsylvania and received a master's degree in American History from the University of Maryland at College Park. Rabbi Roos is committed to Jewish social justice work at Temple Sinai and in the wider community where he focuses particularly on issues of immigration and refugee rights.

**The Rev. David Wacaster** is a Priest in the Episcopal Diocese of Washington.

**The Rev. Jim Wallis** is Director of the Center on Faith and Justice at Georgetown University and inaugural chair in Faith and Justice at the McCourt School of Public Policy.

**John Wimberly** was pastor of Western Presbyterian Church in Foggy Bottom, Washington DC from 1983 to 2012. He was co-founder of Miriam's Kitchen for the Homeless and Project Create. He remains active

in religious issues as a consultant working with Jewish and Christian congregations in the DC area and around the country.

**Rabbi Daniel G. Zemel** is the senior rabbi of Temple Micah in Washington, DC. He first came to Temple Micah in 1983. A graduate of Brown University, Rabbi Zemel received his rabbinic ordination from the New York campus of Hebrew Union College–Jewish Institute of Religion in 1979. Rabbi Zemel is concerned that the defendants' actions at issue clearly violated the free exercise of religion, and the noble concept of a house of worship as a sanctuary, which goes back to the Bible itself.

\*   \*   \*

All parties have consented to the filing of this brief. No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting the brief.

This separate *amicus* brief is appropriate under Circuit Rule 29(d) because no parties or other *amici* are situated to address the free-exercise harms of the defendants' conduct and the risks to religious liberty of failing to recognize a remedy.

## INTRODUCTION AND
## SUMMARY OF ARGUMENT

Denying a remedy for the defendants' violations of free-speech and assembly rights threatens not only freedom of expression, but also freedom of religion. "Together with the other First Amendment guarantees— of free speech, a free press, and the rights to assemble and petition—the Religion Clauses were designed to safeguard the freedom of conscience and belief" that are vital to a robust democracy. *See McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 881-82 (2005) (O'Connor, J., concurring). These intertwined protections together "embody an idea that was once considered radical: Free people are entitled to free and diverse thoughts, which government ought neither to constrain nor to direct." *Id.* And this idea "protects not just the right to *be* a religious person, holding beliefs inwardly and secretly; it also protects the right to *act* on those beliefs outwardly and publicly." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2276 (2020) (Gorsuch, J., concurring).

The defendants' actions violated this right. The plaintiffs ably explain why a *Bivens* remedy for the defendants' free-expression violations is both important and required by controlling law. *See* Br. 18–35. *Amici* write to emphasize that the defendants' concurrent violations of religious

11

liberty underscore the need for a robust constitutional remedy for these violations of the First Amendment. Thus, in the tradition of the Brandeis brief, *amici* offer additional context and color surrounding the defendants' unlawful actions.

Without provocation, the defendants not only attacked peaceful demonstrators in Lafayette Square, but crossed H Street and assaulted ordained clergy and worshippers in a churchyard. Rev. Gerbasi and her colleagues were gathered at St. John's answering their Bishop's invitation to pray, witness, and show solidarity with peaceful demonstrators. Yet the defendants' indiscriminate violence brought an abrupt end to this exercise of faith. And later, the defendants compounded this injury by appropriating the church to send a partisan political message contrary to its teachings, and then preventing clergy from returning to the churchyard to resume their prayer, witness, and ministry.

Now, like the plaintiffs, *amici* "count on" the federal courts "to stand up for the First Amendment." *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1926 (2021) (Alito, J., concurring in the judgment). The defendants' actions violated the intertwined freedoms of speech, assembly, petition, and religious exercise—all essential to a free society, and all protected by the

First Amendment. Indeed, the First Amendment's protections for expression and religious exercise are closely related. Many of the Supreme Court's foundational free-speech cases involved religiously motivated speech. *E.g.*, *W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 629 (1943). And throughout our nation's history, people of faith have relied on the First Amendment's overlapping guarantees to seek social and political change. From the anti-slavery movement to the Progressive era, and from the Civil Rights Movement to today's racial-justice protests, ministers and believers have a long tradition of urging social and political progress toward a more just world. Some *amici* and other people of faith followed that tradition here—but they were met with violence by armed agents of the state.

Denying a remedy for the defendants' unconstitutional actions thus threatens *all* First Amendment freedoms, including the freedom of religion. Federal officials should not be immune from liability under the Constitution for responding with force to peaceful and lawful expressions of faith.

