**[ORAL ARGUMENT NOT SCHEDULED]**

**Nos. 22-5133, -5139**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――

RADIYA BUCHANAN, et al.,

Plaintiffs-Appellants,

v.

WILLIAM P. BARR, et al.,

Defendants-Appellees.

―――――――――――

On Appeal from the United States District Court
for the District of Columbia

―――――――――――

**BRIEF FOR APPELLEES ADAMCHIK, BARR, COX, DANIELS,
FELICIANO, FENNELLY, HENDRICKSON, JARMUZEWSKI,
MCDONALD, MONAHAN, SEIBERLING, AND SINACORE**

―――――――――――

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

MARK B. STERN
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7537*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5446*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Plaintiffs-appellants in No. 22-5133 are Radiya Buchanan; Ann Dagrin; and Lindsay Field.  Plaintiffs-appellants in No. 22-5139 are Black Lives Matter D.C.; Toni Sanders; J.N.C., through his mother Demetria Bright; Kishon McDonald; Garrett Bond; Keara Scallan; Lia Poteet; Dustin Foley; and E.X.F., through her father Dustin Foley.

Defendants-appellees in No. 22-5133 are William P. Barr; Gregory T. Monahan; Mark Adamchik; Russell Fennelly; and Cara Seiberling. Defendants-appellees in No. 22-5139 are William P. Barr; Mark Adamchik; Jonathan Daniels; Sean Cox; Luis Feliciano; Jeffrey Hendrickson; Nicholas Jarmuzewski; Bryan McDonald; Cara Seiberling; Lawrence Sinacore; Thomas LoCascio; and Sean Kellenberger.  The other defendants named in the complaints are Donald J. Trump; Mark T. Esper; William J. Walker; James M. Murray; Michael Carvajal; Peter Newsham; Mr. Seberling; Anthony Alioto; S. Buchanan; Jeffery Carroll; Mr. Hargrove; C. W. Meyer; Clifton I. Murphy; Thomas C. Payne; Mr. Taylor; Daniel M. Thau; Anthony

A. Willis; Wayne Vincent; Ryan Black; Ryan Allen; John and Jane Does 1-50; John and Jane Poes 1-50; John and Jane Roes 1-50; John Does 1-100; John Poes 1-20; and John Roes 1-50.

Amici in this Court are Institute for Justice and Foundation for Individual Rights and Expression; Rev. Virginia Gerbasi; Rev. Julia Joyce Domenick; Interfaith Alliance Foundation; Foundry United Methodist Church; Rev. Dr. Amy Butler; Rt. Rev. John Bryson Chane, D.D.; Rev. Gayle Fisher-Stewart, Ph.D.; Rev. Ginger E. Gaines-Cirelli; Rev. Elenora Giddings Ivory; Rev. Glenna J. Huber; Rev. Linda Kaufman; Rt. Rev. Chilton R. Knudsen; Pastor William H. Lamar IV; Rev. Ledlie I. Laughlin; Rev. Kent Marcoux; Rev. Michele H. Morgan; Rabbi Jonathan Roos; Rev. David Wacaster; Rev. Jim Wallis; John Wimberly; Rabbi Daniel G. Zemel; and Formers Representatives Jason Altmire Les AuCoin, Doug Bereuter, Howard Berman, Bruce Braley, William Brodhead, Yvonne Burke, Thomas Campbell, Lois Capps, Mike Capuano, Tony Coelho, Sam Coppersmith, Mickey Edwards, William Enyart, Barney Frank, Tom Harkin, Paul W. Hodes, Steve Israel, Richard Lehman, Mel Levine, Tim Mahoney, Paul McHale, Jim Moran, Bruce Morrison, Leon Panetta, Harley Rouda, Max

ii

Sandlin, Claudine Schneider, Patricia Schroeder, Chris Shays, Gerry Sikorski, Peter Smith, and Richard Stallings.

Amici who appeared in district court are Concerned Legal Academics and Historians; International Center for Advocates Against Discrimination; International Human Rights Clinic, University of Virginia School of Law; Leitner Center for International Law & Justice, Fordham University School of Law; Robert and Helen Bernstein Institute for Human Rights, New York University School of Law; William J. Aceves; Charles Avery, Jr.; Margaret Burnham; Clayborne Carson; Hazel Dukes; Mary Frances Berry; Wade Henderson; Judith Heumann; Delores Huerta; Jesse Jackson, Sr.; Benjamin Jealous; Martin Luther King, III; Marc Morial, Richard Morrisroe; Ruby Sales; Marian Wright Edelman; Carlos M. Vazquez; Anya Bernstein; James Pfander; Stephen I. Vladeck; and Reporters Committee for Freedom of the Press.

## B.    Rulings Under Review

The rulings under review were entered in *Buchanan v. Trump*, No. 20-cv-1542 (D.D.C.), and in *Black Lives Matter D.C. v. Trump*, No. 20-cv-1469 (D.D.C.), by the Honorable Dabney L. Friedrich.  They are the June 21, 2021 order and opinion granting motions to dismiss in part (J.A. 183-236), and the

iii

May 16, 2022 order entering partial final judgment (J.A. 237-42).  The district court's opinion granting the motions to dismiss in part is available at *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15 (D.D.C. 2021).

### C.    Related Cases

These cases were not previously before this Court.  Counsel is not aware of other pending related cases.