## **ARGUMENT**

**Denying an individual remedy for the plaintiffs' free-expression claims would endanger religious liberty.**

By forcibly clearing ministers and worshipers from a churchyard, and, later, effectively usurping that church's pulpit to communicate a message contrary to the church's teachings, the defendants violated the First Amendment's guarantees of religious freedom. These constitutional injuries, together with the defendants' violations of the plaintiffs' free-speech and assembly rights, require a *Bivens* remedy. A right without an effective remedy is no right at all, and the First Amendment rights to free speech and free exercise have long been intertwined, just as they were on June 1, 2020. Prospective, non-monetary relief alone is not enough; it neither addresses isolated past harms, even egregious ones, nor creates a deterrent effect. Denying the plaintiffs a damages remedy thus imperils not only the freedom of expression, but also the freedom of religion.

A.    **By attacking the St. John's patio, seizing it, and using it as a prop for partisan messaging, the defendants trampled the free exercise of religion.**

1.    **The defendants forcibly ejected clergy and worshippers, supplanted the church's message with their own, and then blocked access to the churchyard for days.**

In the summer of 2020, people around the world came together to call for justice for victims of police violence through demonstrations and solidarity marches. In the District of Columbia, the demonstrations' epicenter was Lafayette Square, a public park just north of the White House complex.

Across H Street from the park sits St. John's Episcopal Church, Lafayette Square, where the church has been located since 1816. St. John's is often called the Church of Presidents; every sitting president since 1789 has attended the church at least once. Abraham Lincoln, for example, habitually joined the evening prayer at St. John's from an inconspicuous rear pew throughout the Civil War.

In front of St. John's is a large stone patio, often used by the church for gatherings and ministry. No fence surrounds the patio, but it is not part of the public sidewalk. The church maintains and uses the patio.

On Monday, June 1, the Right Reverend Mariann Budde, Bishop of the Episcopal Diocese of Washington, sent an online message to diocesan clergy asking members to pray and witness at St. John's, every day from 3:00 to 6:30 p.m. to support the call for racial justice:



*Amicus* Rev. Gerbasi was one of the message's recipients. Moved by her faith and her Bishop's invitation, Rev. Gerbasi went to St. John's, arriving on the patio around 4:00 p.m.

Around twenty other Episcopal clergy and parishioners from area churches also joined the call, including *amicus* Rev. Domenick, then a

seminarian at St. John's. While the demonstrations peacefully continued in the surrounding area, the clergy, including Rev. Gerbasi and Rev. Domenick, passed out water, snacks, hand sanitizer, and face masks. They also coordinated with volunteer medics who had set up on the patio to care for any injured or ill people. And they sought to offer a place of respite, peace, and spiritual comfort. Throughout the day, the clergy prayed for and with demonstrators, whom they welcomed onto the patio to rest, receive water and supplies, and worship together.

After a quiet afternoon, most of the clergy began to leave the patio around 6:10 p.m., in anticipation of a curfew announced to begin at 7:00 p.m. Rev. Gerbasi intended to stay as long as she could.

About 6:15 p.m., Rev. Gerbasi noticed a sudden increase in the police presence in Lafayette Square, including many black-clad riot police holding shields. These officers, as far as Rev. Gerbasi could tell, had no identifying marks on their uniforms.

Suddenly, Rev. Gerbasi heard a loud pop and saw smoke trailing through the air. Demonstrators started running north on 16th Street past the church as police sprayed the crowds with what Rev. Gerbasi

17

believed to be tear-gas, smoke bombs, flash-bang grenades, and rubber bullets. She heard no announcement or warning before the attack.

Rev. Gerbasi grabbed water, eye wash, and wet paper towels to help the crush of demonstrators running onto the St. John's patio. One person ran to the patio and yelled "somebody's hurt over here." Rev. Domenick—trained as a trauma nurse—left the patio to find the injured demonstrator. On her way she encountered officers with riot shields and clubs beating a demonstrator, as well as other officers on horseback pushing people out of the area. Rev. Domenick's eyes started to swell from what she believed to be tear-gas. She had to use Maalox to clear her eyes.

Still back on the patio, Rev. Gerbasi began ministering to a demonstrator who had been tear gassed; while washing out the demonstrator's eyes, she heard a man yell, "rubber bullets!" Looking over, Rev. Gerbasi saw the man crumple to the ground. He was holding his stomach, and there were marks on his shirt where rubber bullets had apparently struck him.