> */s/ Brian J. Springer*
> Brian J. Springer

## TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................ 1

STATEMENT OF THE ISSUE .......................................................................... 1

STATEMENT OF THE CASE ......................................................................... 2

    A.    Statutory and Regulatory Background ............................................ 2

    B.    Factual Background ................................................................ 3

    C.    Procedural Background ........................................................... 6

SUMMARY OF ARGUMENT ......................................................................... 9

STANDARD OF REVIEW ............................................................................ 12

ARGUMENT ................................................................................................ 12

The Judicially Created *Bivens* Remedy Should Not Be Extended to
This Novel Context ....................................................................................... 12

    A.    The Supreme Court Has Repeatedly Reaffirmed that
        Extending *Bivens* Is Disfavored ....................................... 12

    B.    The District Court Correctly Held that Plaintiffs' Claims
        Arise in a New Context Implicating Presidential Security
        and Congressional Prerogatives ...................................... 15

        1.    Plaintiffs' claims arise in a new context .............................. 15

        2.    Special factors preclude implication of a
            constitutional damages remedy .......................................... 17

    C.    Plaintiffs' Arguments Misunderstand the Governing Legal
        Framework ...................................................................... 25

CONCLUSION ........................................................................................... 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                  **Page(s)**

*A Quaker Action Grp. v. Morton,*
    516 F.2d 717 (D.C. Cir. 1975) ........................................................ 18

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................. 12

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
    403 U.S. 388 (1971) ............................................................. 1, 12

*Carlson v. Green,*
    446 U.S. 14 (1980) ............................................................. 13, 15

*Correctional Servs. Corp. v. Malesko,*
    534 U.S. 61 (2001) ................................................................. 12

*Davis v. Passman,*
    442 U.S. 228 (1979) ............................................................... 13

*Dellums v. Powell,*
    566 F.2d 167 (D.C. Cir. 1977) ............................................ 11, 25, 26

*Egbert v. Boule,*
    142 S. Ct. 1793 (2022) ............................ 9, 11, 14, 15, 16, 17, 19, 20, 25, 26

*Fox v. Government of D.C.,*
    794 F.3d 25 (D.C. Cir. 2015) ...................................................... 7

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020) ..................................... 7, 9, 11, 13, 15, 27

*Hobson v. Wilson,*
    737 F.2d 1 (D.C. Cir. 1984) ....................................................... 29

*Hui v. Castaneda,*
    559 U.S. 799 (2010) ............................................................... 27

*Klay v. Panetta,*
    758 F.3d 369 (D.C. Cir. 2014) ................................................ 20, 22

*Lash v. Lemke,*
    786 F.3d 1 (D.C. Cir. 2015) .............................................................. 28

*Loumiet v. United States,*
    948 F.3d 376 (D.C. Cir.), *cert. denied,*
    141 S. Ct. 180 (2020) ........................................................................ 16

*Meshal v. Higgenbotham,*
    804 F.3d 417 (D.C. Cir. 2015) ............................................. 12, 27, 28

*Reichle v. Howards,*
    566 U.S. 658 (2012) .......................................................................... 16

*Tanzin v. Tanvir,*
    141 S. Ct. 486 (2020) ........................................................................ 27

*True the Vote, Inc. v. Internal Revenue Serv.,*
    831 F.3d 551 (D.C. Cir. 2016) ........................................................... 12

*Watts v. United States,*
    394 U.S. 705 (1969) (per curiam) .................................................... 18

*White House Vigil for ERA Comm. v. Clark,*
    746 F.2d 1518 (D.C. Cir. 1984) ........................................................ 18

*Wood v. Moss,*
    572 U.S. 744 (2014) ....................................................................18, 19

*Ziglar v. Abbasi,*
    137 S. Ct. 1843 (2017) .................................... 7, 9, 11, 13, 14, 15, 17, 21, 24, 25

**Statutes:**

Westfall Act:
    28 U.S.C. § 2679(d) ........................................................................... 26

5 U.S.C. app. 3, § 3 ............................................................................... 21

18 U.S.C. § 242 ...................................................................................... 21

18 U.S.C. § 1752(a)(1) ............................................................................. 3

viii

18 U.S.C. § 1752(c)(1)(B) ......................................................... 3

18 U.S.C. § 3663(a)(1)(A) ......................................................... 21

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1331 ......................................................................... 1

54 U.S.C. § 102701(a) ................................................................ 2

54 U.S.C. § 102701(a)(1) ........................................................... 2

54 U.S.C. § 102701(b)(1) ........................................................... 2

54 U.S.C. § 102701(b)(2)(A) ...................................................... 2

D.C. Code Ann. § 5-201 ............................................................. 2

**Regulations:**

36 C.F.R. § 1.5(a)(1) ................................................................... 3

36 C.F.R. § 2.31(a)(3) ................................................................. 3

36 C.F.R. § 2.31(a)(5) ................................................................. 3

36 C.F.R. § 2.32(a)(2) ................................................................. 2

36 C.F.R. § 2.34 .......................................................................... 2

**Rule:**

Fed. R. Civ. P. 54(b) ................................................................... 1

**Legislative Materials:**

H.R. Rep. No. 95-1828 (1979) ................................................. 23

*Oversight Hearing Before the H. Comm. on Nat. Res.*,
   116th Cong. (2020) ........................................................... 22

*Oversight of the Department of Justice:*
   *Hearing Before the H. Comm. on the Judiciary*,
   116th Cong. (2020) ........................................................... 22

**Other Authorities:**

*Designation of Officers or Employees*,
   41 Fed. Reg. 44,876 (Oct. 13, 1976) .................................... 2

Office of Inspector Gen., U.S. Dep't of the Interior:
   *Additional Information About the Complaint Hotline*,
      https://perma.cc/46LP-VCQU ....................................... 20
   OIG-20-0563, *Review of U.S. Park Police Actions at Lafayette Park*
      (2021), https://perma.cc/LSJ9-5BAJ ............................... 21

Press Release, Office of the Inspector Gen., U.S. Dep't of Justice,
   DOJ OIG Announces Initiation of Work (July 23, 2020),
   https://perma.cc/86R7-UE23 ............................................ 21

Press Release, U.S. Dep't of Justice,
   Justice Department Announces Civil Settlement in Lafayette Square
   Cases (Apr. 13, 2022), https://perma.cc/Y9YM-EN4K .............. 24

U.S. Gov't Accountability Office, GAO-22-104470,
   *Law Enforcement: Federal Agencies Should Improve Reporting*
   *and Review of Less-Lethal Force* (2021),
   https://perma.cc/UZ7M-7ZRU ......................................... 22

U.S. Park Police, Nat'l Park Serv.,
   *Office of Professional Responsibility*,
   https://perma.cc/XRS4-BEDN ........................................... 20

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C.