Soon, the riot police, forming a wall with their shields about fifteen feet from Rev. Gerbasi, began to physically push demonstrators and clergy off the St. John's patio. In Rev. Gerbasi's words, the "sacred space

18

became a battleground." Sarah Duggin & Donald Crane, *Commandeering the Churchyard: The First Amendment Implications of the Government's June 2020 Assault on St. John's – Lafayette Square*, 32 Geo. Mason U. C.R. L.J. 99, 100 (2021).

Shocked that the police phalanx had moved past the public sidewalk and entered the churchyard itself, Rev. Gerbasi grabbed as many water bottles as she could and fled. Though the tear gas had given her a headache and left her coughing, she turned back to pass out the remaining water bottles and to help wash out demonstrators' eyes. She saw more smoke, increasingly frequent flashes, and growing panic as demonstrators ran from the officers.

Rev. Gerbasi ultimately left the area shortly before 7:00 p.m. On the way home, her sister texted her that news media had shown President Trump walking across Lafayette Square towards St. John's. Rev. Domenick and other seminarians also left the area and boarded the Metro to return home. While on the train, they saw news reports that President Trump had visited the churchyard and saw photographs of him holding a Bible in front of St. John's.

The next day, Tuesday, June 2, Rev. Gerbasi and some fifty other local clergy returned to St. John's in the afternoon. They were able to minister, pray and care for people on the patio without incident. Some tried to return again on Wednesday to attend a planned prayer vigil at St. John's, including Rev. Gerbasi. But this time, armed officers—whose few insignia indicated they were members of the Bureau of Prisons' tactical teams—blocked access to the patio, preventing the vigil from taking place:

 

Riot police also kept Rev. Gerbasi and others from going back to St. John's on Thursday and Friday. The photos above were taken by Rev. Gerbasi and Rev. Gaines-Cirelli when they tried to reach the church.

On Wednesday, June 3, the Washington Post published Rev. Gerbasi's eyewitness account of these events. *See* Gini Gerbasi, *I'm a priest. The police forced me off church grounds for Trump's photo op.*, Wash. Post (June 3, 2020), http://bit.ly/3GA80ng. Rev. Gerbasi later recounted her experience in testimony before the House Subcommittee on Civil Rights and Civil Liberties, Committee on Oversight & Reform. *See Statement of the Reverend Virginia (Gini) Gerbasi Before the Subcomm. on C.R. & C.L., H. Comm. on Oversight & Reform* (June 29, 2020), http://bit.ly/3Au-Tut3 ("Gerbasi Statement").

Bishop Budde also testified at an oversight hearing conducted by the House Committee on Natural Resources. She confirmed her agreement with Rev. Gerbasi that the photo op was "sacrilege," "because it was taking something sacred and misapplying its message to justify something that was violent and that was abusive, an abuse of power. And

there is nothing in the scriptures that will condone that behavior."[2] Similarly, Presiding Bishop Michael Curry, primate of the Episcopal Church, released a statement condemning the President's use of "a church building and the Holy Bible for partisan political purposes."[3]

> **2.    The defendants' actions were a grave affront to the First Amendment's guarantee of religious freedom.**

When riot police entered the St. John's patio and drove off Rev. Gerbasi, Rev. Domenick, other clergy, and peaceful demonstrators, they violated the First Amendment. Before they were expelled, the clergy had been ministering to the demonstrators by praying for and with them, as well as offering water, snacks, hand sanitizer, and masks. "One ministry team ... posted a sign reading: 'Free water and free prayers.'" *See id.* In short, as churches have done for centuries, they were offering sanctuary. Yet they were forcibly displaced, and—apparently for the first time since

---

[2] *See Unanswered Questions About the U.S. Park Police's June 1 Attack on Peaceful Protesters at Lafayette Square: Oversight Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. 53 (June 29, 2020), http://bit.ly/3VgsB4l.

[3] *Presiding Bishop Michael Curry's statement on President Donald Trump's use of St. John's, Holy Bible*, Episcopal Church Off. of Pub. Affs. (June 1, 2020) http://bit.ly/3VgHGTN.

the Civil War—federal officials seized church property for their own (partisan political) purposes. *See* Duggin & Crane, *supra*, at 118 & n.109.