§ 1331.  J.A. 82, ¶ 49; J.A. 141, ¶ 42.  The district court dismissed the claims

against the federal officers in their individual capacities on June 21, 2021.

J.A. 184-85.  Under Federal Rule of Civil Procedure 54(b), the district court

entered final judgment as to these claims on May 16, 2022.  J.A. 241-42.

Plaintiffs filed timely notices of appeal on May 16, 2022.  J.A. 243-46.  This

Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

These individual and putative class actions arise from the federal and

local response to a large protest in the park adjacent to the White House

before the President arrived at the park.  Plaintiffs seek to hold the former

Attorney General and other federal officers personally liable under *Bivens v.*

*Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388

(1971), for claimed constitutional violations allegedly committed by

undifferentiated law-enforcement officers.  The question presented is:

Whether the district court properly declined to imply a *Bivens* remedy

in this new context implicating interests in the safety and security of the

President and the area surrounding the White House.

## STATEMENT OF THE CASE

### A.  Statutory and Regulatory Background

Congress has charged the Secretary of the Interior with responsibility for "maintain[ing] law and order and protect[ing] individuals and property" within areas like Lafayette Park.  54 U.S.C. § 102701(a)(1).  The Secretary is empowered to designate officers and employees of the Department of the Interior and other federal agencies to perform law-enforcement activities. *See id.* § 102701(a), (b)(1); *see also Designation of Officers or Employees*, 41 Fed. Reg. 44,876 (Oct. 13, 1976) (designating officers of the U.S. Park Police and employees of the National Park Service).  Carrying out this law-enforcement function can involve "cooperat[ing] . . . with [a] State or political subdivision of a State in the enforcement of supervision of the laws or ordinances of that State or subdivision."  54 U.S.C. § 102701(b)(2)(A); *see also* D.C. Code Ann. § 5-201 (granting the U.S. Park Police the authority to enforce D.C. law).

To protect and preserve public lands and resources, agency regulations prohibit engaging in disorderly conduct on federal property, 36 C.F.R. § 2.34; failing to abide by "the lawful order of a government employee or agent authorized to maintain order," *id.* § 2.32(a)(2); destroying or vandalizing

property, *id.* § 2.31(a)(3); and obstructing public passageways, *id.* § 2.31(a)(5). The official in charge of a park area is permitted to "close all or a portion of a park area to all public use or to a specific use or activity." *Id.* § 1.5(a)(1). Any person who "knowingly enters or remains in" a restricted area "where the President . . . is or will be temporarily visiting" may be imprisoned for up to ten years. 18 U.S.C. § 1752(a)(1), (c)(1)(B).

## B.  Factual Background

In the aftermath of George Floyd's murder in May 2020, there were protests around the country. J.A. 74, ¶ 3; J.A. 142, ¶ 46. The cases on appeal arise out of the "large crowds of thousands of people," J.A. 83, ¶ 52, that "gathered in Lafayette Park," which "is located directly north of the White House," J.A. 144, ¶ 52. These protests sometimes involved "instances of looting and vandalism," including a May 31, 2020 fire "that broke out in the basement of the historic St. John's Episcopal Church, adjacent to Lafayette Park." J.A. 143, ¶ 50. In response, the D.C. mayor "announced a citywide curfew beginning at 7:00 p.m. on June 1, 2020." J.A. 143, ¶ 50; J.A. 92, ¶ 104.

Plaintiffs allege that, as part of a "continuation of [the ongoing] protests," J.A. 74, ¶ 3, "a large crowd of peaceful demonstrators" had assembled in Lafayette Park about an hour before the citywide curfew on

3

June 1, 2020, J.A. 145, ¶ 53. Former Attorney General William Barr allegedly arrived at the scene soon afterward and "ordered law enforcement personnel to extend the security perimeter around the White House and clear the streets around Lafayette Park." J.A. 145, ¶ 55. According to the operative complaints, the dispersal of protestors was carried out by federal law-enforcement officers (including from the U.S. Park Police, U.S. Secret Service, and Federal Bureau of Prisons), as well as military personnel and non-federal law-enforcement officers. *See* J.A. 86-87, ¶ 67; J.A. 145, ¶ 55.

In general, plaintiffs allege that "law enforcement officers" used physical strikes and non-lethal munitions against the crowd to clear the park. *See* J.A. 88, ¶ 83; J.A. 89, ¶ 88; J.A. 147, ¶ 57; J.A. 152, ¶ 70. There are few allegations as to the specific defendants in these appeals. For example, plaintiffs allege that the former Attorney General conveyed the order to clear protestors to Park Police Captain Russell Fennelly. J.A. 145, ¶ 55. Plaintiffs further allege that Acting Park Police Chief Gregory Monahan was "responsible for the actions of the U.S. Park Police officers," J.A. 78, ¶ 19, and that Park Police Major Mark Adamchik "gave the immediate order" to clear the area, J.A. 78, ¶ 20; *see also* J.A. 145-46, ¶ 55. Other defendants are alleged to have been involved in incidents with protestors other than

4

plaintiffs, *see* J.A. 90-91, ¶¶ 90-92, 95, 98; J.A. 147, ¶ 57, or in the overall effort to disperse people from Lafayette Park, *see* J.A. 88, ¶ 83; J.A. 140, ¶ 39.