These events trampled the free exercise of religion, in three ways. *First* and most obviously, the government used force, on church land, to stop clergy and worshippers who had been welcomed by the church from peacefully exercising their faith. The government is supposed to "*guard against* activity that impinges on religious freedom"—not to use force to restrict that freedom. *See Est. of Thornton v. Caldor, Inc.*, 472 U.S. 703, 708 (1985) (emphasis added). The people who ratified the First Amendment would have been shocked to find armed federal officers responding to the peaceful exercise of religion in this way. And after expelling clergy and worshippers from church property, the defendants later prevented them from returning there to pray and worship. Again, this violates the most basic tenets of religious freedom. *Cf. Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947) (government cannot "force nor influence a person ... to remain away from church against his will").

*Second*, the defendants' expulsion and seizure violated the ancient tradition of sanctuary. "Throughout the medieval period ... every consecrated church in England and throughout Christendom was understood

to have an inherent right to provide sanctuary. Sanctuary was a powerful institution used to resolve conflict and work justice." Valerie J. Munson, *On Holy Ground: Church Sanctuary in the Trump Era*, 47 Sw. L. Rev. 49, 51 (2017). And the colonists "brought the principle of sanctuary with them to America"; American churches shielded fugitives from British law, runaway slaves, and conscientious objectors throughout history. *See id.* at 52.

Similar principles today motivate churches to use their spaces as soup kitchens and shelters for homeless people, or to care for orphaned children. *Cf. Fulton*, 141 S. Ct. at 1884–85 (Alito, J., concurring in the judgment). And those principles similarly moved the clergy present on June 1 to offer the St. John's patio as a place of respite and worship.

To be sure, sanctuary in its strongest possible sense—an absolute right to turn away government officials—is not part of modern American law. But St. John's was not seeking to harbor criminals or fugitives; the church and clergy merely sought to offer the patio as a safe space for peaceful demonstrators to rest and worship. Yet the government responded with force, without regard to church property or teachings.

24

*Third*, after the defendants' violent attack, the President used St. John's as a prop in his partisan political messaging against the peaceful demonstrators—a message contrary to Episcopal teachings. He posed for pictures using St. John's façade and signage, complete with the names of its clergy, as a backdrop:



The official White House's Twitter account even posted a video compilation of this excursion, set to dramatic music. *See* @WhiteHouse, Twitter (June 1, 2020), available at http://bit.ly/3AUAZie. (The photo above is also an official White House photo.)

Though this "photo op could have taken place anywhere," the President "chose St. John's as his stage" because (in his own words) he "viewed St. John's as 'a very, very special place.'" Duggin & Crane, *supra*, at 118. In fact, one advisor reportedly recommended "visiting the church"

25

specifically to appeal to certain voters. *See id.* at 108 (citation omitted). And the President's subsequent media appearances made clear that he meant this photo op to convey both political and religious messages. Asked about a Jesuit priest's statement that "the church is not a photo op," the President responded: "Well, my response is simple. … I think it was very symbolic. I did hold up a Bible. I think that's a good thing, not a bad thing, and many religious leaders loved it." *See* Brian Kilmeade, *Donald Trump Interview*, Fox News Radio (June 3, 2020), https://youtu.be/cAsHRZCz8fg; *see also* Duggin & Crane, *supra*, at 112–13.

But the message the President used St. John's to convey was not the Episcopal church's message—it was the opposite. "Racial justice, rooted in Scripture, is a critical ministry of the Episcopal Church in the Diocese of Washington." Gerbasi Statement at 1. Bishop Budde publicly condemned the photo op: "The president just used a Bible, the most sacred text of the Judeo-Christian tradition, and one of the churches of my Diocese without permission as a backdrop for a message antithetical to the teachings of Jesus and everything that our churches stand for. ... I am outraged." Duggin & Crane, *supra*, at 113 (quoting Jessie Yeung et

al., *June 1 George Floyd Protest News*, CNN (June 2, 2020),

https://cnn.it/3il7Ypi).

Similarly, the day after these events, the Episcopal bishops of New

England released a joint statement condemning the President's unprece-

dented actions:

> What President Trump did in front of St. John's Episcopal
> Church, Lafayette Square on the evening of June 1 was dis-
> graceful and morally repugnant. Displaying a Bible from
> which he did not quote, using as a mere backdrop an Episco-
> pal church where he did not pray, and—more callously—or-
> dering law enforcement to clear, with force and tear gas, a
> path through demonstrators who had gathered in peace, Pres-
> ident Trump distorted for his own purposes the cherished
> symbols of our faith to condone and stoke yet more violence.
>
> His tactic was obvious. Simply by holding aloft an unopened
> Bible he presumed to claim Christian endorsement and imply
> that of The Episcopal Church. Far more disturbingly, he
> seemed to be affecting the authority of the God and Savior we
> worship and serve, in order to support his own authority and
> to wield enhanced use of military force in a perverted attempt
> to restore peace to our nation.