Plaintiffs further allege that, just after the protestors were dispersed, the former President "emerged from the White House" and "walked through the now-cleared Lafayette Park" with the former Attorney General and security personnel.  J.A. 149-50, ¶ 63; *see* J.A. 109, ¶ 203; J.A. 134, ¶ 4.  The former President allegedly traversed Lafayette Park to St. John's Church, where he paused for photographs and gave "brief remarks," before returning to the White House.  J.A. 109, ¶ 203; J.A. 149-50, ¶ 63.  The federal government installed fencing around Lafayette Park later that night.  *See* J.A. 137, ¶ 11; J.A. 163, ¶ 100.

As plaintiffs' operative pleadings explain, the events at Lafayette Park have received extensive attention from the political branches.  Two Park Police officers became "the subject of an investigation by the [relevant] Office of Professional Responsibility."  J.A. 148, ¶ 58.  The Department of the Interior's Office of Inspector General "launch[ed] an investigation into United States Park Police's actions in Lafayette Park."  J.A. 169, ¶ 112.  And two congressional committees held hearings in which congressmembers "interviewed various witnesses," including the former Attorney General and

Acting Park Police Chief Gregory Monahan.  J.A. 169, ¶ 113.  "Federal authorities continue to investigate the facts and circumstances surrounding" the events that took place.  J.A. 169-70, ¶ 113.

### C.    Procedural Background

Plaintiffs brought these individual and putative class actions against various federal officers, D.C. police officers, and Arlington County police officers.  J.A. 78-82, ¶¶ 16-48; J.A. 138-41, ¶¶ 15-41.  The eight individual plaintiffs in the *Black Lives Matter D.C.* action allege that they participated in the Lafayette Park protests and were subject to unlawful dispersion and unreasonable seizure in violation of the First and Fourth Amendments.  J.A. 77-78, ¶¶ 10-15; J.A. 114-16, ¶¶ 220-30.  The three plaintiffs in the *Buchanan* action make similar allegations and also include a claim under the Fifth Amendment Due Process Clause.  J.A. 137-38, ¶¶ 12-14; J.A. 171-74, ¶¶ 115-35.  As relevant here, plaintiffs assert *Bivens* claims against former Attorney General William Barr and several U.S. Park Police officers in their individual capacities.  J.A. 114-16, ¶¶ 220-30; J.A. 174-75, ¶¶ 136-42.

The federal officers moved to dismiss the *Bivens* claims against them on the grounds that a *Bivens* remedy is unavailable in this context and, alternatively, that they are entitled to qualified immunity.  The district court

determined that a *Bivens* remedy should not be recognized in these circumstances and, therefore, did not reach the arguments regarding qualified immunity. *See* J.A. 193-94.[1]

Noting the Supreme Court's admonition that expanding individual-capacity damages actions is "a disfavored judicial activity," J.A. 194 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017)), the district court explained that a court's task is to assess whether the case "arises in a new context or involves a new category of defendants," J.A. 194 (quoting *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020)), and whether "there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy," J.A. 195 (quoting *Hernandez*, 140 S. Ct. at 743).

Applying that framework, the district court explained that "[t]he *Bivens* claims in these cases—brought under the First, Fourth, and Fifth Amendments—all arise in a new context." J.A. 195. The court noted that "the Supreme Court has never extended *Bivens* to a claim brought under the

---

[1] Plaintiffs' opening brief does not raise any argument regarding qualified immunity, which is not at issue in this appeal. *See Fox v. Government of D.C.*, 794 F.3d 25, 29 (D.C. Cir. 2015) (holding that arguments not raised in an opening brief are forfeited). If this Court were to conclude that a new constitutional damages action could properly be implied in this case, the appropriate course would be to remand to the district court to address the qualified immunity arguments in the first instance.

First Amendment" and that circuit precedent is irrelevant because "it is only Supreme Court decisions that count when determining whether a *Bivens* claim arises in a new context." J.A. 195-96. As to plaintiffs' Fourth and Fifth Amendment claims, the court stressed that "government officers' response to a large protest in Lafayette Square outside the White House" at issue here is "markedly different" from "entering and searching a private apartment to enforce federal narcotics laws" and from "sex-based employment discrimination" at issue in prior *Bivens* cases. J.A. 196-97.

The district court next concluded that special factors counsel against extending *Bivens* to plaintiffs' challenge to decisions about "managing crowd activity directly outside of the White House." J.A. 198. The court highlighted "the country's national-security interest in the safety and security of the President and the area surrounding the White House," J.A. 197, that is implicated by "the presence of a large crowd of protesters, even a peaceful one, near the president," J.A. 198-99. Allowing this sort of claim to proceed would risk disrupting Congress's considered and recurrent balancing of "the trade-offs between White House and presidential security and protesters' freedoms" through reports, hearings, appropriations, and legislation. *See* J.A. 199-201. As a further reason not to create *Bivens*

8

liability, the court noted that plaintiffs had "alternative avenues" to pursue their claims, including that their complaints requested "equitable relief in the form of a permanent injunction." J.A. 201. Those claims settled, with the government agreeing to make changes to agency policies.

The district court therefore found it "inappropriate to extend *Bivens* into the new context presented by these cases" and dismissed the *Bivens* claims against the federal officers. J.A. 201. Plaintiffs sought and obtained final judgments as to these claims. *See* J.A. 238-42. These appeals followed.

## SUMMARY OF ARGUMENT

The Supreme Court has repeatedly emphasized that expanding individual-capacity damages actions under *Bivens* to any "new context" or "new category of defendants" is "a disfavored judicial activity." *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022) (quotation marks omitted); *Hernandez v. Mesa*, 140 S. Ct. 735, 742-43 (2020); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). The Court has "made clear that, in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." *Egbert*, 142 S. Ct. at 1800.