Duggin & Crane, *supra*, at 113 (quoting Laura J. Ahrens et al., *New Eng-

land Bishops Respond to President Donald Trump's Photo Op*, Episcopal

News Serv. (June 2, 2020), http://bit.ly/3EOcQvU)). These statements un-

derline the gravity of the defendants' misconduct: They effectively

usurped the church's pulpit for partisan political purposes, and in doing

27

so thwarted the clergy's efforts to convey and live the church's teachings. The framers recognized that "religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate." *Engel v. Vitale*, 370 U.S. 421, 431–32 (1962). The defendants' actions violated these essential principles.

## B. Freedom of speech and religion are inextricably intertwined, both here and throughout our nation's history.

These religious-liberty interests are not separate from the free-expression rights the plaintiffs seek to vindicate here. All these First Amendment freedoms are inextricably "interrelated." *See O'Hair v. Andrus*, 613 F.2d 931, 934 (D.C. Cir. 1979). In fact, many of the nation's seminal free-speech cases involve religiously motivated speech. Likewise here, the events of June 1 involved a diverse coalition of people expressing moral, political, and religious messages—all silenced by the defendants' misconduct.

Religiously motivated expression has long been at the heart of free-speech jurisprudence. For example, *West Virginia Board of Education v. Barnette* involved schoolchildren with religious objections to saluting the U.S. flag and reciting the Pledge of Allegiance. 319 U.S. at 629. The Court agreed that the school could not compel the children to salute the flag or

28

pledge allegiance to it, because forced devotion "invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id* at 642. Similarly, *Wooley v. Maynard* involved a defendant who objected on religious grounds to displaying the New Hampshire motto "Live Free or Die" on his license plate. 430 U.S. 705, 707 (1977). The Court affirmed his free-speech right "to avoid becoming the courier" for a government-endorsed "ideology." *Id.* at 717; *see also Nat'l Inst. of Family & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2379 (2018) (Kennedy, J., concurring) (forced disclosure of information about abortion availability "compels individuals to contradict their most deeply held beliefs, beliefs grounded in basic philosophical, ethical, or religious precepts, or all of these").

Many important cases addressing the freedom to pass out pamphlets, speak in public, or knock on doors dealt with religious speech. *See, e.g.*, *Watchtower Bible Tract Soc'y v. Vill. of Stratton*, 536 U.S. 150 (2002); *Schneider v. Town of Irvington*, 308 U.S. 147, 157–59 (1939). The same is true for foundational cases outlining the constitutional standards for public forums and limited public forums. *See Lee v. Int'l Soc'y for Krishna Consciousness, Inc.*, 505 U.S. 830 (1992); *Bd. of Airport Comm'rs v. Jews*

*for Jesus, Inc.*, 482 U.S. 569 (1987); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993). And more recently, the Supreme Court has emphasized that "moral or religious opposition to abortion," *McCullen v. Coakley*, 573 U.S. 464, 472 (2014), or "religious and philosophical objections to gay marriage," are "protected views and in some instances protected forms of expression," *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018).

These cases, many of them foundational, reflect the broader truth that American history is rich with examples of citizens moved by religious conviction to speak out against injustice and support others who do so. People of faith and many ordained ministers, for example, relied on the Bible to call for the abolition of slavery.[4] In 1819, the minister of a Maryland Methodist church, Rev. Jacob Gruber, was prosecuted for preaching anti-slavery sermons; he was acquitted based on a free-expression and religious-freedom defense.[5] Later, a Black Presbyterian

---

[4] *See, e.g.*, *Germantown Quaker Petition Against Slavery*, Nat'l Park Serv. (Apr. 5, 2016), http://bit.ly/3OuvpZh.