In a thorough and well-reasoned decision, the district court held that plaintiffs' First, Fourth, and Fifth Amendment claims against the former

Attorney General and various U.S. Park Police officers present a new context and raise multiple special factors weighing strongly against recognizing a new damages cause of action. The Supreme Court has never extended the remedy to alleged First Amendment violations. The Court has implied a *Bivens* remedy for asserted Fourth and Fifth Amendment violations in only two cases—one involving narcotics agents entering and searching a private residence, and the other involving a Congressperson engaging in alleged employment discrimination. Those circumstances bear no resemblance to the federal and local response to a large protest in Lafayette Park adjacent to the White House before the President arrived.

The district court also recognized that separation-of-powers concerns counsel against extending a *Bivens* remedy to this novel context. Allowing these individual and putative class actions to proceed would intrude into the realm of presidential and White House security, topics on which Congress has legislated pervasively. The conduct at issue also has been the subject of extensive investigation by the political branches, which are well positioned to evaluate the complex considerations involved when protests occur in close proximity to the President and the White House.

10

Plaintiffs do not seriously dispute that their claims arise in a new context implicating presidential security and congressional prerogatives. Instead, they devote the bulk of their opening brief to a discussion of this Court's decision in *Dellums v. Powell*, 566 F.2d 167 (D.C. Cir. 1977), regarding First and Fourth Amendment *Bivens* claims by protesters at the Capitol, and Congress's subsequent enactment of the Westfall Act. The Supreme Court has instructed that prior *Bivens* decisions are relevant only to the extent they "satisf[y] the 'analytic framework' prescribed by the last four decades of intervening case law." *Egbert*, 142 S. Ct. at 1809 (quoting *Abbasi*, 137 S. Ct. at 1859). Plaintiffs rightly do not claim that *Dellums* meets that standard.

Rather, they argue that Congress tacitly approved that decision when it enacted the Westfall Act in 1988. The Westfall Act provides for substitution of the United States in common law tort actions against its employees and does not ratify *Bivens*, which is entirely a judge-made doctrine. The Supreme Court has left no doubt that the Westfall Act "is not a license to create a new *Bivens* remedy in a context [the Supreme Court] ha[s] never before addressed." *Hernandez*, 140 S. Ct. at 748 n.9. This Court has likewise stated that "uncertain interpretations of what Congress did in"

11

the Westfall Act "cannot overcome the weight of authority against expanding *Bivens*." *Meshal v. Higgenbotham*, 804 F.3d 417, 428 (D.C. Cir. 2015).

## STANDARD OF REVIEW

The order dismissing plaintiffs' *Bivens* actions presents an issue of law that is reviewed de novo. *True the Vote, Inc. v. Internal Revenue Serv.*, 831 F.3d 551, 555 (D.C. Cir. 2016).

## ARGUMENT

### The Judicially Created *Bivens* Remedy Should Not Be Extended to This Novel Context

### A.    The Supreme Court Has Repeatedly Reaffirmed that Extending *Bivens* Is Disfavored

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (quoting *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)).  The Court in *Bivens* held that law-enforcement officials acting under color of federal law could be sued for money damages for arresting a person at home and searching the home "from stem to stern" without a warrant.  403 U.S. at 389.  *Bivens* was decided at a time when, "as a routine matter," the Court "would imply causes of action not explicit in [a statute's] text" on the

12

assumption that courts could properly "provide such remedies as [we]re necessary to make effective [the] statute's purpose." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (quotation marks omitted).

In addition to *Bivens* itself, the Supreme Court has only twice implied constitutional damages remedies against individual federal officers and employees: for an equal-protection claim against a Congressman for discrimination in congressional staff employment, *Davis v. Passman*, 442 U.S. 228 (1979), and for an Eighth Amendment claim against federal prison officials for their failure to provide vital medical care to prevent the death of a person in federal custody, *Carlson v. Green*, 446 U.S. 14 (1980).  The Supreme Court has otherwise "consistently rebuffed requests" to extend *Bivens* liability to new contexts or categories of defendants.  *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (collecting cases).

The Court has recognized that, because creating a damages action in a new setting requires evaluating considerations such as "economic and governmental concerns," "the time and administrative costs attendant upon intrusions resulting from the discovery and trial process," and the "impact on governmental operations systemwide," *Abbasi*, 137 S. Ct. at 1856, 1858, "Congress is far more competent than the Judiciary to weigh such policy

considerations" and to decide whether to impose a new substantive legal liability, *Egbert v. Boule*, 142 S. Ct. 1793, 1803 (2022) (quotation marks omitted).  Thus, "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts."  *Id.* at 1800.

To safeguard constitutional separation of powers, the Supreme Court has established stringent criteria to assess whether an implied damages remedy is available.  The inquiry "often resolve[s] to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy."  *Egbert*, 142 S. Ct. at 1803.  Cases involving "a new context" or "a 'new category of defendants'" present one situation "in which a court is not undoubtedly better positioned than Congress to create a damages action."  *Id.*  Even small differences suffice for a case to differ in a meaningful way from the three Supreme Court cases implying a *Bivens* remedy.  *Abbasi*, 137 S. Ct. at 1864; *see also id.* at 1860 (listing various ways in which a case may present a new context, including "the rank of the officers involved," "the constitutional right at issue," "the generality or specificity of the official action," and "the risk of disruptive intrusion by the Judiciary into the functioning of other branches").  "Given th[e] Court's expressed caution about extending the *Bivens* remedy," the "new-context inquiry is easily

14

satisfied." *Id.* at 1865; *see also Hernandez*, 140 S. Ct. at 743 ("[O]ur understanding of a 'new context' is broad.").