[5] *See Trial of the Rev. Jacob Gruber, Minister in the Methodist Episcopal Church, at the March term, 1819, in the Frederick County Court, for a*

minister, Theodore S. Wright, operated his home as "a station on the Underground Railroad, and he spoke out against slavery from the pulpit of his church" in New York City.[6] Rev. Wright was the founder of the American Anti-Slavery Society, which in 1835 conducted a "postal campaign" that sent "bundles of tracts and newspapers to prominent clerical, legal, and political figures throughout the whole country."[7]

Religion also undergirded the Progressive movement of the late 19th and early 20th centuries, in the form of the "social gospel movement." "These reformers," like Walter Rauschenbusch, "argued that Christians should apply their teachings to public problems."[8] "The pastors who created this new way of thinking about sin and salvation were horrified by the ravaging effects of the new industrial economy on poor and working class Americans," and were concerned that "many middle- and upper-class Americans who professed to be Christians turned their

---

*Misdemeanor*, Library of Cong., http://bit.ly/3OoZXvi (last visited Nov. 29, 2022).

[6] MAAP, *Theodore Wright House*, Columbia Univ., http://bit.ly/3girOB5 (last visited Nov. 29, 2022).

[7] Bertram Wyatt-Brown, *American Abolitionism and Religion*, Nat'l Humanities Ctr., http://bit.ly/3Eo3A07 (last visited Nov. 29, 2022).

[8] Marta Cook & John Halpin, *The Role of Faith in the Progressive Movement*, Ctr. for Am. Progress, 1 (Oct. 2010), http://bit.ly/3goYOHJ.

backs on their fellow brothers and sisters—many who were immigrants—
who were forced to live and work under horrible conditions."[9]

And, of course, ordained ministers and seminarians were front and
center in the Civil Rights Movement of the 1950s and 1960s. These lead-
ers, like the Rev. Ralph Abernathy, the Rev. Jesse Jackson, John Lewis,
George Wesley Lee, the Rev. C.T. Vivian, and most famously the Rev. Dr.
Martin Luther King, Jr., spoke of the struggle for civil rights in explicitly
religious terms.[10]

The clergy and others at St. John's on June 1 followed in this proud
American tradition. Moved by their faith, and following the teachings of
their churches, they came to support demonstrators seeking social justice
and to express their own support for this message. That is, they came to
urge, in both moral and religious terms, changes that might help move
our nation toward "a more perfect Union." U.S. Const., preamble. As in
the cases just discussed, their right to express this message was protected
by *both* aspects of the First Amendment. The government could not

---

[9] *Id.* at 4.

[10] *See, e.g.*, Martin Luther King, Jr., *"I Have a Dream" Speech*, NPR (Aug.
28, 1963), http://bit.ly/3Vc3GyB; Martin Luther King, Jr., *"Our God is
Marching On!" Speech*, Stanford Univ. (Mar. 25, 1965),
http://bit.ly/3ErthwT.

lawfully stop them from peacefully expressing their religiously motivated message on church grounds, or from living their faith by caring for others. And it could not use their church as a billboard to convey a contrary political and religious message that it preferred.

In sum, the freedoms of expression and assembly at issue in this appeal are inseparably intertwined with the First Amendment's guarantees of religious freedom. If this Court forecloses the plaintiffs' *Bivens* claims against federal officials responsible for violently suppressing dissent, it will risk imperiling religious freedoms as well. A right without a remedy is no right at all. Denying the plaintiffs an effective remedy for the wrongs committed against them on June 1, 2020 not only undermines the freedom of expression at democracy's heart, but also imperils the religious liberty that is its soul. To ensure Americans of all faiths and traditions are free to exercise and proclaim their religion without interference by the government, the Court should reverse and allow the plaintiffs' damages claims to go forward.

## CONCLUSION

For these reasons and those set forth in the plaintiffs' brief, the Court should reverse the dismissal of the *Bivens* claims.

November 30, 2022

Sarah Helene Duggin
Room 411
3600 John McCormack Road NE
Washington, DC 20064
(301) 509-7023
sarah@stjohnsgeorgetown.org

Donald Crane
3727 Northampton Street NW
Washington, DC 20015
(202) 664-9858
donaldexplore@gmail.com

*Counsel for Amicus*
*Rev. Virginia Gerbasi*

Respectfully submitted,

/s/ *Tobias S. Loss-Eaton*
Kwaku A. Akowuah
Tobias S. Loss-Eaton
 *Counsel of Record*
John L. Gibbons
Lakeisha F. Mays
SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC 20005
(202) 736-8427
tlosseaton@sidley.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

On November 30, 2022, I caused a copy of this brief to be filed with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

/s/ *Tobias S. Loss-Eaton*
Tobias S. Loss-Eaton

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because this brief contains 6,162 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionately spaced typeface using Microsoft Word, in 14-point Century Schoolbook font.

/s/ *Tobias S. Loss-Eaton*
Tobias S. Loss-Eaton