Where a plaintiff seeks to extend *Bivens* to a new context, courts consider whether "special factors" counsel against implying a constitutional damages action without "affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18). The special factors analysis "concentrate[s] on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857-58. To respect the legislative role, courts refrain from creating a damages remedy if "there is *any* rational reason (even one) to think that *Congress* is better suited" to make that determination. *Egbert*, 142 S. Ct. at 1805.

### B. The District Court Correctly Held that Plaintiffs' Claims Arise in a New Context Implicating Presidential Security and Congressional Prerogatives

#### 1. Plaintiffs' claims arise in a new context

Plaintiffs do not contest the district court's determination that their claims arise in a novel context, and that determination is clearly correct. The crux of plaintiffs' claims is that federal officers, acting in accordance with instructions of high-ranking officials, dispersed protestors in Lafayette Park

15

in retaliation for the message of their protest and thereby violated the right to speech, assembly, and due process.  *See* J.A. 114-15, ¶¶ 221-23; J.A. 171-72, ¶¶ 116-21; J.A. 173-74, ¶¶ 131-34.  They also allege that the crowd dispersal resulted in their being subjected to the unreasonable use of force under the Fourth Amendment.  *See* J.A. 115-16, ¶ 228; J.A. 173, ¶¶ 124-28.

The Supreme Court has made clear that a "First Amendment claim presents a new *Bivens* context," *Egbert*, 142 S. Ct. at 1807, and the Court has "never held that *Bivens* extends to First Amendment claims," *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012).  As this Court has explained, "the new-context analysis may consider only Supreme Court decisions approving *Bivens* actions."  *Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir.), *cert. denied*, 141 S. Ct. 180 (2020); *see also Egbert*, 142 S. Ct. at 1803 (explaining that, in determining whether a claim implicates a new context, the sole points of reference are "the three cases in which the [Supreme] Court has implied a damages action").

 Plaintiffs' allegations also concern a markedly different context than *Bivens* or *Davis*, in which the Supreme Court recognized damages remedies based on asserted Fourth and Fifth Amendment violations.  Those cases involved claims "against [narcotics] agents for handcuffing a man in his own

16

home without a warrant" and "against a Congressman for firing his female secretary." *Abbasi*, 137 S. Ct. at 1860. Plaintiffs' claims here center on the role of the former Attorney General and various U.S. Park Police officers in the interagency and intergovernmental "response to a large protest in Lafayette Square outside the White House" with implications for presidential security. J.A. 196-97. The operative pleadings allege no personal interaction between any federal defendant and any named plaintiff, and instead rely on general allegations that the federal defendants were involved in the effort to disperse people from Lafayette Park. *See, e.g.*, J.A. 88, ¶ 83; J.A. 140, ¶ 39.

## 2. Special factors preclude implication of a constitutional damages remedy

A variety of special factors militate against implying a constitutional damages remedy in this novel setting, any one of which provides a "rational reason" to think "that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.'" *Egbert*, 142 S. Ct. at 1805 (quoting *Abbasi*, 137 S. Ct. at 1858).

**a.** The district court correctly emphasized that "the country's national-security interest in the safety and security of the President and the area surrounding the White House" is a factor that "strongly weighs against

17

creating a *Bivens* remedy here." J.A. 197. The Nation has "an
overwhelming[] interest in protecting the safety of its Chief Executive."
*Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam). "At stake is
not merely the safety of one man, but also the ability of the executive branch
to function in an orderly fashion and the capacity of the United States to
respond to threats and crises affecting the entire free world." *White House
Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984).

Plaintiffs' challenge to government officers' management of "crowd
activity directly outside of the White House" before the President's arrival
implicates these security concerns. J.A. 198. "Just as the White House area
is a unique situs for first amendment activity, it is also a unique situs for
considerations of presidential and national security." *White House Vigil*, 746
F.2d at 1533 (footnote and quotation marks omitted). "[I]t cannot be denied
that a public gathering," especially a group of thousands of unscreened
demonstrators, "presents some measure of hazard to the security of the
President and the White House." *A Quaker Action Grp. v. Morton*, 516 F.2d
717, 731 (D.C. Cir. 1975). As the district court explained, "the presence of a
large crowd of protesters, even a peaceful one, near the president implicates
presidential security questions." J.A. 198-99; *see Wood v. Moss*, 572 U.S. 744,

762-63 (2014) (describing 200 to 300 protesters "within weapons range" of the President as posing "a potential security risk").

These concerns are present "[r]egardless whether the park was cleared to protect the President, to expand the perimeter of the White House, or to enforce the curfew or prevent further violence by demonstrators near the White House." J.A. 198 n.7. Each of these "possible justifications raise[s] national security issues that counsel hesitation." J.A. 198 n.7.

Plaintiffs concede that "national security can qualify as a special factor" (Pls. Br. 38) but urge that such concerns are absent because the protests occurred "at Lafayette Square, not on the White House Lawn" and "[t]he President was not present" (Pls. Br. 44). Plaintiffs are quite wrong to suggest that security threats materialize only when the President faces a large crowd of demonstrators on the White House lawn or in similar immediate proximity. And in any event, the special factors analysis is not conducted at so "granular a level." *Egbert*, 142 S. Ct. at 1806. Rather, under the proper approach, a court must ask "more broadly if there is any reason to think that judicial intrusion into a given field might be harmful or inappropriate." *Id.* at 1805 (alteration and quotation marks omitted). "If so,

19

or even if there is the *potential* for such consequences, a court cannot afford a plaintiff a *Bivens* remedy." *Id.* (quotation marks omitted).  Plaintiffs' own evaluation of security concerns does not alter the proper inquiry.

**b.**  Implying a constitutional damages remedy is also unwarranted where "the Executive Branch already ha[s] investigated alleged misconduct," *Egbert*, 142 S. Ct. at 1806, or where "Congress is extensively engaged with the problem," *Klay v. Panetta*, 758 F.3d 369, 376 (D.C. Cir. 2014).  Here, the political branches have been actively reviewing the conduct at issue.

The U.S. Department of the Interior's Office of Inspector General provides an accessible website and hotline through which "[a]nyone, including members of the public and Department employees, may file a complaint" regarding allegations of misconduct.  Office of Inspector Gen., U.S. Dep't of the Interior, *Additional Information About the Complaint Hotline*, https://perma.cc/46LP-VCQU; *see also* U.S. Park Police, Nat'l Park Serv., *Office of Professional Responsibility*, https://perma.cc/XRS4-BEDN (noting that the internal affairs unit "conducts investigations of Force officers and civilians for alleged or suspected misconduct" based on "information received within the Force or from the public").  That Office—in accordance with its investigatory and reporting obligations under the

20

Inspector General Act, *see* 5 U.S.C. app. 3, § 3—promptly initiated an investigation, J.A. 169, ¶ 112, and provided a report to Congress regarding the federal response in Lafayette Park, *see* Office of Inspector Gen., U.S. Dep't of the Interior, OIG-20-0563, *Review of U.S. Park Police Actions at Lafayette Park* (2021), https://perma.cc/LSJ9-5BAJ; *see also Abbasi*, 137 S. Ct. at 1862 (considering Inspector General report as part of the special factors analysis).

The U.S. Department of Justice's Office of the Inspector General also opened an investigation into use-of-force allegations, and that investigation is ongoing. *See* Press Release, Office of the Inspector Gen., U.S. Dep't of Justice, DOJ OIG Announces Initiation of Work (July 23, 2020), https://perma.cc/86R7-UE23. The Executive Branch "continue[s] to investigate the facts and circumstances surrounding" Lafayette Park, as plaintiffs acknowledge, J.A. 169-70, ¶ 113, and a successful prosecution of any officer who acted unlawfully under 18 U.S.C. § 242 can result in an order of restitution for the victims, *see* 18 U.S.C. § 3663(a)(1)(A).

Congress has also focused on the alleged misconduct at issue in this case. Shortly after the events that precipitated this lawsuit, the former Attorney General testified before a congressional committee about the

events that took place in Lafayette Park.  *See* J.A. 169, ¶ 113; *Oversight of the Department of Justice: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (2020).  Another congressional committee held multiple days of hearings on the same subject in which congressmembers "interviewed various witnesses," including one of the U.S. Park Police defendants in these appeals.  J.A. 169, ¶ 113; *Oversight Hearing Before the H. Comm. on Nat. Res.*, 116th Cong. (2020).  And the U.S. Government Accountability Office has investigated and prepared reports regarding the events at issue.  *See, e.g.*, U.S. Gov't Accountability Office, GAO-22-104470, *Law Enforcement: Federal Agencies Should Improve Reporting and Review of Less-Lethal Force* (2021), https://perma.cc/UZ7M-7ZRU.

**c.**  This Court has also explained that if "Congress has legislated pervasively on a particular topic but has not authorized the sort of suit that a plaintiff seeks to bring under *Bivens*, respect for the separation of powers demands that courts hesitate to imply a remedy."  *Klay*, 758 F.3d at 376. The district court detailed Congress's recurrent "activity in the field governing the relationship between White House and presidential security and protesters' rights."  J.A. 199.  In response to multiple tragic presidential assassinations, Congress in the early twentieth century "undert[ook] an

22

escalating series of measures to protect the President, including appropriating funds for the President's protection and making it a federal crime to threaten the President." J.A. 199 (citations omitted). In 1979, the House Select Committee on Assassinations released a 600-page report, but "a damages remedy for federal officers' violations of protesters' rights was not among the reforms that the committee recommended or that Congress adopted." J.A. 199-200. And "Congress has remained attentive" to "security breaches at the White House" over "the last several decades." J.A. 200.

In taking these actions, Congress "considered the trade-offs between White House and presidential security and protesters' freedoms." J.A. 200. For example, the House Select Committee on Assassinations addressed "the need to weigh the costs that could accrue to individual privacy, group protest, legitimate dissent, political competition and social change against the benefits of stronger protective measures." H.R. Rep. No. 95-1828, at 464 (1979); *see also id.* ("The committee was acutely aware of the problem of insuring [sic] that civil liberties are preserved, while affording adequate protection to the institutions of democratic society and to public figures."). Not only is the legislative branch better equipped to "consider and weigh the costs and benefits of allowing a damages action to proceed" in these

23

circumstances, but Congress's involvement makes it "much more difficult to believe" that the failure to provide a damages remedy is "inadvertent." *Abbasi*, 137 S. Ct. at 1858, 1862 (quotation marks omitted).

**d.**  Nor have plaintiffs been deprived of a judicial remedy.  Plaintiffs in this case sought "equitable relief in the form of a permanent injunction," J.A. 201 (citing J.A. 126, ¶ 291; J.A. 179); *see Abbasi*, 137 S. Ct. at 1865 (discussing possibility of an "injunction" or "some other form of equitable relief" to remedy alleged prison abuses), and the federal government agreed to implement changes to law-enforcement policies governing demonstrations, *see* Press Release, U.S. Dep't of Justice, Justice Department Announces Civil Settlement in Lafayette Square Cases (Apr. 13, 2022), https://perma.cc/Y9YM-EN4K.[2]

**e.**  Finally, the nature of plaintiffs' claims underscores the problems of permitting these suits to proceed.  Plaintiffs allege that the former Attorney General ordered Lafayette Park to be cleared "at the behest of the [former] President."  J.A. 134, ¶ 4; *see also* J.A. 109, ¶ 202.  Discovery thus would risk exposing sensitive Executive Branch communications between high-ranking

---

[2] In addition to the agency investigations noted above, there are also separate pending Federal Tort Claims Act claims stemming from the 2020 protests in Lafayette Park.

24

officials. *See Abbasi*, 137 S. Ct. at 1861. Further, plaintiffs have made motive an express feature of their *Bivens* case, questioning the purpose of the crowd dispersal as "pretextual," J.A. 172, ¶¶ 120-21, and claiming that the actions were taken "in retaliation for the viewpoint being expressed by the demonstrators," J.A. 115, ¶ 223; J.A. 171, ¶ 116. As the Supreme Court explained in *Egbert*, allowing claims that turn on questions of intent "would pose an acute risk" of increasing social costs and inhibiting officers from performing their duties for fear of personal liability and burdensome litigation. *See* 142 S. Ct. at 1807.

### C.    Plaintiffs' Arguments Misunderstand the Governing Legal Framework

Plaintiffs' brief largely disregards the framework that the Supreme Court has established for evaluating whether a court may properly imply a constitutional damages remedy. Instead, plaintiffs seek to rely on *Dellums v. Powell*, 566 F.2d 167, 195 (D.C. Cir. 1977), in which this Court considered *Bivens* claims asserted by protestors at the Capitol. This Court did not rigorously consider whether any factors militated against implication of a constitutional damages remedy but concluded that false arrest and imprisonment claims could be shaped "by reference to the parallel common law," *id.* at 175, and First Amendment claims could proceed because the

25

calculation of damages was "administrable by the courts" and the case presented "no question of causation," *id.* at 194-95.  The Supreme Court has made clear that no *Bivens* extension is warranted "unless [the plaintiff] also satisfies the analytic framework prescribed by the last four decades of intervening case law." *Egbert*, 142 S. Ct. at 1809 (quotation marks omitted).  This Court's decision in *Dellums* "predates [the] current approach to implied causes of action and diverges from the prevailing framework," *id.* at 1808, and should not form part of a special factors inquiry.

Plaintiffs nevertheless urge (Pls. Br. 24-35) that Congress ratified the *Dellums* analysis when it enacted the Westfall Act in 1988.  That argument fails at every turn.  The Westfall Act provides that when an employee is sued in tort for actions within the scope of their employment, the United States may be substituted as defendant and the suit then proceeds under the Federal Tort Claims Act.  *See* 28 U.S.C. § 2679(d).  Had Congress enacted a similar procedure for *Bivens* actions, it would have waived immunity for constitutional torts and relieved employees of liability for constitutional torts

26

as well as common law torts. Instead, the Westfall Act "simply left *Bivens* where it found it." *Hernandez*, 140 S. Ct. at 748 n.9.[3]

*Bivens* is a judge-made remedy. That Congress chose not to legislate with respect to constitutional torts has no bearing on the contours of the doctrine and does not affect the Supreme Court's ability to refine its scope. Indeed, the Court has made quite clear that the Westfall Act "is not a license to create a new *Bivens* remedy in a context [the Supreme Court] ha[s] never before addressed." *Hernandez*, 140 S. Ct. at 748 n.9. As this Court has observed, "uncertain interpretations of what Congress did in . . . 1988 cannot overcome the weight of authority against expanding *Bivens*." *Meshal v. Higgenbotham*, 804 F.3d 417, 428 (D.C. Cir. 2015). And "[i]n any event, if the courts, as [plaintiffs] argue, have radically misunderstood the nature and scope of *Bivens* remedies, a course correction must come from the Supreme Court, which has repeatedly rejected calls for a broad application of *Bivens*." *Id.* at 428-29. The lack of textual support for plaintiffs' position in the

---

[3] The statements that plaintiffs rely on (Pls. Br. 24-25) from other cases likewise say only that the Westfall Act did not abrogate *Bivens*. *See, e.g.*, *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020) (noting that the Westfall Act "left open claims for constitutional violations"); *Hui v. Castaneda*, 559 U.S. 799, 807 (2010) (noting the Westfall Act's "explicit exception for *Bivens* claims").

Westfall Act, *see id.* at 428 n.9, further distinguishes the cases that they invoke (Pls. Br. 25-28) in which Congress enacted language with a settled judicial interpretation.

Plaintiffs' contention that the district court "misidentified the field in question" by focusing on "the safety of the President and the security of the White House" instead of "protesters' rights" (Pls. Br. 47) likewise misses the mark. The district court specifically discussed Congress's awareness of "the potential for conflict between the demands of presidential security and protesters' freedoms." J.A. 200. And plaintiffs' attempted reliance on cases that supposedly "recognized *Bivens* damages claims by demonstrators" (Pls. Br. 36) underscores their misunderstanding of the relevant legal inquiry. Plaintiffs cite two decisions of this Court that did not apply the current analytic framework. In the first, the Court noted in a footnote that "[t]here is no question" that a protester subdued by U.S. Park Police officers for actively resisting arrest "may pursue an excessive force claim under *Bivens*." *Lash v. Lemke*, 786 F.3d 1, 5 n.2 (D.C. Cir. 2015). In the second, the plaintiffs alleged that Federal Bureau of Investigation agents, as part of an "operation targeting people who opposed American involvement in the Vietnam War and other related policies of the national Government,"

"engaged in a variety of legal and illegal activities" over a period of several years "in a specific effort to disrupt and interfere with the plaintiffs' political activities, [including] urging violent or unlawful actions, and supplying the public and/or news media with false information about the plaintiffs and their plans." *Hobson v. Wilson*, 737 F.2d 1, 10, 27 (D.C. Cir. 1984) (quotation marks omitted).  Neither of these cases bears any relevance or resemblance to the crowd dispersal implicating interests of presidential security.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

MARK B. STERN

*/s/ Brian J. Springer*
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5446*
*brian.j.springer@usdoj.gov*

January 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,001 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*/s/ Brian J. Springer*
Brian J. Springer

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Brian J. Springer*
Brian J. Springer